## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

YIPIT, LLC d/b/a YIPITDATA,

               Plaintiff,

      -against-

ZACHARY EMMETT,
ALEXANDER PINSKY, and
JOHN DOES 1-10,

               Defendants.

Case No. _24_-cv-___7854__ (_____)


**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Yipit, LLC, d/b/a YipitData ("Yipit"), by its undersigned attorneys, for its Complaint against Zachary Emmett ("Mr. Emmett"), Alexander Pinsky ("Mr. Pinsky"), and John Does 1-10, alleges as follows:

### NATURE OF THE ACTION

1.      Yipit brings this lawsuit to redress the misdeeds of two of its former employees, Zachary Emmett and Alexander Pinsky, who took proprietary, confidential, and trade secret information at the heart of Yipit's business in violation of their obligations to Yipit and used it to benefit themselves and their new employer, one of Yipit's direct competitors (herein, "Competitor").

2.      Starting no later than March 2024, Mr. Emmett and Mr. Pinsky carried out a scheme for their own personal gain and the benefit of Competitor. Mr. Pinsky, who had departed Yipit in December 2022 and began working at Competitor, facilitated a job offer for Mr. Emmett at Competitor in the spring of 2024. Around that same time, Mr. Emmett stole a slew of Yipit's most competitively sensitive files and information, sometimes providing information at the

behest of Mr. Pinsky, and sometimes storing it in his own personal accounts, presumably for later use.  Armed with the misappropriated information, Mr. Emmett joined Mr. Pinsky at Competitor on June 17, 2024, while he was still technically a Yipit employee.  There, Defendants sought to use the information to convince Yipit's customers to defect to Competitor—which evidence suggests that some ultimately did—and enrich themselves with commissions and bonuses from these wrongfully-gained sales.

3.      In support of this scheme, Mr. Emmett spent his last few months at Yipit stealing the crown jewels of Yipit's confidential, proprietary, and trade secret information.  He exfiltrated several of Yipit's extremely sensitive and competitively valuable documents, including detailed lists of proprietary information and analyses related to Yipit's most important customer accounts.  On several occasions, Mr. Emmett renamed these files to disguise their contents; for example, before he exfiltrated a full list of Yipit's customers, their contract prices, and their renewal dates, Mr. Emmett renamed the file "ZETaxes2024" to make it appear that he was merely sending himself personal tax information.  Mr. Emmett also regularly texted Mr. Pinsky details about Yipit's customer accounts, packages, and prices, passing on trade secrets and confidential information whenever Mr. Pinsky requested it.

4.      All the while, Mr. Emmett intentionally undermined Yipit in the job it was paying him to do.  Instead of managing Yipit's relationships with, and selling Yipit's products to, its customers, he avoided making sales where the products did or could overlap with Competitor's products, and he funneled customer information to Mr. Pinsky so that (in Mr. Emmett's words) Mr. Pinsky could "hit up" Yipit customers on behalf of Competitor.  And as his time at Yipit drew to a close, Mr. Emmett tried to sabotage Yipit's business.  He deliberately withheld information from his colleagues at Yipit, assuring Mr. Pinsky that they wouldn't "know the

details" of "anything." Worse, Mr. Emmett withheld information or provided misleading information about customer accounts and pricing in an effort to undermine Yipit's customer relationships and benefit himself and Competitor.

5.      Mr. Emmett also took steps to cover his tracks and actively deceived Yipit about his true intentions. After he announced his departure—which he postponed for over a month after accepting his offer from Competitor, in an effort to earn another commission payment from Yipit before he left—Mr. Emmett lied to his supervisors, falsely assuring them that he was not going to work for a competing company. He repeatedly dodged his exit interview and even claimed that he was on vacation on his last day as a Yipit employee, when in fact, he was starting his job at Competitor and scheming to share Yipit information with his new coworkers. And before returning his Yipit company laptop (which he delayed for more than a month after his departure), Mr. Emmett deleted evidence of his misappropriation.

6.      Fortunately for Yipit, though, Mr. Emmett's efforts did not completely hide his misdeeds. Once Yipit learned that, contrary to his representations, Mr. Emmett had joined Competitor, Yipit's security team commenced an in-depth investigation of his actions for the months leading up to his departure. Using state-of-the-art security tools, they discovered proof positive that Mr. Emmett had repeatedly transferred Yipit's files via, and copied sensitive information into, Facebook Messenger and LinkedIn (even though there was no legitimate work reason to do so). Further, when Yipit inspected Mr. Emmett's company laptop after (finally) receiving it back, Yipit discovered smoking gun evidence that Mr. Emmett had neglected to delete: months of text messages between himself and Mr. Pinsky, in which Mr. Emmett repeatedly disclosed Yipit's secret customer information and conspired with Mr. Pinsky to surreptitiously share and use Yipit's information for their own benefit and that of Competitor.

7.      Yipit now brings this lawsuit against Mr. Emmett, Mr. Pinsky, and their currently unidentified co-conspirators to recover its proprietary, confidential, and trade secret information, prevent any further disclosure or misuse of that information, and obtain compensation for the resulting damages Yipit suffered.

## THE PARTIES

8.      Plaintiff Yipit, LLC d/b/a YipitData is a Delaware limited liability company with its principal place of business at 90 5th Ave, 11th Floor, New York, NY 10011.

9.      Defendant Zachary Emmett is an individual who, upon information and belief, resides in Point Pleasant Beach, New Jersey.

10.      Defendant Alex Pinsky is an individual who, upon information and belief, resides in Bernardsville, New Jersey.

11.      Defendants John Does 1-10 are other individuals or entities who have conspired with Mr. Emmett and Mr. Pinsky to misappropriate Yipit's trade secret, confidential, and proprietary information; steal Yipit's customers; undermine Yipit's business; and/or benefit Yipit's competitors (including but not limited to Competitor) using Yipit's information.  The true names and capacities, whether individual, associate, corporate or otherwise of Defendants named herein as Does 1 through 10, inclusive, are unknown to Plaintiff, who therefore sues these Defendants by fictitious names.

## JURISDICTION AND VENUE

12.      This is a civil action for trade secret misappropriation arising under federal law in violation of the Defend Trade Secrets Act, 18 U.S.C. §§ 1836 et seq. ("DTSA") and for trade secret misappropriation, breach of contract, tortious interference with contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, faithless servant, conversion, and conspiracy under the common law of the state of New York.

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the DTSA claim arises under federal law.

14.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the New York state law claims because they are so related to the DTSA claim that they form part of the same case and controversy.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred in this judicial district.

16.     Both Mr. Pinsky and Mr. Emmett consented to venue in federal courts located in the State of New York for any lawsuit filed by Yipit arising from or relating to their Proprietary Information, Inventions, and Non-Solicitation Agreements with Yipit.  (Mr. Emmett's Proprietary Information, Inventions, and Non-Solicitation Agreement is attached hereto as **Exhibit A**.  Mr. Pinsky's Proprietary Information, Inventions, and Non-Solicitation Agreement is attached hereto as **Exhibit B**.)

17.     Both Mr. Pinsky and Mr. Emmett consented to personal jurisdiction in federal courts located in the State of New York for any lawsuit filed by Yipit arising from or relating to their Proprietary Information, Inventions, and Non-Solicitation Agreements with Yipit.

18.     This Court also has personal jurisdiction over Mr. Pinsky and Mr. Emmett because both Defendants have purposely availed themselves of New York's laws and protections, because the causes of action arise from Defendants' employment within New York (both at Yipit and Competitor) and from their tortious acts within New York, and because their actions caused Yipit, a New York company, to incur damages in New York.

**FACTS**

### I.     Yipit's Business and Trade Secrets

19.     Yipit is a leading market research firm for the disruptive economy.  It analyzes billions of data points on a daily basis to provide accurate, detailed insights on a variety of industries, such as ridesharing, e-commerce marketplaces, payments, and more.  It uses proprietary technology to identify, collect, clean, and analyze the data many of the world's largest investment funds and corporations depend on.

20.     The type of data that Yipit packages and sells to its customers is referred to as "alternative data."  Unlike traditional data obtained from conventional sources such as corporate disclosures and financial reports, alternative data relies on a variety of non-traditional sources, such as credit card data, consumer receipts, mobile device data, social media data, and web scraping.  Yipit compiles alternative data into over 100 research reports.  Those reports are divided into two primary data feeds and several core packages, called the "red," "blue," "green," "cloud," "medtech," and "consumer" packages.  Yipit's customers choose which of those products they wish to receive, and reports can be bought on a per stock ticker basis (*e.g.*, data about a specific company) or at the package level (*e.g.*, the "Red" package).  Yipit offers individualized pricing based on those selections and the attributes of each customer.  Yipit learns and hones information about its customers' preferences and attributes through substantial time and effort, including by having account managers engage with and develop customers.

21.     Yipit serves more than 500 customers nationally and internationally.  The bulk of Yipit's customers are investment companies, including financial institutions, hedge funds, private equity firms, and mutual funds, who use Yipit's products to gain actionable insights about potential investments and make smarter investment decisions.  Yipit also serves major

corporate customers in a wide range of industries, providing them with data products designed to increase their own market share, sales, and customer bases.

