**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YIPIT, LLC d/b/a YipitData<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>ZACHARY EMMETT,<br>ALEXANDER PINSKY, and<br>JOHN DOES 1-10,<br><br>　　　　　　Defendants. | Case No. _24_-cv-_7854_____ (_____)<br><br>**JURY TRIAL DEMANDED**<br><br>**[REDACTED VERSION]** |

**PLAINTIFF YIPIT'S MEMORANDUM OF LAW**
**IN SUPPORT OF PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...........................................................................................................1

II.    FACTUAL BACKGROUND....................................................................................3

    A.    Yipit's Business and Trade Secrets.................................................................3

    B.    Defendants' Employment with Yipit ..............................................................4

    C.    Defendants' Misappropriation and Scheme to Harm Yipit ...........................5

    D.    Yipit's Efforts to Recover its Trade Secrets .................................................9

III.    ARGUMENT ..............................................................................................................11

    A.    Yipit Is Overwhelmingly Likely to Succeed on the Merits. ........................11

        1.    Yipit Is Likely to Succeed in Its DTSA Claim (Count 1)..........................12

            (a)    Yipit Owns Protectable Trade Secrets. ...........................................12

            (b)    Defendants Misappropriated Yipit's Trade Secrets......................15

        2.    Yipit Is Likely to Succeed in Its Misappropriation of Trade Secrets Claim Under New York Common Law (Count 2)....................................17

        3.    Yipit Is Likely to Succeed in Its Breach of Contract Claim (Count 3)......18

    B.    Yipit Will Suffer Irreparable Harm Without an Injunction. .................................19

    C.    The Balance of Hardships Strongly Favors Yipit................................................22

    D.    The Public Interest Favors a Preliminary Injunction. ...........................................24

    E.    The Court Should Not Require Yipit to Post a Bond...........................................25

IV.    CONCLUSION...........................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

FEDERAL CASES

*725 Eatery Corp. v. City of New York*,
   408 F. Supp. 3d 424 (S.D.N.Y. 2019)...................................................................................11

*Airbnb, Inc. v. City of New York*,
   373 F. Supp. 3d 467 (S.D.N.Y. 2019)...................................................................................19

*Ayco Co., L.P. v. Feldman*,
   No. 1:10-CV-1213 GLS/DRH, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010)................12, 23

*BaseCap Analytics Inc. v. Amenn*,
   No. 1:23-CV-09370-MKV, 2023 WL 8113524 (S.D.N.Y. Nov. 22, 2023)...........................24

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
   784 F.3d 887 (2d Cir. 2015)....................................................................................11, 23, 24

*Brainwave Sci., Inc. v. Arshee, Inc.*,
   No. 21-CV-4402 (BMC), 2021 WL 6211630 (E.D.N.Y. Dec. 14, 2021) .............................24

*Capstone Logistics Holdings, Inc. v. Navarrete*,
   No. 17-cv-4819 (GBD), 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018),
   *aff'd and remanded in part*, 796 F. App'x 55 (2d Cir. 2020)...........................................19, 23

*Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*,
   602 F. Supp. 3d 663 (S.D.N.Y. 2022)..............................................................................13, 18

*Chadha v. Chadha*,
   No. CV 16-3739 (ENV) (AKT), 2020 WL 1031385 (E.D.N.Y. Mar. 2, 2020) ...............21, 24

*Citizens Sec., Inc. v. Bender*,
   No. 1:19-CV-916, 2019 WL 3494397 (N.D.N.Y. Aug. 1, 2019)...........................................22

*Clarkson Co., Ltd. v. Shaheen*,
   544 F.2d 624 (2d Cir. 1976)..................................................................................................25

*Credit Suisse Sec. (USA) LLC v. Ebling*,
   No. 06 CIV. 11339 (RCC), 2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006) .....................20, 23

*In re Dana Corp.*,
   574 F.3d 129 (2d Cir. 2009)...................................................................................................13

*eShares, Inc. v. Talton*,
   No. 22-CV-10987, 2024 WL 3970847 (S.D.N.Y. Mar. 29, 2024) .........................................13

*Estee Lauder Cos. v. Batra*,
    430 F. Supp. 2d 158 (S.D.N.Y. 2006)......................................................................21

*ExpertConnect, L.L.C. v. Fowler*,
    No. 18 CIV. 4828 (LGS), 2019 WL 3004161 (S.D.N.Y. July 10, 2019) .........................15, 16

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)...........................................................................18, 20

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
    730 F.2d 61 (2d Cir. 1984) (per curiam)..................................................................19

*Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*,
    No. 20-CV-181 (KMK), 2020 WL 915824 (S.D.N.Y. Feb. 26, 2020)..................................24

*Golden Krust Patties, Inc. v. Bullock*,
    957 F. Supp. 2d 186 (E.D.N.Y. 2013) ....................................................................25

*Grand River Enter. Six Nations, Ltd. v. Pryor*,
    481 F.3d 60 (2d Cir. 2007)..............................................................................19

*Hirschfeld v. Stone*,
    193 F.R.D. 175 (S.D.N.Y. 2000) .........................................................................19

*Iacovacci v. Brevet Holdings, LLC*,
    437 F. Supp. 3d 367 (S.D.N.Y. 2020)................................................................14, 18

*IDG USA, LLC v. Schupp*,
    416 F. App'x 86 (2d Cir. 2011) .........................................................................21

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) .............................................................15, passim

*Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*,
    323 F. Supp. 2d 525 (S.D.N.Y. 2004)....................................................................19

*KCG Holdings, Inc. v. Khandekar*,
    No. 17-CV-3533 (AJN), 2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020)................................21

*Liberty Power Corp., LLC v. Katz*,
    No. 10-CV-1938 (NGG) (CLP), 2011 WL 256216 (E.D.N.Y. Jan. 26, 2011).........................18

*MacDermid, Inc. v. Selle*,
    535 F. Supp. 2d 308 (D. Conn. 2008)....................................................................22

*Mercer Health & Benefits LLC v. DiGregorio*,
    307 F. Supp. 3d 326 (S.D.N.Y. 2018)....................................................................20

*Mission Cap. Advisors LLC v. Romaka*,
No. 16 CIV. 5878 (LLS), 2016 WL 11517104 (S.D.N.Y. July 29, 2016)..............................23

*N. Atl. Instruments, Inc. v. Haber*,
188 F.3d 38 (2d Cir. 1999)..........................................................................................19, 22

*Onyx Renewable Partners L.P. v. Kao*,
No. 22-CV-3720 (RA), 2023 WL 405019 (S.D.N.Y. Jan. 25, 2023) ....................................16

*Plaza Motors of Brooklyn, Inc. v. Bogdasarov*,
No. 21-CV-6545 (KAM), 2021 WL 5630910 (E.D.N.Y. Dec. 1, 2021) ...........................23, 24

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
754 F. Supp. 2d 616 (S.D.N.Y. 2010).................................................................................25

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010)........................................................................................11, 24

*Shamrock Power Sales, LLC v. Scherer*,
No. 12-CV-8959 (KMK), 2015 WL 5730339 (S.D.N.Y. Sept. 30, 2015)..............................14