22.     To run its business, Yipit develops, maintains, and continuously uses a host of proprietary, confidential, and trade secret information, including:

(a)     Proprietary data sources and collection methodologies that feed into its product offerings, and related guidance to enable its employees to discuss its proprietary products with customers and distinguish them from similar products offered by its competitors;

(b)     Comprehensive customer lists, including the names of actual and prospective customers, contact information, subscriptions, pricing details, and contract renewal dates;

(c)     Individual and cumulative customer analyses, which include, among other things, assessments of the health of its customer accounts, notes about prior interactions with its customers, the specific strengths and weaknesses in Yipit's relationships with its customers, any long-term threats to its customer relationships, opportunities for expansion, and the risk that specific customers will "churn," *i.e.*, decide not to renew their contracts with Yipit;

(d)     Detailed internal information regarding its product and sector pricing, as well as guidance for employees on any applicable volume discounts; and

(e)     Detailed internal reports for Yipit's products and sectors measuring the current and historical accuracy of its data product reporting.

23.     None of this information is generally known to or readily ascertainable by individuals who do not work at Yipit. Yipit's proprietary data sets and methodologies—the

equivalent of its "secret sauce"—are the result of years of confidential development and refinement.  Yipit's other proprietary, confidential, and trade secret information are likewise the product of years of work.  Although a small subset of Yipit's corporate customers are listed on its website, its full customer lists, including its full roster of investment fund customers, are highly confidential and cannot be readily derived from any general industry knowledge or publicly available sources.  In fact, almost all of Yipit's investment fund customers require Yipit to keep their identities, and the fact that they receive services from Yipit, confidential.  Nor is there any industry knowledge or public source from which a non-Yipit employee could derive Yipit's pricing lists or strategies, replicate its insights about specific actual and prospective customers, or recreate its data product reporting.

24.     Yipit carefully safeguards all of its trade secrets in multiple ways.  Notably, guided by its Chief Information Security Officer (CISO) and four other members of its security team (all of whom focus primarily or exclusively on data security), Yipit has implemented numerous technical measures to ensure the security of its data, including:

(a)     Yipit provides its employees with company-managed laptops and password-protected company accounts to use for their work.

(b)     Yipit also provides its employees with the ability to access its systems remotely, from non-Yipit devices, but it implements additional protections and requirements when they do so.  For example, to access certain Yipit tools that sit in the Amazon cloud from a non-Yipit device, employees must first log in through a VPN.

(c)     Yipit's company laptops are equipped with a host of protective software to mitigate against external threats, including CrowdStrike endpoint protection and intrusion detection and Kandji mobile device management.

(d)     Yipit's company laptops are also equipped with several data loss protection tools, including software called Cyberhaven.

(e)     Yipit also uses other security tools.  For example, it uses a monitoring software called Obsidian to track sign on locations and file sharing within Yipit's cloud systems.  Yipit also uses Google Workspace, which provides certain monitoring and review capabilities, such as the ability to determine when files were created, opened, edited, printed, or deleted.

(f)     Within Yipit's shared document storage systems, Yipit employees can elect to save particularly sensitive documents in folders that are restricted to specific teams (*e.g.*, a "finance" folder that is only accessible by members of the finance team).

(g)     Yipit also implements technical measures to ensure the security of its physical office in New York, including badge-swipe access and video camera surveillance.

25.     Yipit also implements a number of policies, trainings, and other requirements to protect its trade secrets and other proprietary information:

(a)     Yipit requires its employees to sign a "Proprietary Information, Inventions and Non-Solicitation Agreement" upon accepting employment with Yipit.  This agreement, as further described below, defines Yipit's "Proprietary Information" and requires its employees to keep such information confidential.

(b)     All new Yipit employees must attend a security onboarding training to ensure, among other things, their familiarity with policies and best practices to protect Yipit's data.  Yipit employees must also complete quarterly security trainings on a variety of topics, including attacks that could jeopardize the security of Yipit's information and cyber systems (*e.g.*, phishing attacks).

(c)     Yipit maintains company policies for its employees, including a Compliance Manual and an Information Security Policy.  Both now and when Mr. Emmett worked for Yipit, those policies instructed employees to, *inter alia*, "access, use, or share Company confidential information only to the extent that it is authorized and necessary to fulfill assigned job duties"; share confidential information "only with colleagues who have a business need to see that information"; keep passwords, workspaces, and laptops secure; "use caution when opening email attachments received from unknown senders" or "when clicking on hyperlinks included in email from unknown senders"; "validate intended recipients and their authorization to receive confidential information before sending email or other communications containing confidential information"; and to store all business information in Yipit's Google Drive and not locally or in "a personal storage account such as Dropbox or iCloud."  Within its Information Security Policy, Yipit also maintains a detailed "Mobile Device Policy," "Remote Access Policy," and "Unacceptable Use" restrictions.

(d)     When an employee departs from Yipit, Yipit's People Department (Yipit's equivalent of human resources or "HR"), conducts exit interviews where they

discuss, among other things, the employee's ongoing obligations to keep Yipit's information confidential.

(e)     Yipit also reminds departing employees to return and/or delete Yipit's proprietary and confidential information and requires them to sign an "Acknowledgement and Attestation Form" (also referred to as a "Document Deletion Attestation") confirming that they have done so.

(f)     When employees depart from Yipit, Yipit's security team's standard practice is to conduct a review of their recent activities to ensure that the departing employee did not take any of Yipit's information or engage in any other suspicious activity.

26.     Safeguarding its trade secrets provides Yipit with an economic and competitive advantage over its competitors; disclosure of that information, conversely, would risk undermining Yipit's competitive edge.  For example, Yipit's customer information includes specific details about customers' prices to renew their contracts and the timing of their renewals. If misappropriated, competitors could use Yipit's information to target its customers at exactly the time when they are making renewal decisions, strategically provide free trials and other incentives, and undercut Yipit's price, thus increasing a competitor's ability to steal away Yipit's sales or customers.  Unfortunately, that is precisely what Defendants did and threaten to continue doing here.

**II.    Defendants' Employment with Yipit**

27.     Mr. Emmett and Mr. Pinsky both joined Yipit on the same day, August 26, 2019. Both were originally employed in the same role, Sales Executive, although they worked on different teams and reported to different immediate supervisors.

11

28.     Upon accepting their offers of employment with Yipit, and in consideration of their employment with Yipit, Defendants signed Proprietary Information, Inventions and Non-Solicitation Agreements.  Their agreements were identical in all material respects.  Mr. Emmett signed his agreement on August 6, 2019, as reflected in **Exhibit A**.  Mr. Pinsky signed his agreement on August 13, 2019, as reflected in **Exhibit B**.

29.     The agreements contained the following acknowledgement in § 1.1, under the "Nondisclosure" heading:

> I understand and acknowledge that my employment by the Company creates a ***relationship of confidence and trust*** with respect to the Company's Proprietary Information (defined below) and that the Company has a protectable interest therein.  ***At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information***, except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing.

(emphases added).

30.     Section 1.2 of the agreements further defined Yipit's "Proprietary Information" as "any and all confidential and/or proprietary knowledge, data or information," including without limitation Yipit's "trade secrets," "proprietary technology," "pricing and billing policies," and customer information, "including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by [Yipit] . . . , contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of the Company and other non-public information relating to customers and potential customers."

31.     In Section 1.4 of the agreements, Defendants acknowledged that they "understand that Proprietary Information . . . is ***never*** to be used or disclosed by me, as provided in this Section 1."  (emphasis added).

32.     Section 12.4 of the agreements also specified that "[t]he provisions of this Agreement shall survive the termination of [Defendants'] employment, regardless of the reason."

33.     In their roles as Sales Executives, Mr. Emmett and Mr. Pinsky focused on Yipit's hedge fund customers.  Initially, they focused on both potential new customers and existing customers, but about six months after they started at Yipit, both transitioned into account management roles on the business development team, where their primary duties involved sales to existing hedge fund customers.  As part of their jobs, Mr. Emmett and Mr. Pinsky had access to much of Yipit's proprietary, confidential, and trade secret information, including details about Yipit's customers and related analyses and business strategies.

34.     Members of the business development team earn a base salary plus a significant sales commission, paid at the end of each month.  The sales commissions account for a substantial portion of their expected total compensation.  For example, for calendar year 2023, Mr. Emmett's on-target compensation was a six-figure base salary plus approximately the same amount in commissions, and his actual compensation exceeded that.

35.     At the end of December 2022, Mr. Pinsky departed Yipit and began working as Head of Client Strategy at Competitor.  Mr. Pinsky was later promoted to VP of Sales at Competitor.

36.     Mr. Emmett remained at Yipit.  Over time, he advanced to the role of Director of Business Development, the highest level individual-contributor (*i.e.*, sales and non-managerial) position in Yipit's business development team.  Mr. Emmett continued to focus on sales for existing accounts.

37.     On June 4, 2024, Mr. Emmett notified Yipit that he was leaving the company, but refused to disclose where he was going.  Instead, he vaguely claimed that he was going to a

smaller company in the data space and falsely stated that the company was not a competitor to Yipit.  Yipit did not learn that Mr. Emmett had accepted a role with Competitor until early July 2024, weeks after he had left.

38.    Mr. Emmett's last day as a Yipit employee was June 17, 2024.  He received his last commission payment, covering May 2024, about two weeks later, on June 30, 2024.