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*,
No. 15 CIV. 211 (LGS), 2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021),
*aff'd in part, vacated in part on other grounds*, 68 F.4th 792 (2d Cir. 2023)...................21, 24

*Wealth Mgmt. Assocs. LLC v. Farrad*,
No. 17CIV.1924 (KPF) (HBP), 2019 WL 5725044 (S.D.N.Y. June 21, 2019),
*report and recommendation adopted,* No. 17 CIV. 1924 (KPF), 2019 WL
6497424 (S.D.N.Y. Dec. 3, 2019).......................................................................................22

*Webcraft Techs., Inc. v. McCaw*,
674 F. Supp. 1039 (S.D.N.Y. 1987)....................................................................................12

## STATE CASES

*34-06 73, LLC v. Seneca Ins. Co.*,
39 N.Y.3d 44 (2022) .........................................................................................................18

## FEDERAL STATUTES

18 U.S.C. § 1836(b)(1) ...............................................................................................12, 15

18 U.S.C. § 1836..................................................................................................12, 15, 18

18 U.S.C. § 1839(3) ...............................................................................................................12

18 U.S.C. § 1839(3)(A) ..........................................................................................................13

18 U.S.C. § 1839(3)(B)...........................................................................................................13

18 U.S.C. § 1839(5)(A)................................................................................................16

18 U.S.C. § 1839(6)(A)................................................................................................16

**FEDERAL RULES**

Fed. R. Civ. P. 65(c) ...................................................................................................25

## I.    INTRODUCTION

Over a months-long conspiracy, Zachary Emmett and Alexander Pinsky ("Defendants") methodically pilfered Yipit, LLC d/b/a YipitData's ("Yipit's") confidential, proprietary, and trade secret information and used it to benefit Yipit's direct competitor, M Science LLC ("M Science").  Mr. Pinsky, a former Yipit employee and current M Science employee, recruited Mr. Emmett, a Business Development Executive at Yipit, to join M Science.  Mr. Emmett accepted M Science's offer—but instead of resigning from Yipit, Mr. Emmett retained his position and surreptitiously stole many of Yipit's most valuable secrets.  Between March and May 2024, Mr. Emmett uploaded several of Yipit's confidential files to Facebook and LinkedIn, sometimes renaming those files with benign titles to disguise their contents.  Over the same period, Mr. Pinsky repeatedly solicited sensitive details about Yipit's customers, products, and renewal dates, which Mr. Emmett repeatedly provided.

Once both Defendants became M Science employees, they leveraged Yipit's information to try and increase M Science's sales, which would generate sizeable bonuses for themselves.  On his first day at M Science, Mr. Emmett cross-checked Yipit's customers with M Science's, hunting for new business opportunities and the potential to make a "quick upside."  The next day, Mr. Emmett compiled a list of "current [M Science] accounts that underpay" compared to Yipit's accounts, which Defendants planned to use and share with other M Science employees.

Defendants' misappropriation is egregious.  It is unusual to see a case in which the evidence of misappropriation is so clear, and in which Defendants have so brazenly used trade secrets to try to harm their former employer.  Since it first uncovered evidence of Defendants' wrongdoing, Yipit has repeatedly attempted to recover its property from Mr. Emmett and Mr. Pinsky (vis-à-vis counsel for M Science).  But Defendants have not returned any of Yipit's documents, nor does Yipit have any assurances against their continued misappropriation.  To the

contrary, the evidence strongly suggests that Defendants' scheme to steal Yipit's customers has begun to succeed. Accordingly, Yipit now moves for a preliminary injunction to prevent further misappropriation, recover its confidential and trade secret information, and require the permanent removal of misappropriated information from Defendants' possession.

Each part of the familiar four-prong test for injunctive relief is satisfied here. ***First***, Yipit is highly likely to succeed on its trade secret misappropriation and breach of contract claims. The documents and information at issue—comprehensive and sensitive customer preferences and account information, proprietary pricing information, internal reports on product accuracy, and business strategies about proprietary products—are among Yipit's most competitively sensitive assets, and Yipit safeguards this information zealously. Forensic evidence demonstrates that Mr. Emmett and Mr. Pinsky misappropriated these trade secrets, including by exfiltrating files and exchanging text messages full of such information. In doing so, Defendants also violated their contracts with Yipit, which required them to hold Yipit's Proprietary Information "in strictest confidence" and refrain from disclosing or using it, even after leaving Yipit.

***Second***, Yipit faces an immediate risk of irreparable harm. It is axiomatic that the disclosure and use of trade secrets and confidential information constitutes irreparable harm. That harm is particularly acute for Yipit. So far, Defendants have not hesitated to use and share Yipit's information where it benefits their employer or themselves, and there is no reason to believe they will stop doing so in the future. And their actions have real consequences. Yipit learned in recent weeks that it lost five of the customers whose sensitive information Defendants had stolen. Without an injunction, there is a substantial and urgent risk that Yipit will irretrievably lose control over its trade secrets, lose other customers, miss out on long-term growth, and suffer the diminution of its goodwill and reputation in a highly competitive market.

***Third***, the balance of the equities tips decisively in Yipit's favor.  In sharp contrast to the profound harm that Yipit would face in the absence of an injunction, Defendants would not be harmed at all by the issuance of an injunction.  Yipit's requested relief would simply prevent Defendants from further misappropriating Yipit's secrets, which they are not entitled to do regardless, and require them to return those secrets, which they have no right to possess.  ***Fourth***, and finally, a preliminary injunction would further the public's interest in protecting trade secrets, fostering innovation, and ensuring that parties to valid and voluntary contracts receive the benefits of their bargains.  For these reasons, and as further described below and in the attached Declarations, this Court should not hesitate to issue preliminary injunctive relief.

## II.    FACTUAL BACKGROUND

### A.    Yipit's Business and Trade Secrets

Yipit is a leading market research firm that specializes in alternative data.  Declaration of Jamie Melzer ("Melzer Decl.") ¶¶ 3-5.  Alternative data derives from non-traditional sources, such as credit card data, consumer receipts, mobile device data, social media data, and web scraping.  *Id.* ¶ 5.  Yipit compiles alternative data into over 100 research reports, which are then divided into two primary data feeds and several core packages, called the "red," "blue," "green," "cloud," "medtech," and "consumer" packages.  *Id.* ¶ 6.  Yipit's customers choose which of those products they wish to receive, and Yipit offers individualized pricing based on those selections and the attributes of each customer.  *Id.*

Yipit has more than 500 customers worldwide.  *Id.* ¶ 4.  Most of those customers are investment companies, including hedge funds, private equity firms, financial institutions, and mutual funds, which use Yipit's products to gain actionable insights about potential investments and make smarter investment decisions.  *Id.*

To run its business, Yipit develops, maintains, and continuously uses its proprietary, confidential, and trade secret information. *Id.* ¶ 8. These trade secrets include, in the words of Jamie Melzer, Yipit's Senior Vice President of Investor Revenue:

(a) Proprietary data sources and collection methodologies that feed into its product offerings, and related guidance to enable its employees to discuss its proprietary products with customers and distinguish them from similar products offered by its competitors;

(b) Comprehensive customer lists, including the names of actual and prospective customers, contact information, subscriptions, pricing details, and contract renewal dates;

(c) Individual and cumulative customer analyses, which include, among other things, assessments of the health of its customer accounts, analyses on users and engagement, notes about prior interactions with its customers, the specific strengths and weaknesses in Yipit's relationships with its customers, any long-term threats to its customer relationships, opportunities for expansion, and the risk that specific customers will "churn," *i.e.*, decide not to renew their contracts with Yipit;

(d) Detailed internal information regarding its product and sector pricing, as well as guidance for employees on any applicable volume discounts; and

(e) Detailed internal reports for Yipit's products and sectors measuring the current and historical accuracy of its data product reporting.