### III.    Defendants' Conspiracy and Misdeeds

39.    As Yipit later learned, by no later than March 2024, months before his departure from Yipit, Mr. Emmett began to have conversations with Mr. Pinsky and other representatives of Competitor about the possibility of obtaining a job there.  But for Mr. Emmett, this was no innocent career move.  Instead, it was part of a broader effort by Defendants to misappropriate Yipit's trade secrets and proprietary information for the benefit of Competitor and, by extension, themselves.

40.    Their scheme worked like this: Mr. Pinsky would help Mr. Emmett obtain a job at Competitor, which he assured Mr. Emmett would benefit his career and increase his marketability.  In exchange, Mr. Emmett would exfiltrate critical proprietary, confidential, and trade secret information from Yipit, providing some of it to Mr. Pinsky right away for his use at Competitor and storing some of it on his own personal accounts for later use.  Once Mr. Emmett left Yipit and joined Mr. Pinsky at Competitor, they would further leverage the stolen information to target Yipit's customers, particularly its investor customers, and convince them to use Competitor's products instead.  In the process, Mr. Emmett and Mr. Pinsky would rake in commissions and bonuses to line their own pockets.

41.    Consistent with this scheme, Mr. Pinsky appeared to pull the strings during Mr. Emmett's recruitment to ensure that Mr. Emmett would get a job at Competitor.  In March and

April 2024, Mr. Pinsky arranged, and helped Mr. Emmett prepare for, lunches and drinks with high-level employees of Competitor. By April 19—before Mr. Emmett had received an offer from Competitor or even provided a reference or a resume—Mr. Emmett was already discussing specific aspects of Competitor's compensation plan with Mr. Pinsky. A few days later, on April 22, Mr. Pinsky asked Mr. Emmett to provide a reference, noting that the reference was "more a formality." Likewise, on April 25, Mr. Pinsky asked for Mr. Emmett's resume, apparently for the first time, but minimized the request, explaining: "Just need it on file for offer lol." As promised, Mr. Emmett had an offer from Competitor in hand on Monday, April 29, just four days later.

42.    As this informal hiring process unfolded, Mr. Emmett lived up to his end of the bargain and executed key parts of their conspiracy: misappropriating Yipit's data and undermining its operations. Mr. Emmett texted detailed information about Yipit's customers to Mr. Pinsky, uploaded some of Yipit's most sensitive files to his personal accounts, and repeatedly took disloyal actions or inactions during his last months at Yipit.

43.    All the while, Defendants communicated extensively by phone and text message. Until discovery, Yipit will have no way of knowing the full extent of what was said on their calls, which their text messages suggest occurred frequently, with more than three calls in some weeks. But the contents of Mr. Emmett and Mr. Pinsky's text messages reveal their intentions to steal Yipit's business and "make some money" working for Competitor—and strongly suggest that the phone calls furthered the conspiracy as well. For example, after Mr. Emmett provided Mr. Pinsky with information about a particular Yipit customer (redacted for confidentiality below) to Mr. Pinsky, Mr. Pinsky (the messages on the left) told Mr. Emmett (the messages on the right) that the same customer could be his first deal at Competitor:



Mon, May 6 at 1:31 PM

U ever speak to ▮▮▮▮ at ▮▮▮

Maybe the biggest a-hole in the entire industry

iMessage

lol i haven't

Guy is the new vendor point person fyi.

iMessage

Sounds delightful

Just had a dicey convo lol.

He threatens to churn after a free trial expires on consumer and asked for feedback lol. Said I was bothering him.

I personally extended trial two weeks so he could collect feedback since he's new in the role.

Said if I ask him again he will churn yipit haha. I said sir that isn't up to you

Users asked to move forward two weeks ago

iMessage

Our renewal with them ▮

Can be your first one

Lmao

Good

He thinks alt data is like a Bloomberg subscription

You'll need the buy in of the team

Guaranteed he'll try pulling some shit

Just a heads up

A few weeks later, Mr. Emmett followed up about Competitor's efforts to close that deal. Mr. Pinsky affirmed that he was waiting until Mr. Emmett joined Competitor:



44.     As another example, when Defendants were discussing whether Mr. Emmett should exercise his stock shares upon leaving Yipit, they expressed their hopes that they would take the value of those shares "to 0," or that Yipit would "give up" its investor business (which competes with Competitor) and target only corporate customers. And once Mr. Emmett finally started at Competitor, Mr. Emmett and Mr. Pinsky exchanged messages about the best way to share Mr. Emmett's information with others at Competitor.

45.     Central pieces of Defendants' conspiracy, including several overt acts they took to further their scheme, are described in detail below.

### A.     Mr. Emmett Exfiltrated Key Yipit Documents and Information.

46.     Mr. Emmett's efforts to misappropriate Yipit's proprietary, confidential, and trade secret information began several months before he joined Competitor, when he started transferring Yipit documents from his Yipit computer to his personal social media accounts.

Between March and May 2024, Mr. Emmett uploaded at least the following files on the following occasions to file-sharing or messaging applications in Facebook and LinkedIn:[1]

| File Name | Date and Time | Destination |
|---|---|---|
| ZEtaxes2024.xlsx | March 6, 2024 at 16:46 | LinkedIn |
| ZEtaxes2024.xlsx | March 6, 2024 at 16:52 | Facebook |
| [Strategy].pdf | April 23, 2024, at 13:15 | Facebook |
| Yipit Apple Battle Deck.pdf | April 23, 2024, at 13:18 | Facebook |
| YipitData Historical Accuracy Tables by Sectors .xlsx | April 23, 2024, at 13:19 | Facebook |
| [Customer1] Overlap.xlsx | May 1, 2024, at 18:27 | Facebook |
| Top 40 Account Deck.pdf | May 16, 2024, at 21:08 | Facebook |
| Book2.xlsx | May 23, 2024, at 14:35 | Facebook |
| [Customer2].xlsx | May 23, 2024, at 14:38 | Facebook |
| Copy of Top 40 Account Deck.pdf | May 31, 2024, at 14:51 | Facebook |

47.     Each of these files contains or comprises Yipit's proprietary, confidential, and trade secret information.  Indeed, these files were among Yipit's "crown jewels."  Yipit does not share the details in these files or any compilation thereof with third parties, and has policies and security measures in place to prevent employees from doing so.  For example:

(a)     The file "Yipit Apple Battle Deck" is an internal presentation, marked "Confidential," concerning Yipit's AAPL product, which covers sales of Apple

---

[1] Where file names contain confidential information about a customer's identity or Yipit's strategy, those names are replaced with a generic placeholder in brackets (*e.g.*, "[Strategy]" or "[Customer1]") in the table and hereafter.  The actual names of these files appear in the sealed versions of the Motion for a Preliminary Injunction and the Declaration of Paul Pasquale, filed concurrently herewith.

purchases.  Yipit had recently launched its AAPL product after working for years

to develop it and bring it to market.  The "Battle Deck" presentation was created

to assist Yipit's revenue team (*i.e.*, including both new customer sales and

business development sales to existing customers) in selling the product.  It

includes a detailed breakdown of the differences between Yipit's product and

those of its competitors; descriptions of Yipit's product's data sources, its

accuracy, and the underlying proprietary methodology; and guidance for pitching

the product to customers.  Notably, Competitor also offers an AAPL product and

is Yipit's key competitor for this product.

(b)      The file "YipitData Historical Accuracy Tables by Sectors" is a highly

sensitive report containing the current and historical accuracy of all of Yipit's

products and sectors.  In other words, this document shows exactly how Yipit's

products performed for every single ticker, on every single earning cycle,

including which products were the most and least accurate.  In some instances,

this document contains more than 8 years of historical back-tested data accuracy

for Yipit's products.  In a competitor's hands, this document is a roadmap of

Yipit's vulnerabilities, which the competitor could use to gain an unfair advantage

in selling its products against Yipit's.

(c)      The files "Top 40 Account Deck" and "Copy of Top 40 Account Deck"

are copies of an internal presentation, designated "Confidential," that describes

Yipit's top 40 customer accounts in the Hedge Fund segment for 2024.  The deck

contains highly sensitive strategic analysis for each fund's account, including

internal assessments of the health of the account, the Yipit employee(s) managing

each account, opportunities for upsell, specific weaknesses or challenges in Yipit's relationship with each fund, and long term threats to its relationship with each fund. The document also outlines the specific amount of revenue at risk for each fund by product offering.

(d)    The "[Strategy]" document includes highly sensitive and confidential information regarding Yipit's pricing, as well as Yipit's approach for discounting its products. A competitor could use this information to inform its business plans and strategically undercut Yipit's pricing.

48.    In addition to simply exfiltrating Yipit's files, Mr. Emmett also appears to have deliberately renamed some of them in an effort to disguise their contents. The renamed files include:

(a)    "ZEtaxes2024." This document has nothing to do with Mr. Emmett's taxes. Instead, it is a highly sensitive and confidential document that lists Yipit's customers, the Yipit employees managing their accounts, the amount these customers pay annually, and the lengths of these customers' contracts. Mr. Emmett uploaded this file first to LinkedIn and then, within minutes, to Facebook.

(b)    "[Customer1] Overlap." This file is named in a way that does not accurately describe its contents and is not how the information would be kept in the ordinary course of business. It contains a list of all of Yipit's investor customers by category. For each customer account, it lists the status of the account, the relevant product subscriptions, the associated Yipit sales and customer service employees, and date of the last update.