*Id.* Yipit takes great pains to protect these trade secrets from disclosure, including through sophisticated technical and physical security measures, robust data use policies, regular employee training, and mandatory confidentiality agreements. *See* Declaration of Paul Pasquale ("Pasquale Decl.") ¶¶ 7-8; Declaration of Rose Frawley ("Frawley Decl.") ¶¶ 4, 8, 12.

### B.    Defendants' Employment with Yipit

Mr. Emmett and Mr. Pinsky are both former Yipit employees. Frawley Decl. ¶ 3. In fact, both Defendants started as Sales Executives on the very same day, August 26, 2019. *Id.*

Upon accepting their offers of employment with Yipit, and in consideration of that employment, Defendants signed Proprietary Information, Inventions and Non-Solicitation

Agreements ("Agreements") with Yipit. *Id.* ¶ 4; *see id.* Ex. 1 (Mr. Emmett's Agreement); *id.* Ex. 2 (Mr. Pinsky's Agreement). In those Agreements, Defendants agreed to hold Yipit's Proprietary Information "in strictest confidence" and to not "disclose, use, lecture upon or publish any of [Yipit]'s Proprietary Information." *Id.* Exs. 1-2 § 1.1. That "Proprietary Information" was defined to include Yipit's "trade secrets," "proprietary technology," "pricing and billing policies," and customer information. *Id.* Exs. 1-2 § 1.2. And the Agreements were clear that these obligations continued after Defendants' employment. *Id.* Exs. 1-2 §§ 1.1, 1.4.

Mr. Pinsky left Yipit on December 31, 2022, and began working for M Science. *Id.* ¶ 5; Melzer Decl. ¶ 15. Mr. Emmett, meanwhile, remained at Yipit, eventually being promoted to Director of Business Development. Frawley Decl. ¶ 5; Melzer Decl. ¶ 14. Mr. Emmett notified Yipit of his resignation on June 4, 2024; his last day was June 17. Frawley Decl. ¶¶ 6-7. Although Yipit did not know it then, Mr. Emmett had long since accepted a job at M Science. *Id.* ¶ 14; Pasquale Decl. Ex. 9 at 14-15, 18.

### C. Defendants' Misappropriation and Scheme to Harm Yipit

Beginning several months before Mr. Emmett's departure from Yipit, and continuing after he started working at M Science, Defendants conspired to misappropriate Yipit's confidential information, mislead Yipit's personnel, and steal Yipit's customers.

Beginning no later than March 2024, and continuing for months thereafter, Mr. Emmett misappropriated some of Yipit's most important and valuable information. As evidence from Yipit's forensic analysis proves, Mr. Emmett uploaded at least the following files from his Yipit work laptop to messaging applications in his personal LinkedIn and Facebook accounts:

| File Name | Date and Time | Destination |
| --- | --- | --- |
| ZEtaxes2024.xlsx | March 6, 2024 at 16:46 | LinkedIn |

| File Name | Date and Time | Destination |
|---|---|---|
| ZEtaxes2024.xlsx | March 6, 2024 at 16:52 | Facebook |
| ▓▓▓▓.pdf | April 23, 2024, at 13:15 | Facebook |
| Yipit Apple Battle Deck.pdf | April 23, 2024, at 13:18 | Facebook |
| YipitData Historical Accuracy Tables by Sectors .xlsx | April 23, 2024, at 13:19 | Facebook |
| ▓▓▓ Overlap.xlsx | May 1, 2024, at 18:27 | Facebook |
| Top 40 Account Deck.pdf | May 16, 2024, at 21:08 | Facebook |
| Book2.xlsx | May 23, 2024, at 14:35:53 | Facebook |
| ▓▓▓.xlsx | May 23, 2024, at 14:38:45 | Facebook |
| Copy of Top 40 Account Deck.pdf | May 31, 2024 at 14:51:56 | Facebook |

Pasquale Decl. ¶¶ 10-12.  Several of these files were renamed to hide their contents.  For example, the "ZETaxes2024" file has nothing to do with Mr. Emmett's personal taxes; instead, it contains the names, contact information, renewal dates, and contract prices for *hundreds* of Yipit's customers.  Melzer Decl. ¶ 19(e).  Similarly, the files "▓▓▓ Overlap" and "▓▓▓" are named after customers Mr. Emmett handled, giving the impression that they related to his legitimate duties.  *Id.* ¶ 19(a), (c). But in fact, these files contain confidential detailed information about Yipit's product performance, pricing, and marketing strategies, and *hundreds* of customers, most of which were not within Mr. Emmett's purview.  *Id.* ¶¶ 17-20, 28.

These actions undisputedly made Yipit's files available to Mr. Emmett outside of Yipit's auspices—but the evidence suggests that Mr. Emmett sent at least one of these files, "▓▓▓ Overlap," to Mr. Pinsky as well.  *See* Pasquale Decl. ¶¶ 15, 24-27.  On May 1, shortly after 5:52 pm, Mr. Pinsky messaged Mr. Emmett asking for a "general guide" on two of Yipit's customers,

████████████, if Mr. Emmett had "facebook open." *Id.* Ex. 9 at 17. Mr. Pinsky's message clearly indicates that he already knew Mr. Emmett was using Facebook as a means to surreptitiously share and misappropriate trade secret information. Mr. Emmett responded that he could "help" with one of the customers. *Id.* At 6:27 pm, Mr. Emmett uploaded the "██████ Overlap" file, which includes information about those same two customers (along with hundreds of others) to Facebook Messenger. *Id.* ¶¶ 11, 27. Yipit's data does not reveal the identity of the recipient, but this timeline and text evidence very strongly suggests it was Mr. Pinsky.

Each of these files contains trade secrets and is highly confidential and competitively sensitive. *See* Melzer Decl. ¶¶ 17-20. Six of them contain comprehensive customer lists and details, including information such as customers' subscriptions, contract prices, renewal dates, analyses of the health of customer accounts, the Yipit employees managing each account, and records of the time and engagement Yipit gave to each customer. *Id.* ¶ 19. The remaining files contain Yipit's proprietary approach to pricing and discounting; detailed guidance about Yipit's "AAPL" product and the underlying proprietary methodology; and years of historical back-tested data accuracy for Yipit's products for every single stock ticker. *Id.* ¶ 17.