(c)    "Book2." This file is named generically and is not how the information would be kept in the ordinary course of business. This spreadsheet contains a list of all of Yipit's investor customers, the associated Yipit employees, and the customers' upcoming renewal dates. Additionally, this file includes: assessments of contracts (or portions of contracts) that are at risk for non-renewal, a "churn score" for each customer for how likely (or not) a customer account is to renew, records of meetings and touch points between Yipit employees and specific customers, how much time and engagement the Yipit team gave to each customer, and internal data about the amount of revenue at risk for each customer account.

(d)    "[Customer2].xlsx." This file is named in a way that does not accurately describe its contents and is not how the information would be kept in the ordinary course of business. It contains a list of all Yipit's investor customers and how much they spend annually on each of Yipit's products on a product-by-product and customer-by-customer basis. This file also shows Yipit's whole company annual recurring revenue and is extremely sensitive.

49.    Individually and collectively, these files are gold mines for Yipit's competitors. Using the data in these files—which, again, is not available in any public sources and which is fiercely guarded by Yipit—a competitor could identify Yipit's most valuable customer accounts, as well as its most vulnerable customer accounts; target Yipit's customers precisely when they are starting to think about their renewal decisions; undercut Yipit's pricing on a customer-by-customer basis; and more.

50.    Not only did Mr. Emmett exfiltrate these competitively sensitive files, but he also attempted to hide his tracks as he did so. On April 23, after Mr. Emmett uploaded the files

"Yipit Apple Battle Deck" and "YipitData History Accuracy Tables by Sector" to Facebook, he moved the local versions of those files to his laptop trash in an apparent attempt to hide his trail (which, of course, he would not have needed to do if he were using the files for legitimate Yipit purposes).  Similarly, on May 1, he moved the local version of "[Customer1] Overlap" to his laptop trash after uploading it to Facebook.  On May 23, Mr. Emmett uploaded two files to Facebook, and then moved the local versions of these files to his laptop trash.  And again, on May 31, Mr. Emmett uploaded "Copy of Top 40 Account Deck" to Facebook and then moved the local version to his laptop trash.  (Fortunately for Yipit, its high-end security tools were not foiled by such measures.)

51.    Further, in addition to uploading these files to Facebook and LinkedIn, Mr. Emmett also copied information from internal Yipit documents and sent it to Facebook Messenger and text message.  On May 16—the same day Mr. Emmett first uploaded the "Top 40 Account Deck" to Facebook—Mr. Emmett copied and pasted the contents of an email, which contained detailed information about a customer that had "churned" (*i.e.*, declined to renew their contract with Yipit) into a Facebook message.  The contents included confidential internal discussion of the negotiation and loss of an investor customer, including lessons learned from the process and next steps with regards to that customer.  This information is highly sensitive to Yipit and valuable to competitors, as it provides Yipit's confidential insights, learnings, and approach for that customer and reveals Yipit's business strategy.  Then, on May 23, Mr. Emmett sent six very lengthy text messages to himself, which consisted of copy-and-pasted information about customers that had churned off of Yipit's products and the associated "learnings" and comments.

52.    Yipit's security tools confirm that Mr. Emmett uploaded all of the above documents and information to file transfer or messaging applications in Facebook or LinkedIn. Those tools do not show whether Mr. Emmett sent them to himself or to other people. However, text messages between Mr. Emmett and Mr. Pinsky suggest that Mr. Emmett sent Mr. Pinsky Yipit proprietary, confidential, and trade secrets documents via Facebook at least once. On May 1 (days after Mr. Emmett received a job offer from Competitor), shortly after 5:52 pm, Mr. Pinsky messaged Mr. Emmett asking for a "general guide" on two of Yipit's customers if Mr. Emmett had "facebook open." Mr. Pinsky's message clearly indicates that he already knew Mr. Emmett was using Facebook as a means to surreptitiously share and misappropriate trade secret information. Mr. Emmett responded that he could "help" with one of the customers and provided some information over text, as shown below.



53.    But the above text messages, bad as they are, do not tell the full story. Mr. Emmett *also* uploaded the "[Customer1] Overlap" file to Facebook Messenger at 6:27 pm that

same evening—less than an hour after Mr. Pinsky's request.  As described above, this (intentionally misnamed) file contains a list of all of Yipit's customers, including the ones that Mr. Pinsky had asked Mr. Emmett about.  It also lists the Yipit customer service ("CS") employees associated with the accounts, which Mr. Emmett discussed with Mr. Pinsky in the above messages.  The strong inference—and indeed, the only reasonable inference—of this sequence of events is that Mr. Emmett did not merely send the "[Customer1] Overlap" file to himself over Facebook—he uploaded that file to Facebook Messenger and sent it to Mr. Pinsky.

54.    Mr. Emmett never sought or obtained authorization from Yipit to transfer, share, or upload Yipit's proprietary, confidential, and trade secret information to his personal accounts or to any third party.

55.    There is no legitimate business reason for Mr. Emmett's actions.  For example, much of the information that he took, shared, or used without authorization related to customers that were outside of his book of business.  There was no logical business reason for him to pull or compile that information, let alone shortly before his departure to a competitor.  Furthermore, Mr. Emmett would not have needed to send any of these files to himself for remote access purposes; he could access Yipit's files through established and proper channels, whether he was on-site or working remotely.  But once he transferred Yipit's files and information over Facebook and LinkedIn, Mr. Emmett would be able to access those documents without using either his Yipit laptop or his Yipit company credentials—even after he left Yipit and his Yipit credentials expired.  There is no legitimate business reason for Mr. Emmett to put any of Yipit's confidential and trade secret information on Facebook or LinkedIn, let alone to grant himself such unfettered access to Yipit's documents.  And of course, there is no legitimate business

reason, and it was an obvious breach of duty, for Mr. Emmett to share Yipit's competitively sensitive files and information with Mr. Pinsky, the employee of a direct competitor.

**B.    Mr. Pinsky Repeatedly Solicited, and Mr. Emmett Provided, Yipit's Proprietary, Confidential, and Trade Secret Information.**

56.    In addition to exfiltrating Yipit's documents, including some of its most comprehensive customer data, Mr. Emmett also repeatedly disclosed key information about individual customers to Mr. Pinsky over text messages.

57.    No later than April 4, 2024, Mr. Pinsky began texting Mr. Emmett with requests for details about Yipit's investor customers.  He asked, among other things, whether the investors were current Yipit customers, what products they use, how much they pay for those products, whether they were "decent" customers, and when their contracts with Yipit renewed.

58.    Mr. Emmett never expressed any surprise or confusion at Mr. Pinsky's inquiries—clearly because he understood the assignment all too well.  Nor did he show any reluctance to answer Mr. Pinsky's questions, or even ask why Mr. Pinsky wanted the requested information.  Instead, without batting an eye, Mr. Emmett provided the requested information to Mr. Pinsky every time, even when it was clear from context that Mr. Pinsky intended to use that information at Competitor.  At times, Mr. Emmett volunteered additional, unsolicited information about Yipit's customers or business strategies, including the Yipit employees who managed the accounts, details about his interactions with the customers or their representatives, and approaches Competitor might take to induce those customers away from Yipit.

59.    Between April and mid-June 2024, Mr. Pinsky solicited Yipit's information from Mr. Emmett, and Mr. Emmett provided it, no fewer than 18 times.  A small sample of the text message exchanges (which, again, are redacted to protect Yipit's trade secret and confidential customer information), are provided below.



Wed, Apr 24 at 10:29 AM

You know what the ▮▮▮ proposal was? Rich just told me YD did a "very fair" multi year offer

I have to think he's full of shit

Let me see

The only quote we sent said it's ▮▮k per team for red package

And he said it's widely off what other funds are offering. Call on April 19 where he said they need to be given enterprise like a ▮▮▮▮▮▮▮, and team is to follow up

Nothing proposed from yipit

Realistically it's prob gonna be like ▮▮▮k for red, blue, green, cloud year 1

Which is around ▮▮▮▮price

Rich may knock it down to ▮▮k bc new sales is confused always



iMessage
Tue, May 28 at 4:11 PM

▮▮▮▮▮

Decent clients?

Doin a little San Fran trip ?!

Both six figures, but under ▮▮k

▮▮▮▮ uses all package. ▮▮▮▮ is ALC.



Tue, Jun 4 at 8:33 AM

Is ▮▮▮ over a ▮▮▮ number?

Yes lol

Double



60.     The text messages are not ambiguous and leave no doubt about what was taking place.  Mr. Pinsky was asking Mr. Emmett to provide confidential details about Yipit's customers, the terms of their contracts, and Yipit's strategies for fostering its customer relationships, so that Mr. Pinsky and Competitor would have a better chance of poaching those customers.

61.     It bears repeating: This information is part of Yipit's proprietary, confidential, and trade secret business information, as well as Yipit's Proprietary Information as defined in the Proprietary Information, Inventions and Non-Solicitation Agreements.  With the exact kinds of information Mr. Emmett provided to Mr. Pinsky, Yipit competitors are able to strategically

undercut Yipit's prices, offer customized packages designed to compete with Yipit's offerings, and ultimately entice Yipit's customers to take their business to a competitor instead.