In addition to exfiltrating these files, Mr. Emmett also repeatedly sent Yipit's confidential, proprietary, and trade secret information to Mr. Pinsky over text messages. Text messages synced to Mr. Emmett's Yipit laptop revealed that, between April and mid-June 2024, Mr. Pinsky solicited Yipit information from Mr. Emmett, and Mr. Emmett provided it, at least 18 times. Pasquale Decl. ¶¶ 17, 20-22, Ex. 9. That information included sensitive details about numerous Yipit customers, such as their exact contract prices and renewal dates, the identities of Yipit employees who managed the accounts, details about Yipit's interactions with the

customers, and approaches Mr. Pinsky might take to induce those customers to buy M Science's products instead of Yipit's. *See id.* Ex. 9; Melzer Decl. ¶¶ 22-26.

On June 17, 2024—his last day with Yipit—Mr. Emmett simultaneously began working at M Science, where Defendants collaborated to leverage Yipit's information for their benefit and M Science's. Pasquale Decl. ¶ 28, Ex. 9 at 48-49. That day, he texted Mr. Pinsky that he would "do a cross check" on the "account list" to see if there was "any quick upside to grab":



*Id.* Ex. 9 at 49. Based on Mr. Emmett's prior messages and his exfiltration of Yipit's account lists—including and especially ████.xlsx—this message indicates that Mr. Emmett had now obtained an account list from M Science and was cross-referencing it with Yipit's, to see if he could identify vulnerable customers for M Science to steal. Melzer Decl. ¶ 24.

The following day, Mr. Emmett texted that he had compiled "a list of current accounts that underpay compared to the distribution of spend [we've] discussed," Pasquale Decl. Ex. 9 at 50-51, which, from context, referred to *M Science* accounts that underpay compared to *Yipit*. Melzer Decl. ¶ 25. Mr. Pinsky instructed Mr. Emmett *not* to email or send the list (presumably to avoid traceability), but rather to "screenshare" it with himself and "Val"—presumably, M Science's Chief Revenue Officer, Val Roduit—to "discuss the best way to attack and share" it:

Pasquale Decl. Ex. 9 at 51.  In short, Defendants were discussing Yipit trade secrets and explicitly strategizing how to avoid detection.

These actions will have, and already have had, profound negative consequences for Yipit. In fact, the evidence suggests that Defendants' misdeeds have already cost Yipit at least five customers, whose pricing information and other sensitive details were contained within the misappropriated files.  *See* Melzer Decl. ¶¶ 26, 30.  On June 11 and 14, 2024, Mr. Emmett and Mr. Pinsky exchanged pages of text messages concerning two of Yipit's then-customers,

███████████████████████████████████████████████████████████████

Pasquale Decl. Ex. 9 at 44-46.  Mr. Emmett provided detailed information about their subscriptions, contract prices, and renewal dates, advised Mr. Pinsky about specific customer representatives, and estimated the value of a deal with those customers (*e.g.*, "I think it's worth six figures," "I think u can also get more than ███").  *Id.*  ████████████████████████████
████████████████████████████████████████  Melzer Decl. ¶¶ 26, 30.  ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
█████████████████  *Id.*  One of those customers, ██████, notified Yipit that it would not renew its contract because ████████████████████████  *Id.* ¶ 26.

### D.    Yipit's Efforts to Recover its Trade Secrets

After Yipit began uncovering evidence of Mr. Emmett's misappropriation in early July 2024, Pasquale Decl. ¶¶ 9-10, it retained outside counsel, who on July 15, 2024 sent letters to Mr. Emmett and M Science outlining Yipit's initial findings.  Declaration of Laura D. Smolowe ("Smolowe Decl.") ¶¶ 2-3, Exs. 1-2.  Those letters demanded, among other things, details about Mr. Emmett's misappropriation and the return and deletion of Yipit's information.  *Id.* Exs. 1-2.

Meanwhile, Yipit continued to discover deeply concerning evidence against Defendants. On July 16, 2024—the day after Yipit's counsel sent the initial demand letters—Mr. Emmett finally shipped his company laptop back to Yipit. Pasquale Decl. ¶¶ 18-19. After receiving it, Yipit discovered months of texts messages between Mr. Emmett and Mr. Pinsky, which provided new and compelling evidence of their misappropriation and conspiracy. *Id.* ¶¶ 17, 20-24, Exs. 8-9. Armed with this information, on August 15, 2024, Yipit's counsel sent a follow-up letter to counsel for M Science and Mr. Emmett, demanding a thorough investigation of Mr. Emmett and Mr. Pinsky and the return of Yipit's confidential information. Smolowe Decl. ¶ 5, Ex. 4. Yipit demanded a response as soon as possible, but no later than August 21. *Id.* Ex. 4.

At first, M Science represented it would take prompt action in response to Yipit's demand. Counsel for M Science replied on August 21, as requested, and informed Yipit that Mr. Emmett no longer worked for M Science and was no longer represented by his firm. *Id.* ¶ 6, Ex. 5. As to Mr. Pinsky and M Science, counsel represented that "M Science is conducting a continued and thorough review" and advised that he would provide an update the following week. *Id.* On August 30, counsel for M Science wrote again, noting that the investigation was "ongoing," *id.* ¶ 7, Ex. 6, and Yipit expected that a more substantive update would follow.

But Yipit heard nothing. So on September 13, Yipit sent a follow-up letter reiterating that M Science needed to "respond to [Yipit's] inquiries and return its information as soon as possible." *Id.* ¶ 8, Ex. 7. Yipit's general counsel met by phone a week later with the general counsel for Jefferies Financial Group, Inc. ("Jefferies"), M Science's parent company; they agreed to connect again in 7-10 days to discuss the outputs of M Science's investigation. *Id.* ¶ 9.

On October 2, general counsel for Yipit and Jefferies and outside counsel for Yipit and M Science had another call. *Id.* ¶ 10. But M Science and Jefferies did not provide the promised

investigation "outputs"; instead, they represented that they would provide a copy of any documents from M Science's systems containing potential Yipit confidential information by the following week.  *Id.*  On October 8, counsel for Yipit emailed M Science to confirm that it still planned to return Yipit's information and requested that Mr. Pinsky and M Science certify that they possessed nothing else.  *Id*. ¶ 11, Ex. 8.  On October 10, counsel for M Science replied that their review and return of documents would be delayed.  *Id.* ¶ 12, Ex. 9.  To date, neither M Science nor Mr. Emmett has returned any documents or provided certifications.  *Id.* ¶¶ 13, 14.

Meanwhile, Yipit's continuing investigation revealed that five customers that Yipit recently lost were ones whose information Defendants had stolen.  Melzer Decl. ¶¶ 26, 30.  This evidence made it painfully clear that Yipit needed to take urgent action to protect its secrets.  Accordingly, Yipit filed this lawsuit and now seeks a Preliminary Injunction against them.

## III.    ARGUMENT

"A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits . . . '; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction."  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting,* 607 F.3d 68, 79-80 (2d Cir. 2010)).  Yipit easily meets all four of these requirements.

### A.    Yipit Is Overwhelmingly Likely to Succeed on the Merits.

To demonstrate a likelihood of success on the merits, a plaintiff "need not show that success is an absolute certainty," but only that it is "more likely than not to succeed" "on the merits of at least one of [its] claims."  *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (citations omitted).  Yipit easily meets this standard.  Yipit's evidence

demonstrates that Defendants repeatedly and surreptitiously misappropriated Yipit's proprietary, confidential, and trade secret information and violated their contractual obligations to Yipit.[1]

        **1.**        **Yipit Is Likely to Succeed in Its DTSA Claim (Count 1).**

To prevail on its cause of action for trade secret misappropriation in violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, Yipit needs to show that (1) it owns one or more "trade secret[s]" that "relate[] to a product or service used in, or intended for use in, interstate or foreign commerce"; and (2) that Defendants misappropriated its trade secrets. 18 U.S.C. § 1836(b)(1).  The facts and the law fully support Yipit on both of these elements.