### C.    Mr. Emmett Was Disloyal and Deceptive in the Months Leading Up to His Departure from Yipit.

62.    Not only did Mr. Emmett share critical data outside of Yipit and to Yipit's direct detriment, but he also failed to fully and faithfully perform his job at Yipit for his last several months with the company.

63.    According to Mr. Emmett's own text messages, in April and May 2024, he endeavored to avoid certain sales to Yipit's investor customers, which would otherwise take away from sales he or Mr. Pinsky could bring in for Competitor.  In April, Mr. Emmett told Mr. Pinsky that he was "slinging consumer exclusively," meaning that he was focusing on selling Yipit's consumer package, for which Competitor did not have a directly analogous product, rather than selling Yipit products for which Competitor did have a directly analogous product. The reason for this appears to be that in anticipation of working for Competitor, Mr. Emmett no longer wished to undertake any actions that could compete with them (in direct violation of his own duties to Yipit, of course). In May, Mr. Emmett reiterated that he was "[s]elling the stuff that doesn't overlap.  Consumer package only life."  Mr. Pinsky responded "lol nice," and then, "Make em bleed."  Mr. Emmett, however, was not authorized to focus on some Yipit product sales while abandoning others; he took it upon himself to do so, with the aim of preserving Competitor's ability to target overlapping areas.

64.    But even though Mr. Emmett was no longer loyal to Yipit, he still sought to extract as much compensation as he could from Yipit before he left.  He pushed back his start date with Competitor by two weeks in order to remain a Yipit employee through the end of the May commissions cycle and "make yipit pay out" his anticipated $40,000 commission.  And

even though Mr. Emmett accepted his offer from Competitor on May 3, he pretended to be committed to Yipit during the May commission cycle and waited until June to notify Yipit of his resignation.  Mr. Emmett's plan worked: He received his May commission shortly after his departure from Yipit notwithstanding his faithless behavior.

65.    On June 4, 2024, Mr. Emmett finally notified Yipit of his departure and set June 17 as his last day at Yipit.  Immediately, Mr. Emmett engaged in even more deceptive behavior. On that same day, June 4, Mr. Emmett had Zoom calls with Yipit's Senior Vice President of Investor Revenue and its Chief Revenue Officer, and he intentionally hid the fact that he had accepted a job at Competitor.  He not only refused to disclose his new position when asked, he also gave nonsensical and cagey answers to their questions and falsely represented that his new employer was not a competitor.  Due to this deception, Yipit did not find out that Mr. Emmett had accepted a position with Competitor until early July 2024, after his departure from Yipit.

66.    Shortly after Mr. Emmett notified Yipit of his departure, some of Mr. Emmett's colleagues (redacted below) asked him for information about his accounts before he departed. He immediately relayed the information to Mr. Pinsky, complete with a mocking image,[2] and sarcastically commented "yeah sureee" and that the request was "[t]oo funny"—implying that he would give Yipit incomplete or misleading information so it would not be up to speed:

---

[2] That image appears to be a popular .GIF file of a character from the 1980 comedy Caddyshack rolling his eyes.  *See* https://tenor.com/view/rolling-my-eyes-eye-roll-gif-12891400 (last visited Oct. 15, 2024).



Mr. Pinsky then mentioned the specific customer that he was "saving for" Mr. Emmett at Competitor, and Mr. Emmett responded "Haha they will not know the details" "Of anything."

67.    Furthermore, when Mr. Emmett relayed that his colleagues "hit [him] up today asking for pricing across stuff," Mr. Pinsky encouraged him to "Go high!", that is, to provide his colleagues with misleading or incorrect information that would cause them to present Yipit customers with inflated prices.  Mr. Emmett responded: "Will do."  Such misinformation could make other Yipit team members look unprepared or incompetent when continuing sales

discussions with Mr. Emmett's customer accounts or deter customers from continuing with Yipit.

68.     All the while, Mr. Emmett continued not to pursue certain sales on behalf of Yipit, and to funnel opportunities and business intelligence to Mr. Pinsky and Competitor.  On June 11, Mr. Emmett sent Mr. Pinsky a screenshot of an email he received from a customer that was interested in Yipit's products.  Mr. Emmett told Mr. Pinsky that he was "gonna let this email die, so hit up ASAP."  Throughout the first half of June, Mr. Emmett also continued to provide sensitive Yipit information to Mr. Pinsky, including details about Yipit's consumer package (complete with a screenshot) and information about the pricing and renewal dates for Yipit's existing customers.

69.     Indeed, in the weeks leading up to Mr. Emmett's departure, his performance declined.  He had to be chased aggressively to close sales.  And he ultimately failed to close several sales before his departure.

70.     As the day of his departure approached, Mr. Emmett repeatedly dodged his formal exit interview with Yipit's People Department.  As is Yipit's typical practice, a People Department employee (in this case, Gabe Myerson) scheduled the interview and sent Mr. Emmett a calendar invitation.  Mr. Emmett declined the interview, originally scheduled for June 13, ostensibly due to overlapping meetings.  He told Mr. Myerson to reschedule his interview for June 17, his last day at Yipit.  But then, late in the evening on June 16, Mr. Emmett messaged Mr. Myerson that he and his wife "will be headed to NC tomorrow a day early," so he would "be OOO [out of office] for [his] last day."

71.     This was a lie.  June 17, 2024 was not only Mr. Emmett's last day with Yipit—it was his first day at Competitor.  Mr. Emmett's text messages confirm that he was in New York

City at Competitor's offices that day, not on vacation in North Carolina.  His log-in activity likewise indicates that he was not only in New York City that day, but also accessed his Yipit laptop from New York City.  But Yipit only discovered this after the fact, and Mr. Emmett's lie went undetected at the time.

72.     Further, although Mr. Myerson offered to set up an exit interview with Mr. Emmett anytime over the next two weeks, Mr. Emmett never responded to reschedule, and never completed, his exit interview.

73.     Mr. Emmett was not, however, able to avoid signing Yipit's Deletion Attestation Form.  As noted above, Yipit now requires every departing employee to sign this form, and Mr. Myerson repeatedly instructed Mr. Emmett to do so.  On June 16, after Mr. Emmett claimed that he would be out of office on his last day, Mr. Myerson told Mr. Emmett that "it's **required that you sign and return** [the Deletion Attestation Form] **before EOD on your last day,** as this is part of our security protocol" (emphasis in original).  Mere minutes later, Mr. Emmett sent Mr. Pinsky a text message asking about this form.  Mr. Pinsky (who did not complete such a form, as Yipit had not yet instituted that practice when Mr. Pinsky left) assured Mr. Emmett that it was not policed and just "a check the box":



74.     Mr. Myerson sent a further follow-up email on the morning of June 17 (Mr.

Emmett's last day) to request Mr. Emmett's signed Deletion Attestation Form.  Mr. Emmett

finally submitted it, attached hereto as **<u>Exhibit C</u>**, later that morning.  But his attestation was also

a lie: Mr. Emmett's text messages about his early days at Competitor make clear that he not only

still possessed Yipit's information, but actively used it to benefit himself, Mr. Pinsky, and

Competitor.

        **D.      At Competitor, Defendants Used and Shared Yipit's Trade Secrets.**

75.     Mr. Emmett joined Mr. Pinsky at Competitor on June 17, 2024.  And from day

one, Defendants worked together to leverage and share the trade secrets and confidential

information they had misappropriated from Yipit.

76.     On June 17, Mr. Emmett messaged Mr. Pinsky about a "cross check" of an "account list":

> Now that I got account list gonna do a cross check
>
> See if any quick upside to grab from new biz – then can hand it to AM :)

Based on Mr. Emmett's prior messages and his exfiltration of Yipit's account lists, this message indicates that Mr. Emmett had now obtained an account list from Competitor and was going to cross-reference it with Yipit's accounts, to see if he could identify vulnerable customers for Competitor to steal. This behavior illustrates why Yipit's information is so competitively sensitive and valuable and why Mr. Emmett and Mr. Pinsky's misappropriation causes extreme and irreparable harm to Yipit.

77.     The next day, June 18, Mr. Emmett apparently disclosed some of Yipit's information over Competitor's Teams channel. Mr. Pinsky reminded Mr. Emmett to avoid putting such information on Teams:

> Tue, Jun 18 at 7:45 PM
>
> Reminder if talking who subs what try not on teams for now
>
> True, can I delete
>
> iMessage
>
> Na leave it. You good
>
> Yeah. I was being generic I thought but agree
>
> Will keep price here :)

78.     Mr. Emmett then informed Mr. Pinsky that he had created "a list of current accounts that underpay compared to the distribution of spend [we've] discussed"—which, from context, apparently means current *Competitor* accounts that underpay compared to *Yipit*. (This understanding is bolstered by the fact that Mr. Emmett references a "non-account[]" that is a Yipit customer but not, on information and belief, a customer of Competitor.) Such a list would enable Mr. Pinsky and Mr. Emmett to target Yipit's customers (particularly "high spend" customers) as potential sources to grow *Competitor's* business. Mr. Pinsky instructed Mr. Emmett not to send that list around, but instead to screenshare it with himself and Competitor's Chief Revenue Officer, Valentin Roduit ("Val"), presumably to avoid a written record of sharing what they clearly knew they were not supposed to have. They would then "discuss the best way to attack and share." Mr. Emmett noted that he also had the information "written down."