        ***(a)***        ***Yipit Owns Protectable Trade Secrets.***

The highly confidential and competitively sensitive business information that Mr. Emmett and Mr. Pinsky exfiltrated, including sourcing and guidance regarding Yipit's proprietary products, comprehensive customer lists and details, customer analyses, internal pricing and discount guidelines, and internal reporting about product accuracy, all constitute Yipit's trade secrets under the DTSA.  *See* Melzer Decl. ¶¶ 8-9, 16-23; 18 U.S.C. § 1839(3).

***First***, the Yipit information that Defendants took falls within the categories of financial, business, technical, or economic information protected as trade secrets by the DTSA.  18 U.S.C. § 1839(3).  For example, courts often treat customer lists as "confidential information deserving protection," *Ayco Co., L.P. v. Feldman*, No. 1:10-CV-1213 GLS/DRH, 2010 WL 4286154, at *11 (N.D.N.Y. Oct. 22, 2010), particularly where, as here, "it is a long, difficult process to educate and convert a prospective customer" into an actual customer.  *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1045 (S.D.N.Y. 1987); *see* Melzer Decl. ¶¶ 6-9, 19, 21, 23, 30-31.

---

[1] Yipit is likely to succeed on each of its causes of action, but this motion focuses on those causes of action for which Yipit seeks preliminary injunctive relief.

The same is true of Yipit's other confidential and proprietary information at issue, including its internal product information, its proprietary data sourcing and methodologies, its marketing strategies, and its customer-specific details such as pricing and renewal cycles. *See, e.g.*, *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (treating "data relating to pricing" as trade secrets); *eShares, Inc. v. Talton*, No. 22-CV-10987 (JGLC), 2024 WL 3970847, at *6 (S.D.N.Y. Mar. 29, 2024) (same, for "proprietary methodologies"); *see also* Melzer Decl. ¶¶ 8-9, 17, 23.

*Second*, Yipit takes extensive steps to maintain the secrecy of this information, *see* 18 U.S.C. § 1839(3)(A), as detailed at length in the attached Declarations.  *See* Pasquale Decl. ¶¶ 7-8; Frawley Decl. ¶¶ 4, 8, 12.  It employs an array of technical tools, including company-managed laptops and password-protected company accounts; endpoint protection, intrusion detection, and mobile device management software; and data loss protection tools.  Pasquale Decl. ¶ 7.  Yipit also contractually requires its employees to hold its trade secrets "in strictest confidence," Frawley Decl. Exs. 1-2 § 1.1, and provides detailed guidance for employees in its Compliance Manual and Information Security Policy, *see* Pasquale Decl. ¶ 8(b), Exs. 4-5.  "These measures are in line with those found by courts to reasonably guard the secrecy of information warranting trade secret protection." *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 676 (S.D.N.Y. 2022) (collecting cases).

*Third*, Yipit's information at issue derives independent economic value from not being generally known to, or readily ascertainable by, others who can obtain economic value from them. *See* 18 U.S.C. § 1839(3)(B).  The information that Defendants exfiltrated includes highly confidential information about Yipit's products, including its proprietary data sources and methodologies; product- and sector-based pricing; approach to discounting products; strategic initiatives to change pricing and packing and roll out new products; marketing strategies; and the

13

detailed accuracy performance for every aspect of every product. Melzer Decl. ¶¶ 17, 23. This information—the equivalent of Yipit's "secret sauce" to differentiate its products, ensure they outperform competing products, and generate customer sales and loyalty—is the result of years of confidential development, refinement, and analyses, and cannot be easily replicated. *Id.* ¶ 9; *cf. Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 381 (S.D.N.Y. 2020) (defendant that "expended considerable resources, both financial and in personnel time, developing this non-public information" adequately alleged information was trade secret).

Defendants also stole highly confidential customer-specific information belonging to Yipit, including, *inter alia*, comprehensive spreadsheets of its investor customers, their annual spending on a product-by-product and customer-by-customer basis, and associated details and strategies for each customer; a list of all of Yipit's investor customers by category, with the status of each account, relevant subscriptions, and associated Yipit contacts; and an internal presentation with strategic analyses for each of Yipit's top 40 customer accounts in the Hedge Fund segment. Melzer Decl. ¶ 19, 21, 23. To develop this information, Yipit "devoted significant time, effort, and money to establishing relationships with its Customer Contacts over a number of years" and to learning "the purchasing needs and preferences of its Customers." *Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959 (KMK), 2015 WL 5730339, at *26 (S.D.N.Y. Sept. 30, 2015) (collecting cases finding customer lists and related information to be trade secrets); *see also* Melzer Decl. ¶¶ 6, 8-9, 19, 21, 23, 30-31. There is no industry knowledge or public source from which a non-Yipit employee could derive Yipit's pricing lists, replicate its insights about specific customers, or recreate its account strategies. Melzer Decl. ¶¶ 6, 9, 17, 19.

The secrecy of this information gives Yipit economic and competitive advantages in a highly competitive industry, by allowing it to ensure its products are among the most accurate

and differentiated in the market, tailor its products for its customers, and strategically increase customer sales and loyalty. *See id.* ¶¶ 5, 7, 9, 17-21, 23. Conversely, if this information were *not* secret, a competitor could, among other things, use it to improve its own products, develop its own business plans, lure away Yipit's customers, target those customers at strategic times (*i.e.*, shortly before a renewal), undercut Yipit's pricing, and cross-sell products based on Yipit's vulnerabilities. *See id.* ¶¶ 7, 9, 17-21, 23, 25-26, 29. Indeed, this is exactly why Mr. Pinsky repeatedly solicited such information from Mr. Emmett: to "underprice or underbid [Yipit] and divert customers." *Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 341 (E.D.N.Y. 2020); *see also* Pasquale Decl. Ex. 9 (text messages showing repeated requests). Under these circumstances, courts regularly hold that "client and pricing information derives independent economic value from being kept secret." *Intertek*, 443 F. Supp. 3d at 341 (granting preliminary injunction); *cf. ExpertConnect, L.L.C. v. Fowler*, No. 18 CIV. 4828 (LGS), 2019 WL 3004161, at *5 (S.D.N.Y. July 10, 2019) (reaching similar conclusion on motion to dismiss).

      ***Fourth***, Yipit's trade secrets "relate to products and services used in interstate commerce." 18 U.S.C. § 1836(b)(1). Yipit provides its data feeds and packages to customers across the country and the world, and its trade secrets underlie those products and enable Yipit to provide services across its broad customer base. *See* Melzer Decl. ¶¶ 3-7.