79.     The text messages in Yipit's possession stop as of that date. But, on information and belief, and based on their past course of conduct, Defendants continued to share Yipit's trade

secret and confidential information with others at Competitor and to use that information to benefit Competitor at Yipit's expense.  Further, because Defendants have retained these materials, they can use them for their benefit and to Yipit's detriment even outside of their connection with Competitor.

80.    By early October 2024, at least five of Yipit's investor customers unexpectedly "churned," *i.e.*, declined to renew completely.  Pricing information and other sensitive details for all five of these customers were contained within the files that Defendants misappropriated.  Mr. Emmett was previously the Yipit point person for three of these customers.  For two of the customers, Mr. Emmett provided Mr. Pinsky with specific, confidential Yipit information about them over text messages.  Those text conversations provided an exact roadmap that Mr. Pinsky and Competitor could use to steal these customers away from Yipit—and indeed, at the very next renewal cycle, they unexpectedly declined to continue purchasing *any* services from Yipit.  The remaining three customers recently informed Yipit that they were discontinuing Yipit's services and using a competitor's services instead; one of those customers even informed Yipit that it had received better pricing from Competitor and opted to sign on with Competitor instead.

### IV.    The Discovery of Defendants' Misappropriation and Scheme

81.    In early July 2024, roughly a month after Mr. Emmett submitted his resignation to Yipit, Yipit learned that Mr. Emmett had in fact gone to work for Competitor.  Yipit's security team immediately conducted an in-depth investigation of Mr. Emmett's behavior in the months leading up to his departure.  Using, among other things, the Cyberhaven tool, Yipit's security

team uncovered proof that Mr. Emmett had repeatedly uploaded its files to Facebook and LinkedIn and copied and pasted data into Facebook Messenger.[3]

82.    Yipit retained outside counsel, who sent letters to Mr. Emmett and Competitor outlining Yipit's initial findings and demanding, among other things, the return and deletion of Yipit's information, as well as detailed information about the scope and nature of Mr. Emmett's misappropriation.  Yipit asked that Competitor complete a thorough investigation, and once all of Yipit's documents and information were returned, that Mr. Emmett sign and return a certification that he had no additional Yipit proprietary, confidential, and/or trade secret information.

83.    The day after receiving Yipit's letter, Mr. Emmett finally sent his Yipit laptop back to Yipit.  (He had delayed returning the laptop despite multiple requests from Yipit.)  After receiving the laptop back, Yipit's security team investigated it and began uncovering the text messages with smoking gun evidence of Mr. Emmett's and Mr. Pinsky's misappropriation and scheme.

84.    Armed with this new information, Yipit sent a follow-up letter to Competitor and Mr. Emmett vis-à-vis Competitor's counsel, demanding a thorough investigation encompassing not only Mr. Emmett's misappropriation but also Mr. Pinsky's involvement, Val Roduit's involvement, and the involvement of anyone else at Competitor.  Yipit also requested a detailed accounting of Yipit's proprietary, confidential, and trade secret information, reiterated its request for a certification from Mr. Emmett, and requested an additional, similar certification from Competitor.

---

[3] This investigation could and did proceed without access to Mr. Emmett's laptop, as he had not yet returned that laptop to Yipit.

85.    In its response, counsel for Competitor noted that it no longer represented Mr. Emmett and that Mr. Emmett no longer worked at Competitor.  Competitor also informed Yipit's counsel that it was purportedly conducting an investigation.  But despite Competitor's assurances, Competitor has not provided any responses about Mr. Pinsky's involvement in the misappropriation and scheme or an accounting of Yipit's proprietary, confidential, and trade secret information.  Nor has Mr. Emmett responded to all of Yipit's questions to him; returned any of Yipit's proprietary, confidential, or trade secret information; or signed the requested certification.  As of the filing of this complaint, no information has been returned, and no certifications have been signed, by either Defendant.

86.    Yipit's inability to obtain further information about Defendants' misappropriation and scheme, or to recover its proprietary, confidential, and trade secret information from Mr. Emmett and Mr. Pinsky, is particularly alarming.  Even though Mr. Emmett no longer works for Competitor, he is or will soon be searching for another job.  Without court intervention, nothing will stop him from using Yipit's trade secrets and confidential information at his next job, just like he unabashedly did at Competitor.  Meanwhile, Mr. Pinsky remains at Competitor, and Competitor has thus far failed to return any of Yipit's information or propose any mechanisms to prevent the further use and disclosure of such information at Competitor.  Accordingly, without court intervention, Yipit does not have sufficient assurances that Mr. Pinsky will not also continue to use and disclose Yipit's trade secrets and confidential information.

**COUNT 1:**

**VIOLATION OF THE DEFEND TRADE SECRETS ACT**
(18 U.S.C. § 1836 et seq.)

(All Defendants)

87.     Yipit repeats, re-alleges, and incorporates by reference paragraphs 1-86 above as if set forth fully herein.

88.     Yipit owns financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, which constitute trade secrets within the meaning of 18 U.S.C. § 1839(3).  These trade secrets include the information described in paragraphs 22, 47-48, and 59-60.

89.     Yipit's trade secrets are related to its data products and services, which are used in interstate commerce.

90.     Yipit has taken (more than) reasonable measures to protect its trade secrets, including the measures described in paragraphs 24-25.

91.     Yipit's trade secrets derive independent economic value from the fact that they are not generally known to, or readily ascertainable through proper means by, other individuals or entities who can obtain economic value from the disclosure or use of the information.

92.     Mr. Emmett misappropriated Yipit's trade secrets, including by acquiring them in breach of his duty to maintain secrecy and by disclosing them to Mr. Pinsky and other employees of Competitor without Yipit's express or implied consent.

93.     Mr. Pinsky misappropriated Yipit's trade secrets, including by acquiring them from Mr. Emmett, who he knew or had reason to know had acquired them in violation of his duty to maintain secrecy.

94.     Defendants' actions have caused and will continue to cause damage to Yipit. Unless restrained, their actions will further damage and irreparably injure Yipit, leaving it without an adequate remedy at law.

95.     Yipit is entitled to damages for actual losses caused by Defendants' misappropriation of its trade secrets and damages for any unjust enrichment caused by this misappropriation that is not addressed in computing its actual losses.  In the alternative, Yipit is entitled to a reasonable royalty for Defendants' misappropriation of its trade secrets.

96.     Defendants' misappropriation of Yipit's trade secrets was willful and malicious, entitling Yipit to attorney's fees and exemplary damages.  18 U.S.C. § 1836(b)(3)(C)-(D). Further, Defendants' misappropriation was gross, wanton, willful, and reckless, rendering punitive damages appropriate.

97.     Preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of Yipit's trade secrets.

## COUNT 2:

### MISAPPROPRIATION OF TRADE SECRETS
(New York Common Law)

(All Defendants)

98.     Yipit repeats, re-alleges, and incorporates by reference paragraphs 1-86 above as if set forth fully herein.

99.     Yipit owns financial, business, and technical information, including proprietary methodologies, detailed customer lists, and analyses, which constitute trade secrets under New York Law.  These trade secrets are in continuous use and include the information described in paragraphs 22, 47-48, and 59-60.

100.     Yipit's trade secrets are not known outside of Yipit's business.

101.    Yipit's trade secrets are revealed to their employees to the extent that those employees require that information to complete their job duties.

102.    Yipit has taken extensive measures to guard the secrecy of its trade secrets, including the measures described in paragraphs 24-25.

103.    Yipit's trade secrets are extremely valuable to its business and would likewise be extremely valuable to Yipit's competitors.

104.    Yipit's trade secrets are the result of years of development and refinement.

105.    It would be tremendously difficult for anyone aside from a Yipit employee to properly acquire or duplicate Yipit's trade secrets.

106.    Mr. Emmett misappropriated and used Yipit's trade secrets in breach of his Proprietary Information, Inventions and Non-Solicitation Agreement and in violation of his duty of secrecy to Yipit.

107.    Mr. Pinsky misappropriated and used Yipit's trade secrets in breach of his Proprietary Information, Inventions and Non-Solicitation Agreement and as a result of discovery by improper means, namely, Mr. Emmett's misappropriation.

108.    Yipit is entitled to damages for actual losses caused by Mr. Emmett and Mr. Pinsky's misappropriation of its trade secrets and damages for any unjust enrichment caused by this misappropriation that is not addressed in computing its actual losses.  In the alternative, Yipit is entitled to a reasonable royalty for Mr. Emmett and Mr. Pinsky's misappropriation of its trade secrets.

109.    Mr. Emmett and Mr. Pinsky's misappropriation of Yipit's trade secrets was willful and malicious, entitling Yipit to attorney's fees and exemplary damages.

110.     Preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of Yipit's trade secrets.

### COUNT 3:

### BREACH OF CONTRACT

(Zachary Emmett & Alexander Pinsky)

111.     Yipit repeats, re-alleges, and incorporates by reference paragraphs 1-86 above as if set forth fully herein.

112.     A contract entitled "Proprietary Information, Inventions and Non-Solicitation Agreement" and executed on August 6, 2019, exists between Yipit and Mr. Emmett.  *See* **Exhibit A**.

113.     A contract entitled "Proprietary Information, Inventions and Non-Solicitation Agreement" and executed on August 13, 2019, exists between Yipit and Mr. Pinsky.  *See* **Exhibit B**.