### (b)     *Defendants Misappropriated Yipit's Trade Secrets.*

      The evidence not only shows that Yipit possesses trade secrets—it demonstrates that Mr. Emmett and Mr. Pinsky both misappropriated those trade secrets. Under the DTSA, defendants can "misappropriate[] a trade secret (1) by acquiring a trade secret by improper means, or (2) disclosing or using the trade secret without consent." *ExpertConnect*, 2019 WL 3004161, at *6. Every one of these mechanisms occurred here.

Beginning with *acquisition*: Mr. Emmett acquired Yipit's trade secrets by improper means when he sent that information to himself via Facebook, LinkedIn, and text, without Yipit's authorization and with no legitimate business purpose. Pasquale Decl. ¶¶ 11, 14-16, 21, 29, Ex. 8; Melzer Decl. ¶¶ 17-23, 27-28. He also renamed several of these files with innocuous names (*e.g.*, "ZETaxes2024" or "Book2"), and deleted the local copies of the files from his Yipit computer after he uploaded them. Pasquale Decl. ¶ 13; Melzer Decl. ¶ 19(a)-(c), (e). In other words, not only did Mr. Emmett "t[ake] the trade secrets for purposes unrelated to [his] employment," he also "attempted . . . to conceal the fact that []he took files." *ExpertConnect*, 2019 WL 3004161, at *6. Such conduct constitutes "a textbook claim of misappropriation via acquisition." *Onyx Renewable Partners L.P. v. Kao*, No. 22-CV-3720 (RA), 2023 WL 405019, at *4 (S.D.N.Y. Jan. 25, 2023) (finding misappropriation where defendant downloaded files without "a legitimate purpose" and "under 'unusual circumstances'") (citation omitted).

Mr. Emmett then *disclosed* Yipit's trade secrets, without Yipit's consent, to Mr. Pinsky. *See* Pasquale Decl. Ex. 9; Melzer Decl. ¶¶ 27-28. No fewer than 18 times, Mr. Pinsky requested, and Mr. Emmett provided, confidential customer information, including actual and projected pricing information, precise renewal dates, and specific advice about Yipit customers. *See* Pasquale Decl. ¶ 22, Ex. 9; Melzer Decl. ¶¶ 23, 26. Further, Yipit has strong evidence that Mr. Emmett disclosed Yipit's trade secrets by sending a misappropriated file, " ████ Overlap," to Mr. Pinsky over Facebook. *See* § II.C, *supra*; *see also* Pasquale Decl. ¶¶ 25-27. Mr. Pinsky, for his part, *acquired* Yipit's trade secrets, often after he actively solicited them. Mr. Pinsky knew that Mr. Emmett worked at Yipit and, as a former Yipit employee himself and now employee at a direct competitor, he knew or had reason to know that Mr. Emmett's disclosures violated his duty to maintain the secrecy of Yipit's information. *See* 18 U.S.C. § 1839(5)(A), (6)(A).

As the text messages between Defendants indicate, they then ***disclosed*** and ***used*** Yipit's trade secrets at M Science.  For example, after Mr. Emmett gave Mr. Pinsky detailed information about one of Yipit's customers, █████, Mr. Pinsky promised that ██████ could be Mr. Emmett's first renewal at M Science.  Pasquale Decl. Ex. 9 at 19, 28-29.  Mr. Emmett also used Yipit's information (likely, the █████.xlsx document), together with an M Science account list, to "do a cross check" for "quick upside" for M Science.  *See* § II.C, *supra*; *see also* Melzer Decl. ¶ 24.  Similarly, Mr. Emmett used Yipit's information to write "a list of current accounts that underpay"—that is, *M Science* accounts that underpay compared to *Yipit*.  Melzer Decl. ¶ 25.  Defendants disclosed their illicit list to others at M Science via "screenshare" (presumably to avoid leaving digital evidence of their disclosure), "discuss[ed] the best way to attack" that list, and worked on "planning / executing" related strategies.  Pasquale Decl. Ex. 9 at 51.

Not only did Defendants use Yipit's trade secrets, it appears they did so successfully. After Mr. Emmett gave Mr. Pinsky detailed information about ████████████████—which formed a precise roadmap Mr. Pinsky and M Science could use to undercut Yipit and attract these customers—these very same customers "churned" from Yipit.  Melzer Decl. ¶¶ 26, 30; *see also* Pasquale Decl. Ex. 9 at 44-46.  And after Defendants stole information about ███████ ████████████, including pricing information, these customers also churned in favor of a competitor.  Melzer Decl. ¶¶ 26, 30.  ██████████████████████████████ ████████████████████████ *Id.* ¶ 26.  The clear inference is that Defendants' misuse of Yipit's trade secrets cost Yipit at least five customers so far.

> **2.    Yipit Is Likely to Succeed in Its Misappropriation of Trade Secrets Claim Under New York Common Law (Count 2).**

Yipit will also succeed on its claim for misappropriation of trade secrets under New York common law, as its evidence "demonstrate[s]: (1) that it possessed a trade secret, and (2) that the

defendants used that trade secret in breach of an agreement, confidential relationship or duty . . . ." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (citation omitted).  These "elements for a misappropriation claim under New York law are fundamentally the same" as a DTSA claim.  *Iacovacci*, 437 F. Supp. 3d at 380.

As explained above, Yipit's information, including its "customer-specific . . . pricing arrangements and contract renewal dates," can "constitute[] trade secrets" under New York law—especially given Yipit's extensive efforts to keep such information secret.  *Liberty Power Corp., LLC v. Katz*, No. 10-CV-1938 (NGG) (CLP), 2011 WL 256216, at *2 (E.D.N.Y. Jan. 26, 2011); *see also Catalyst Advisors*, 602 F. Supp. 3d at 672 ("the 'most important consideration' . . .  is 'whether the information was secret'" (citation omitted)).  And Defendants used Yipit's trade secrets at M Science, *see* § III.A.1(b), *supra*, in breach of their confidentiality obligations to Yipit and as a result of Mr. Pinsky improperly inducing Mr. Emmett's breach.  *See Liberty Power*, 2011 WL 256216, at *5 ("inducing employees or others to reveal the information in breach of duty" is "improper" means (citation omitted)); *see also* §§ III.A.3, *infra*.

### 3.    Yipit Is Likely to Succeed in Its Breach of Contract Claim (Count 3).

Yipit also has a strong likelihood of success on its breach of contract claim.  To succeed, Yipit must establish that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages."  *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022) (internal citations omitted).  Once again, Yipit readily satisfies every element.  Both Mr. Emmett and Mr. Pinsky signed Proprietary Information, Inventions and Non-Solicitation Agreements with Yipit, *see* Frawley Decl. Exs. 1-2, and Yipit performed its obligations by employing and compensating Defendants, *see id.* ¶ 3; Melzer Decl. ¶¶ 10-15.  But Defendants violated their obligations to "hold in strictest confidence and . . . not disclose, use, lecture upon or publish any of [Yipit's]

Proprietary Information," including its "trade secrets," "proprietary technology," "pricing and billing policies," and customer information.  Frawley Decl. Exs. 1-2 §§ 1.1-1.2.  Mr. Emmett violated this obligation by disclosing "information regarding customers and potential customers of" Yipit to Mr. Pinsky.  *Id*. Ex. 1 § 1.2; *see* III.A.1(b), *supra*.  Thereafter, both Defendants violated their obligations by using Yipit's Proprietary Information at M Science and disclosing it to other M Science employees.  *See* § III.A.1(b), *supra*.  Consequently, Yipit suffered not only damages but also, as expressly provided in the Agreements, "immediate and irreparable injury." Frawley Decl. Exs. 1-2 § 9.1; *see also* § III.B, *infra*.