114.     At all relevant times, the Proprietary Information, Inventions and Non-Solicitation Agreements were and remain valid, binding, and enforceable contracts.

115.     The contracts provided that, in consideration for employment by Yipit, Mr. Emmett and Mr. Pinsky would hold Yipit's "Proprietary Information" "in strictest confidence" both "during [their] employment and thereafter" and would "not disclose, use, lecture upon or publish any" such Proprietary Information.

116.     The contracts also specified that Yipit's "Proprietary Information . . . is never to be used or disclosed by [Defendants], as provided in this Section 1," and that "[t]he provisions of this Agreement shall survive the termination of [Defendants'] employment, regardless of the reason."

117.    Yipit performed its requirements under the contracts by providing employment to Mr. Emmett and Mr. Pinsky.

118.    Mr. Emmett breached his obligations by failing to hold Yipit's proprietary information in strict confidence.  Instead, Mr. Emmett disclosed that information to Mr. Pinsky (after Mr. Pinsky had departed from Yipit) and to other employees of Competitor, and used that information to benefit Competitor, Mr. Pinsky, and himself, all at Yipit's detriment.

119.    Mr. Pinsky breached his obligations by failing to hold Yipit's proprietary information in strict confidence.  Instead, Mr. Pinsky induced Mr. Emmett to disclose Yipit's proprietary information (after Mr. Pinsky had departed from Yipit) and used that information to benefit Competitor, Mr. Emmett, and himself, all at Yipit's detriment.

120.    Yipit is entitled to damages caused by and as a result of Mr. Emmett and Mr. Pinsky's breaches of their contracts.

121.    The Agreements acknowledge that "any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to [Yipit] and [Yipit] shall have the right to enforce this Agreement and any of its provisions by injunction." Accordingly, preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure or use of Yipit's Proprietary Information.

122.    Under the provisions of the Agreements, Yipit is also entitled to payment of all costs, including reasonable attorney's fees, from Defendants.

## COUNT 4:

## TORTIOUS INTERFERENCE WITH CONTRACT

(Alexander Pinsky)

123.    Yipit repeats, re-alleges, and incorporates by reference paragraphs 1-86 above as if set forth fully herein.

124.    Yipit and Mr. Emmett entered into a contract entitled "Proprietary Information, Inventions and Non-Solicitation Agreement" on August 6, 2019.  *See* **Exhibit A**.  At all relevant times, the Agreement was and remains a valid, binding, and enforceable contract.

125.    At all relevant times, Mr. Pinsky was aware of Mr. Emmett's contract and its terms, having signed a materially identical contract with Yipit as a condition of his own employment within weeks of when Mr. Emmett signed his agreement.

126.    Mr. Emmett repeatedly breached this agreement by, *inter alia*, disclosing Yipit's Proprietary Information to Mr. Pinsky over text messages on no fewer than 18 occasions between April and June 2024 and sending the "[Customer1] Overlap" file to Mr. Pinsky over Facebook.

127.    Mr. Pinsky intentionally and improperly facilitated Mr. Emmett's breach of the agreement by soliciting Yipit's Proprietary Information from Mr. Emmett, including by requesting information on individual customers and by requesting a "general guide" over Facebook.

128.    Mr. Emmett would not have breached his Agreement on these occasions but for Mr. Pinsky's solicitation of Yipit's Proprietary Information.

129.    Mr. Pinsky's conduct was without justification and improper.

130.    Yipit is entitled to compensatory damages caused by and as a result of Mr. Pinsky's tortious interference with Mr. Emmett's contract, in an amount to be determined at trial. These damages flow directly from and are the natural and probable consequence of Mr. Pinsky's inducement of Mr. Emmett's breach of contract.

131.    Yipit is entitled to consequential damages for the harm to its business as a result of Mr. Pinsky's tortious interference in an amount to be determined at trial.  Such damages were

foreseeable and were within the contemplation of the contracting parties at the time when the contract was executed.

132.    Mr. Pinsky's misconduct evinced such a high degree of moral culpability as to warrant punitive damages.  Yipit is entitled to punitive damages against Mr. Pinsky in an amount to be determined at trial.

**COUNT 5:**

**BREACH OF FIDUCIARY DUTY**

(Zachary Emmett)

133.    Yipit repeats, re-alleges, and incorporates by reference paragraphs 1-86 above as if set forth fully herein.

134.    As a Yipit employee, Mr. Emmett owed fiduciary duties to Yipit, including an undivided duty of loyalty to and the duty to act with the utmost good faith and candor and in the best interests of Yipit.

135.    Yipit was entitled to rely on, and did in fact rely on, Mr. Emmett's duty of loyalty, integrity, and faithful performance of his duties and responsibilities for Yipit.

136.    Mr. Emmett knowingly and willingly breached his fiduciary duties to Yipit by, *inter alia*, misappropriating Yipit's confidential, proprietary, and trade secret information, renaming exfiltrated documents in an effort to hide his misappropriation from Yipit, providing Mr. Pinsky with Yipit information to help him steal away Yipit's customers on behalf of Competitor, providing incomplete or misleading information to Yipit about customer pricing and interactions before his departure from Yipit, ignoring Yipit customer emails and funneling related information to Mr. Pinsky and Competitor, consciously declining to sell Yipit's products to the extent they did or could overlap with Competitor's products, and beginning work for Competitor while still employed by Yipit.

137.     As a direct and proximate result of Mr. Emmett's faithlessness, Yipit has been, is being, and will continue to be harmed.  For example, Mr. Emmett misappropriated some of Yipit's most valuable trade secrets and proprietary information, shared that information, and used that information for his own benefit and the benefit of Competitor and to the detriment of Yipit.  As another example, Yipit has already lost at least five customers since—and, evidence suggests, because of—Mr. Emmett's misappropriation.  Upon information and belief, Mr. Emmett is still in possession of that information and is able to access and use it for the benefit of Yipit's competitors and to the detriment of Yipit.

138.     Yipit is entitled to compensatory and consequential damages in an amount to be proven at trial.

139.     The facts establish that Mr. Emmett's misconduct was willful, wanton and reckless, and that Mr. Emmett had a high degree of moral culpability manifesting a conscious disregard for Yipit's rights, rendering punitive damages appropriate.

## COUNT 6:

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

(Alexander Pinsky & John Does 1-10)

140.     Yipit repeats, re-alleges, and incorporates by reference paragraphs 1-86 above as if set forth fully herein.

141.     Mr. Emmett breached his fiduciary duty to Yipit by, *inter alia*, misappropriating Yipit's confidential, proprietary, and trade secret information, renaming exfiltrated documents in an effort to hide his misappropriation from Yipit, providing Mr. Pinsky with Yipit information to help him steal away Yipit's customers on behalf of Competitor, providing incomplete or misleading information to Yipit about customer pricing and interactions before his departure from Yipit, ignoring Yipit customer emails and funneling related information to Mr. Pinsky and

competitor, consciously declining to sell Yipit's products to the extent they did or could overlap with Competitor, and beginning work for Competitor while still employed by Yipit.

142.    Mr. Pinsky knew that Mr. Emmett was a Yipit employee.  As a Yipit employee, Mr. Emmett owed fiduciary duties to Yipit, including a duty of secrecy and a duty of loyalty, and Mr. Pinsky was aware of these duties, having been a Yipit employee.

143.    Mr. Pinsky was aware of Mr. Emmett's breach of fiduciary duty.  He received text messages from Mr. Emmett wherein Mr. Emmett disclosed Yipit's confidential, proprietary, and trade secret information.  He also received text messages in which Mr. Emmett revealed other breaches of his fiduciary duty to Yipit, including when Mr. Emmett told Mr. Pinsky that he was not going to give his Yipit colleagues "the details" about the Yipit customers he had discussed with Mr. Pinsky.

144.    Mr. Pinsky knowingly and repeatedly induced Mr. Emmett to breach his fiduciary duties to Yipit, and substantially assisted Mr. Emmett's breach, by, *inter alia*, requesting Yipit's confidential, proprietary, and trade secret information from Mr. Emmett; instructing him to "go high!" when leaving misleading pricing records for his colleagues at Yipit; and discussing "the best way to attack and share" the information Mr. Emmett his misappropriated from Yipit.

145.    As a direct and proximate result of Mr. Pinsky's inducement and substantial assistance, and Mr. Emmett's faithlessness, Yipit has been and is being harmed.  For example, Mr. Emmett misappropriated some of Yipit's most valuable trade secrets and proprietary information and shared that information with Mr. Pinsky.  As another example, Yipit has already lost at least five customers since—and, evidence suggests, because of—Mr. Emmett's misappropriation and Defendants' use of that information at Competitor.  Upon information and

belief, Mr. Pinsky is still in possession of that information and is able to use it for his benefit and that of Competitor and to the detriment of Yipit.

146.    Yipit is entitled to compensatory and consequential damages in an amount to be proven at trial.

147.    The facts establish that Mr. Pinsky's misconduct was willful, wanton and reckless, and that Mr. Pinsky had a high degree of moral culpability manifesting a conscious disregard for Yipit's rights, rendering punitive damages appropriate.

## COUNT 7:

## FAITHLESS SERVANT

### (Zachary Emmett)

148.    Yipit repeats, re-alleges, and incorporates by reference paragraphs 1-86 above as if set forth fully herein.

149.    As a Yipit employee, Mr. Emmett owed Yipit an undivided duty of loyalty and fidelity and was obligated to act with the utmost good faith and in the best interests of Yipit.