### B.    Yipit Will Suffer Irreparable Harm Without an Injunction.

Without injunctive relief, Yipit will continue to suffer "injury that is neither remote nor speculative, but actual and imminent," *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted), and "for which a monetary award does not adequately compensate." *Intertek Testing Servs.*, 443 F. Supp. 3d at 328.

"The disclosure of private, confidential information 'is the quintessential type of irreparable harm that cannot be compensated or undone by money damages.'" *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (quoting *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000)).  Indeed, the Second Circuit has repeatedly observed that "the loss of trade secrets cannot be measured in money damages," as "[a] trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam); *see also N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999). Where, as here, the trade secret or confidential information includes "pricing methods, customer lists and customer preferences," the potential "loss of client relationships and customer good will built up over the years constitutes irreparable harm." *Johnson Controls, Inc. v. A.P.T. Critical Sys., Inc.*, 323 F. Supp. 2d 525, 532-33 (S.D.N.Y. 2004); *accord Capstone Logistics Holdings,*

*Inc. v. Navarrete*, No. 17-cv-4819 (GBD), 2018 WL 6786338, at \*33 (S.D.N.Y. Oct. 25, 2018)
("use and disclosure of an employer's confidential customer information and the possibility of
loss of customers . . . constitutes irreparable harm"), *aff'd and remanded in part*, 796 F. App'x
55 (2d Cir. 2020).

      Customer loss is a real and imminent danger here. Yipit has already lost two customers
that Mr. Emmett was responsible for—███████████████—after Defendants exchanged the
exact information that could cause those customers to defect to M Science. Melzer Decl. ¶¶ 26,
30. Yipit lost three more customers after Defendants stole sensitive files containing their
information; one of those customers, ████████████████████████████████

████████████████ *Id.* Notably, these customers churned *after* M Science assured Yipit that it
would take steps to prevent the use of Yipit's information. *See* Smolowe Decl. Ex 5. Yipit now
faces a huge risk that Defendants' future misconduct will cause it to lose even more customers.
Melzer Decl. ¶¶ 29-31. Such losses are often irreversible and have long-term repercussions:
Customer relationships and good will in the alternative data market take years to build, and
customers tend to increase their purchases over time, so the loss of a customer reduces long-term
growth potential and harms Yipit's goodwill and reputation. *Id.*; *see Mercer Health & Benefits
LLC v. DiGregorio*, 307 F. Supp. 3d 326, 348 (S.D.N.Y. 2018) (finding irreparable harm where
Defendants "targeted" plaintiff's clients, attempted to "lur[e] away" business, and caused "loss
of goodwill"); *Credit Suisse Sec. (USA) LLC v. Ebling*, No. 06 CIV. 11339 (RCC), 2006 WL
3457693, at \*3 (S.D.N.Y. Nov. 27, 2006) (similar).

      Further, where "there is a danger that . . . a misappropriator of trade secrets will
disseminate those secrets to a wider audience or otherwise irreparably impair the value of those
secrets," "[a] rebuttable presumption of irreparable harm might be warranted." *Faiveley Transp.*

*Malmo AB*, 559 F.3d at 118; *accord IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm."). Yipit faces this exact danger. Defendants already disseminated Yipit's information to others at M Science, including M Science's Chief Revenue Officer. *See* Pasquale Decl. Ex. 9 at 51. These Defendants are not trustworthy[2] and cannot be counted on to refrain from further dissemination. *See Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 176 (S.D.N.Y. 2006) (granting injunction after considering evidence that defendant was not trustworthy). Mr. Pinsky remains at M Science, and Yipit has no assurances that he no longer possesses its information. Nor is it aware of any procedures in place at M Science that could prevent Mr. Pinsky from continuing to disseminate it. *See Chadha v. Chadha*, No. CV 16-3739 (ENV) (AKT), 2020 WL 1031385, at *15 (E.D.N.Y. Mar. 2, 2020) (finding irreparable harm where plaintiff has no control over use and dissemination of stolen information).

Mr. Emmett's departure from M Science only broadens the risk and potential scope of disclosure. He has not returned or destroyed the information he misappropriated, despite multiple demands. And "[t]his is not a situation where there is little risk of dissemination to a wider audience." *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 CIV. 211 (LGS), 2021 WL 1553926, at *13 (S.D.N.Y. Apr. 20, 2021), *aff'd in part, vacated in part, remanded*, 68 F.4th 792 (2d Cir. 2023). If Mr. Emmett accepts new employment for another competitor, "he could disseminate the trade secrets he improperly acquired to . . . members of his new firm," which would further "impair the value of [Yipit's] secrets." *KCG Holdings, Inc. v.*

---

[2] Indeed, Mr. Emmett dodged Yipit's multiple attempts to conduct an exit interview, including by lying that he would be in North Carolina on his last day when, in fact, he was starting work for M Science in New York. *See* Frawley Decl. ¶¶ 8-11, Ex. 3; *see also* Pasquale Decl. ¶ 28, Ex. 9 at 48-49. He also signed Yipit's Document Deletion Attestation on his last day at Yipit affirming that he had returned and/or deleted Yipit's proprietary and confidential information, which was a lie. *See* Frawley Decl. ¶¶ 12-13, Ex. 4.

21

*Khandekar*, No. 17-CV-3533 (AJN), 2020 WL 1189302, at \*17 (S.D.N.Y. Mar. 12, 2020). And he may be incentivized to do so not just for financial gain, but also to hurt Yipit, as he repeatedly demonstrated antagonism towards Yipit in his text messages and expressed a desire to bring the value of Yipit's shares to zero. *See, e.g.*, Pasquale Decl. Ex. 9 at 33-35, 43-44.

Finally, the Agreements between Yipit and Defendants confirm that Defendants' breaches "constitute immediate and irreparable injury to" Yipit. Frawley Decl. Exs. 1-2 § 9.1. Time and again, courts within this Circuit have found such contractual provisions sufficient to demonstrate irreparable harm. *See, e.g.*, *N. Atl. Instruments*, 188 F.3d at 49 (affirming finding of irreparable harm where defendant had "acknowledged in his Employment Agreement that a breach of the confidentiality clause would cause 'irreparable injury'"); *Wealth Mgmt. Assocs. LLC v. Farrad*, No. 17CIV.1924 (KPF) (HBP), 2019 WL 5725044, at \*6 (S.D.N.Y. June 21, 2019) (similar), *report and recommendation adopted,* No. 17 CIV. 1924 (KPF), 2019 WL 6497424 (S.D.N.Y. Dec. 3, 2019). The Court should reach the same conclusion here.