150.    Yipit was entitled to rely on, and did in fact rely on, Mr. Emmett's duty of loyalty, integrity, and faithful performance of his duties and responsibilities for Yipit.

151.    Since at least March 2024, Mr. Emmett has been faithless in the performance of his services to Yipit.  Among other things, Mr. Emmett misappropriated Yipit's confidential, proprietary, and trade secret information, renamed exfiltrated documents in an effort to hide his misappropriation from Yipit, provided Mr. Pinsky with Yipit information to help him steal away Yipit's customers on behalf of Competitor, provided incomplete or misleading information to Yipit about customer pricing and interactions before his departure from Yipit, ignored Yipit customer emails and funneling related information to Mr. Pinsky and competitor, consciously

declined to sell Yipit's products to the extent they did or could compete with Competitor, and began working for Competitor while he was still employed by Yipit.

152.    Unaware of Mr. Emmett's faithlessness, Yipit continued to pay Mr. Emmett's salary, bonuses, and commissions during his period of faithlessness, including (but not limited to) his commissions for May 2024, which Mr. Emmett received on June 30, 2024.

153.    As a direct and proximate result of Mr. Emmett's faithlessness, Yipit has been, is being, and will continue to be harmed.  For example, Mr. Emmett misappropriated some of Yipit's most valuable trade secrets and proprietary information, shared that information, and used that information as an employee of Competitor.  As another example, Yipit has already lost at least five customers since—and, evidence suggests, because of—Mr. Emmett's misappropriation.  Upon information and belief, Mr. Emmett is still in possession of that information and is able to access and use it to Yipit's detriment.

154.    Yipit is entitled to disgorgement of Mr. Emmett's salary, compensation, commission, and company-paid benefits paid or earned during the period of Mr. Emmett's faithless service.  Yipit is further entitled to unwind Mr. Emmett's equity exercises during and after his period of faithless service.

**COUNT 8:**

**CONVERSION**

(Zachary Emmett)

155.    Yipit repeats, re-alleges, and incorporates by reference paragraphs 1-86 above as if set forth fully herein.

156.    Yipit has legal ownership of, and a superior right of possession to, each of the files Mr. Emmett misappropriated.

157.    These files exist as electronic records and were stored on a computer, but they are functionally equivalent to printed documents and hard-copy records.

158.    Mr. Emmett exercised unauthorized dominion over those files, which rightfully belong to Yipit.

159.    Mr. Emmett's unlawful possession of these files was to the exclusion of Yipit's rights and inconsistent with Yipit's private possession.

160.    As a direct and proximate result of Mr. Emmett's unauthorized actions, Yipit has been and is being harmed.  On information and belief, Mr. Emmett has shared these files, including via screensharing, with Mr. Pinsky and other employees at Competitor, enabling Mr. Emmett, Mr. Pinsky, and others to use Yipit's files for their own gain, for Competitor's benefit, and to Yipit's detriment.

161.    Yipit is entitled to damages as a result of Mr. Emmett's conversion to the extent its actual losses are calculable.

**COUNT 9:**

**CONSPIRACY**

(All Defendants)

162.    Yipit repeats, re-alleges, and incorporates by reference paragraphs 1-86 above as if set forth fully herein.

163.    Mr. Emmett and Mr. Pinsky engaged in a conspiracy to undermine Yipit's business, misappropriate its trade secret and proprietary information, use that information for the benefit of Competitor, and enrich themselves in the process.

164.    Mr. Emmett and Mr. Pinsky agreed to engage in this conspiracy, as shown by, *inter alia*, their text message exchanges, their tacit quid pro quo, and their course of conduct.

165.    Mr. Emmett and Mr. Pinsky intentionally participated in the conspiracy to further its purposes, namely, the misappropriation of Yipit's information for Competitor's benefit and their own financial gain.

166.    Mr. Emmett and Mr. Pinsky engaged in several overt acts in furtherance of their agreement, including, *inter alia*, misappropriating Yipit's documents over Facebook and LinkedIn, requesting and providing Yipit's confidential customer information via text message, renaming and deleting documents in an effort to cover their tracks, and creating incorrect pricing records for Yipit's customers.

167.    Yipit has been injured by the conspiracy and is entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

Yipit reserves the right to pursue any and all available remedies against Mr. Emmett and Mr. Pinsky, including but not limited to damages, punitive damages, exemplary damages, statutory damages, attorneys' fees, and any equitable remedies including an order of seizure, a temporary restraining order, a preliminary injunction, a permanent injunction, and other available remedies necessary to prevent propagation or dissemination of Yipit's trade secrets, confidential, and proprietary information.

**WHEREFORE,** Yipit respectfully requests that the Court:

I.    Enter an order:

    (a)    preliminary and permanently enjoining Mr. Emmett and Mr. Pinsky from engaging in further misappropriation, dissemination, copying, and use of any of Yipit's proprietary, confidential, and/or trade secret information (including copies thereof) that they copied, saved, printed, or otherwise obtained from Yipit, including all copies of Yipit's electronic files or

information in their possession (including the files and information that Mr. Emmett sent to any of his personal accounts or provided to Mr. Pinsky);

(b)     requiring Mr. Emmett, Mr. Pinsky, and anyone acting in concert with them to return any and all of Yipit's proprietary, confidential, and/or trade secret information (including copies thereof) that they copied, saved, printed, or otherwise obtained from Yipit's computer systems, including all copies of Yipit electronic files or information in their possession (including the files and information that Mr. Emmett sent to any of his personal accounts or provided to Mr. Pinsky);

(c)     preliminarily enjoining Mr. Emmett and Mr. Pinsky from destroying, deleting, transferring, copying, or downloading of any of Yipit's proprietary, confidential, and/or trade secret information in their custody or control, other than in accordance with Paragraph (e) below;

(d)     requiring Mr. Emmett and Mr. Pinsky to provide a detailed list of any and all of Yipit's proprietary, confidential, and/or trade secret information currently or formerly in their custody or control, the locations where that information is stored, and any locations or persons to which/whom that information was transferred; or, in the alternative, produce for immediate inspection and imaging all computers and/or other electronic devices belonging to, under the control of, accessible to, or operated by Defendants, including their home computer(s) and/or other electronic devices capable of transmitting and/or storing information;

(e)    requiring Mr. Emmett and Mr. Pinsky to permit the permanent removal, deletion, and destruction of all copies of Yipit's electronic files or information transmitted to Defendants' computers or personal accounts or otherwise in their possession, subject to the supervision of Yipit, so as to preserve evidence of all such files or information; and

(f)    preliminarily and permanently enjoining Mr. Emmett from working or consulting for any person or business to whom he has disclosed or discussed any of Yipit's proprietary, confidential, and/or trade secret information.

II.    Enter a judgment that Mr. Emmett has:

(a)    Violated the DTSA;

(b)    Misappropriated Yipit's trade secrets;

(c)    Breached his Proprietary Information, Inventions and Non-Solicitation Agreement with Yipit;

(d)    Breached his fiduciary duties to Yipit;

(e)    Performed his duties faithlessly since at least March 2024;

(f)    Exercised unlawful dominion over Yipit's documents; and

(g)    Conspired with Mr. Pinsky to undermine Yipit's business and misappropriate Yipit's proprietary, confidential, and trade secret information for the benefit of himself, Mr. Pinsky, and Competitor.

III.    Enter a judgment that Mr. Pinsky has:

(a)    Violated the DTSA;

(b)    Misappropriated Yipit's trade secrets;

(c)     Breached his Proprietary Information, Inventions and Non-Solicitation Agreement with Yipit;

(d)     Tortiously interfered with Mr. Emmett's Proprietary Information, Inventions and Non-Solicitation Agreement with Yipit;

(e)     Aided and abetted Mr. Emmett's breach of fiduciary duty; and

(f)     Conspired with Mr. Emmett to undermine Yipit's business and misappropriate Yipit's proprietary, confidential, and trade secret information for the benefit of himself, Mr. Emmett, and Competitor.

IV.     Enter a judgment that Mr. Emmett and Mr. Pinsky's violations and breaches were willful, malicious, gross, wanton, and reckless.

V.     Award Yipit:

(a)     Compensatory and other damages in amounts to be determined at trial;

(b)     Exemplary and punitive damages;

(c)     Disgorgement damages;

(d)     Attorneys' fees;

(e)     Costs of this litigation; and

(f)     Such other legal and equitable relief as this Court deems proper.

Dated: October 16, 2024
      White Plains, NY

YANKWITT LLP

By: _____

Russell M. Yankwitt
Michael H. Reed
140 Grand Street, Suite 501
White Plains, New York 10601
Tel.: (914) 686-1500
*Attorneys for Plaintiff*
*(Local Counsel)*

MUNGER, TOLLES & OLSON LLP
Laura D. Smolowe
*Pro hac vice application pending*
Vincent Y. Ling
*Pro hac vice application pending*
Jennifer L. Bryant
*Pro hac vice application pending*
Matthew Miyamoto
*Pro hac vice application pending*
Taylor L. Benninger
*Pro hac vice application pending*
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Tel: (213) 683-9100
*Attorneys for Plaintiff*
*(Lead Counsel)*