### C.    The Balance of Hardships Strongly Favors Yipit.

Next, the balance of hardships tips decisively in Yipit's favor due to "the demonstrated value of preventing public disclosure of the confidential and proprietary information at issue in this case." *MacDermid, Inc. v. Selle*, 535 F. Supp. 2d 308, 317 (D. Conn. 2008). As explained above, Yipit "will continue to suffer substantial harm absent an injunction through Defendant's use of proprietary information to lure [its] clients to one of [its] direct competitors." *Citizens Sec., Inc. v. Bender*, No. 1:19-CV-916 (MAD/DJS), 2019 WL 3494397, at \*5 (N.D.N.Y. Aug. 1, 2019). It is unsurprising, then, that courts in analogous situations regularly conclude that the balance of the equities supports the exact relief that Yipit now seeks. *See, e.g.*, *Intertek Testing Servs.*, 443 F. Supp. 3d at 347-48 (enjoining defendants from "disclos[ing] or disseminat[ing]

any of plaintiff's confidential information or trade secrets" or violating their agreements with plaintiff); *Capstone Logistics Holdings*, 2018 WL 6786338, at *1 (similar).

Conversely, Defendants have *no* legitimate interests that would be harmed by Yipit's requested injunction. "It is no hardship for [Defendants] to refrain from'" using Yipit's trade secret, confidential, and proprietary information "to lure away [its] customers," as they have no legal right to do so. *Plaza Motors of Brooklyn, Inc. v. Bogdasarov*, No. 21-CV-6545 (KAM), 2021 WL 5630910, at *6 (E.D.N.Y. Dec. 1, 2021) (quoting *Benihana*, 784 F.3d at 897). And "enforcing contractual obligations to which the individual defendants freely agreed" imposes no burden on them either. *Intertek Testing Servs.*, 443 F. Supp. 3d at 346 (collecting cases).

Nor does returning Yipit's confidential, proprietary, and trade secret information impose an undue hardship on Defendants, as they "ha[ve] no legitimate interest in" that information. *Mission Cap. Advisors LLC v. Romaka*, No. 16 CIV. 5878 (LLS), 2016 WL 11517104, at *2 (S.D.N.Y. July 29, 2016); *see* Pasquale Decl ¶ 29; Melzer Decl. ¶¶ 27-28. Courts regularly require defendants to return confidential and trade secret information to plaintiffs, including on the expedited timeline of a temporary restraining order. *See, e.g.*, *Credit Suisse Sec.*, 2006 WL 3457693, at *1 (compelling "Respondent and all those acting in concert with him to return immediately to Credit Suisse all of Credit Suisse's confidential information and trade secrets"); *Ayco*, 2010 WL 4286154, at *1 (similar).

Finally, Yipit's request to bar Mr. Emmett from working or consulting with any person or business to whom he has disclosed or discussed Yipit's trade secrets will impose no real hardship on him. Mr. Emmett no longer works at M Science, *see* Smolowe Decl. Ex. 5, and he has no legitimate reason to share or use Yipit's proprietary, confidential, and trade secret information with any third party, *see* Melzer Decl. ¶ 28. He would still be free to find employment so long as

it is not tainted by any sharing or use of Yipit information.  Any hypothetical burden associated

with this provision (and there is none) pales in comparison to the severe risk of competitive harm

Yipit faces if Mr. Emmett continues to do business with his co-conspirators and other

beneficiaries of his misappropriation.

      **D.**      **The Public Interest Favors a Preliminary Injunction.**

      The final preliminary injunction factor, the public interest, also favors injunctive relief.

To grant a preliminary injunction, this Court need only determine that "the 'public interest would

not be disserved' by" such relief.  *Benihana, Inc.*, 784 F.3d at 895 (quoting *Salinger*, 607 F.3d at

80).  Yipit's requested injunction would affirmatively serve the "substantial public interest in the

protection of trade secrets" and in "the enforceability of contracts."  *BaseCap Analytics Inc. v.*

*Amenn*, No. 1:23-CV-09370-MKV, 2023 WL 8113524, at *4 (S.D.N.Y. Nov. 22, 2023) (citation

omitted); *accord Chadha*, 2020 WL 1031385, at *16.

      First and foremost, an injunction "would serve the public" by protecting Yipit's "interests

in maintaining . . . the secrecy of its trade secrets and confidential information."  *Intertek Testing*

*Servs.*, 443 F. Supp. 3d at 347 (citation omitted); *accord Plaza Motors of Brooklyn, Inc. v.*

*Bogdasarov*, No. 21-CV-6545 (KAM), 2021 WL 5630910, at *7 (E.D.N.Y. Dec. 1, 2021)

(similar).  In other words, "an injunction is in the public interest because it upholds the law that

protects [Yipit's] trade secrets and intellectual property rights, and thus encourages future

investment in innovation."  *Brainwave Sci., Inc. v. Arshee, Inc.*, No. 21-CV-4402 (BMC), 2021

WL 6211630, at *6 (E.D.N.Y. Dec. 14, 2021); *accord Syntel Sterling Best Shores Mauritius Ltd.*

*v. TriZetto Grp., Inc.*, No. 15 CIV. 211 (LGS), 2021 WL 1553926, at *13 (S.D.N.Y. Apr. 20,

2021), *aff'd in part, vacated in part on other grounds*, 68 F.4th 792 (2d Cir. 2023).

      An injunction also serves the "public interest in enforcing valid contracts," namely,

Defendants' Agreements.  *Gen. Mills, Inc. v. Champion Petfoods USA, Inc.*, No. 20-CV-181

(KMK), 2020 WL 915824, at *12 (S.D.N.Y. Feb. 26, 2020) (citation omitted).  "[P]ublic policy holds competent contracting parties to bargains made by them freely and voluntarily, and requires the courts to enforce such agreements."  *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) (citation omitted).

### E.    The Court Should Not Require Yipit to Post a Bond.

Ordinarily, a preliminary injunction may issue "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  However, because the "amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond." *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) (citations omitted).  The Court should do so here, as Defendants have no legitimate interest in or use for the confidential information they stole, and therefore "[t]here is little likelihood of harm to" them.  *Id.*; *Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp. 2d 186, 202 (E.D.N.Y. 2013).  Dispensing with the bond also comports with the parties' Proprietary Information, Inventions and Non-Solicitation Agreements, which specify that Yipit has "the right to enforce th[ose] Agreement[s] and any of [their] provisions by injunction . . . without bond."  Frawley Decl. Exs. 1-2 § 9.1.

## IV.    CONCLUSION

Yipit respectfully requests that the Court issue its proposed preliminary injunction to protect Yipit's trade secrets and confidential information and prevent Yipit from suffering any further irreparable harm as a result of Defendants' misconduct.

Dated: October 16, 2024
     White Plains, NY

YANKWITT LLP

By: _____

Russell M. Yankwitt
Michael H. Reed
140 Grand Street, Suite 501
White Plains, New York 10601
Tel.: (914) 686-1500
*Attorneys for Plaintiff*
*(Local Counsel)*

MUNGER, TOLLES & OLSON LLP
Laura D. Smolowe
*Pro hac vice application pending*
Vincent Y. Ling
*Pro hac vice application pending*
Jennifer L. Bryant
*Pro hac vice application pending*
Matthew Miyamoto
*Pro hac vice application pending*
Taylor L. Benninger
*Pro hac vice application pending*
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Tel: (213) 683-9100
*Attorneys for Plaintiff*
*(Lead Counsel)*