**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YIPIT, LLC d/b/a YipitData, | Case No. 24 Civ. 7854 (JGK) |
| Plaintiff, | |
| -v- | |
| ZACHARY EMMETT, ALEXANDER PINSKY, and JOHN DOES 1-10, | [REDACTED VERSION] |
| Defendants. | |

**DEFENDANT ALEXANDER PINSKY'S MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Blaine Bortnick
James Halter
RASCO KLOCK PEREZ & NIETO, LLC
260 Madison Avenue, 16th Floor
New York, New York 10016
(646) 970-4770
*Counsel for Defendant Alexander Pinsky*

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES ......................................................................................ii

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS .........................................................................................5

    Background .......................................................................................................5

    In 2024, M Science Interviewed Numerous Candidates for a Sales
    Position, Including Emmett ..............................................................................6

    After Receiving an Offer, Emmett Informed M Science that He Had
    Saved Some Yipit Information on His Personal Facebook Account –
    Pinsky Never Accessed or Viewed that Information .......................................7

    Pinsky Fully Cooperated in M Science's Investigation Demanded
    By Yipit..............................................................................................................9

    Yipit Singles Out Pinsky and Omits M Science and its Others
    Employees .......................................................................................................10

    Yipit's Claimed Damages are Base Speculation and Untrue.......................12

ARGUMENT ...........................................................................................................17

I.    The Relief Yipit Requests is not Advanced by a Preliminary Injunction ...................17

II.    Standard ....................................................................................................18

III.    There is No Irreparable Harm – Pinsky Does Not Have Any of the
Information at Issue and Could Not Use Such Information Even if He
Did Have It................................................................................................19

IV.    Yipit Cannot Establish a Likelihood of Success on the Merits of
Whether Pinsky Possessed Confidential Information or That it was
Harmed......................................................................................................21

V.    A Preliminary Injunction Would be Counter to the Public Interest
and Balance of Equities ............................................................................22

CONCLUSION........................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ayco Co., L.P. v. Frisch*,
  795 F. Supp. 2d 193 (N.D.N.Y. 2011) ............................................................ 18

*Dexter 345 Inc. v. Cuomo*,
  663 F.3d 59 (2d Cir. 2011) ............................................................................ 18

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
  559 F.3d 110 (2d Cir. 2009) .......................................................................... 19

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
  730 F.2d 61 (2d Cir. 1984) ............................................................................ 19

*Grimes v. Green Point Sav. Bank*,
  147 B.R. 307 (Bankr. E.D.N.Y. 1992) ............................................................ 23

*Harley Marine NY, Inc. v. Moore*,
  No. 1:23-cv-00163 (AMN/CFH), 2023 U.S. Dist. LEXIS 92265 (N.D.N.Y. Mar. 24, 2023).. 20

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*,
  596 F.2d 70 (2d Cir. 1979) ............................................................................ 19

*Jayaraj v. Scappini*,
  66 F.3d 36 (2d Cir. 1995) .............................................................................. 19

*Mamiya Co. v. Masel Supply Co. Corp.*,
  719 F.2d 42 (2d Cir. 1983) ............................................................................ 18

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ...................................................................................... 18

*Moore v. Consol. Edison Co. of N.Y., Inc.*,
  409 F.3d 506 (2d Cir. 2005) .......................................................................... 18

*Mullins v. City of New York*,
  626 F.3d 47 (2d Cir. 2010) ............................................................................ 14

*Newport Tire & Rubber v. Tire & Battery*,
  504 F. Supp. 143 (E.D.N.Y.1980) .................................................................. 19

*R.R. Donnelley & Sons Co. v. Fagan*,
  767 F. Supp. 1259 (S.D.N.Y. 1991) ............................................................... 21

*Sussman v. Crawford*,
   488 F.3d 136 (2d Cir. 2007) .................................................................................. 18

*Testing Servs., NA v. Pennisi,*
   443 F. Supp. 3d 303 (E.D.N.Y. 2020) .................................................................. 20

*Tri-Star Lighting Corp. v. Goldstein*,
   151 A.D.3d 1102 (2d Dep't 2017) ........................................................................ 21

*USA Network v. Jones Intercable, Inc.*,
   704 F. Supp. 488 (S.D.N.Y. 1989) ...................................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................................................. 18

## PRELIMINARY STATEMENT

Yipit paints a picture of a grand conspiracy to take its customer and pricing information that M Science, its direct competitor, used to steal a handful of customers. That picture is divorced from reality, at least with respect to Defendant Alexander Pinsky ("Pinsky").

According to Yipit, its former employee Defendant Zachary Emmett ("Emmett") allegedly took wholesale files of client and pricing information that Yipit valued and protected. But *Pinsky* did not do that. Nor did Pinsky solicit Emmett to do so. Pinsky did not even know Emmett intended to do so. Emmett later informed Pinsky – and numerous other M Science employees – that he did so. That is not a conspiracy. The only evidence here is that Emmett acted alone.

Upon learning that Emmett had Yipit information, numerous people at M Science – from lower-level salespeople up to the Chief Executive Officer – began asking Emmett, either directly or indirectly, for information. Notably, the text and Teams messages that Yipit possesses and produced to Pinsky show that M Science's CEO, Michael Marrale, sought information from Emmett about how Yipit packages some of its products. (Declaration of Alexander Pinsky ("Pinsky Decl.") ¶¶ 14-15, Ex. C).

In other words, M Science's CEO was well aware that Emmett possessed Yipit information and sought to capitalize on it. One of Marrale's written request includes Valentin Roduit (M Science's Chief Revenue Officer who reported directly to Marrale and who was Pinsky's direct supervisor) and Sante Faustini (Head of Product Intelligence reporting directly to Roduit and not in Pinsky's reporting line) on the communication. (Pinsky Decl. ¶ 15, Ex. C).

Indeed, the documents produced by Yipit unquestionably demonstrate that all levels of M Science were thoroughly aware of the information that Emmett possessed, sought it out independent of Pinsky's involvement, and sought to take advantage of it. The total of at least *ten*

M Science employees involved that left a paper trail examined thus far equates to approximately 20-25% of M Science's sales force. (Pinsky Decl. ¶ 16, Declaration of Blaine Bortnick ("Bortnick Decl.") ¶ 4). Given the widespread knowledge throughout M Science (including the text evidence which has several M Science employees other than Pinsky seeking/discussing information), there is undoubtedly many more M Science employees involved with Emmett.

Yipit knows that two of the most senior M Science employees were directly involved, as well as the identities of numerous other employees (and that is just from the paper trail discovered to date – only three M Science employees had their devices forensically reviewed (Pinsky Decl. ¶ 36)). But Yipit has chosen to single out Pinsky and not seek a preliminary injunction, or even file any action, against M Science or any of Pinsky's former colleagues. In short, Yipit's application is an exercise in humiliation and punishment. Yipit's application is simply not designed to prevent the harm it purportedly claims.

Yipit's damages theory is also pure speculation. Yipit assumes that five customers who reduced their purchases from Yipit all must have done so for the specific reason that M Science used Yipit information to lure those customers away. That theory ignores the host of other reasons that customers could have decided to reduce their payments to Yipit, including that Yipit's reports experienced some very significant gaffes and issues at the time.

In fact, at least with respect to Pinsky, none of the information that Emmett is alleged to have provided to him was used to harm Yipit – even assuming that Yipit accurately states that the relevant customers reduced their payments to Yipit. Overall, the text messages contain high-level, generic prices that are often shared in the industry (and thus do not qualify as trade secrets) and, regardless, the evidence shows that any reduction by the customers was affirmatively ***not*** due to any information that Pinsky received.

Nor can Yipit demonstrate any potential for irreparable harm from Pinsky. Pinsky is unemployed. He departed M Science on October 22, 2024. He is without employment prospects in this industry as a result of this lawsuit which has been widely publicized. He has no ability to compete with Yipit and likely never will given that "Yipit is making sure these guys don't work in alt data ever again."[1]

Further, Pinsky does not currently have any information he could theoretically use to harm Yipit. When Yipit approached M Science about its belief that Emmett inappropriately took M Science information, M Science, at Yipit's demand, forensically reviewed his work laptop and mobile telephone which contained, among other things, his personal email, text messages, and social media. (Pinsky Decl. ¶ 36).

Also, at Yipit's demand, M Science directed Pinsky to wipe all potentially problematic information from Pinsky's device including scrubbing Pinsky's text messages (which is the only way that Pinsky and Emmett communicated relevant to this action). (Pinsky Decl. ¶ 36). Two other M Science employees went through the same process and were instructed to scrub data as well. (Pinsky Decl. ¶ 36). Accordingly, Pinsky does not have any Yipit information. (Pinsky Decl. ¶ 36). Prior to Pinsky's resignation, Yipit demanded that M Science provide a "Certification" from Pinsky attesting that all of the information at issue here had been removed. Pinksy provided the demanded certification. (Pinsky Decl. Ex. E). Thus, even if Pinsky were able to join another competitor, he would still have no ability to use any Yipit information.

---

[1] Saacks, Bradley, "Inside the trade secret lawsuit that has the alternative data industry buzzing," Business Insider, Nov. 15, 2024 (https://www.msn.com/en-in/money/news/inside-the-trade-secrets-lawsuit-that-has-the-alternative-data-industry-buzzing/ar-AA1ua9Xo).

Accordingly, Yipit cannot demonstrate a likelihood of imminent irreparable harm from Pinsky to justify a preliminary injunction as to him.

Further, even if Yipit could establish the other elements of a preliminary injunction (it cannot), the public interest and balance of equities do not justify a preliminary injunction as to Pinsky. For some reason, Yipit has chosen to single out Pinsky from the numerous other M Science employees, including M Science's CEO, its Chief Revenue Officer, and its head of Product Intelligence. Yipit chose not to name M Science itself as a defendant. In fact, Yipit does not even use M Science's name in the complaint, even though Pinsky's employer is obviously not confidential information.

It appears that Yipit's selective "prosecution" and omission of even the mention of M Science results from some part of the relationship between Yipit's parent company, global private equity firm The Carlyle Group LP ("Carlyle"), and M Science's parent company, global investment firm Jefferies Financial Group ("Jeffries"), that has caused Yipit to try to protect M Science. (Pinsky Decl. ¶¶ 39-40). Carlyle is what is known as a "buy side" firm – it primarily purchases investments in companies sourced by outside investment bankers or through its internal research. (Pinsky Decl. ¶ 41). It thereafter sells such companies. Jeffries, on the other hand, is known as a "sell side" firm. (Pinsky Decl. ¶ 42). With respect to its investment banking division, it sources deals and sells them to investors such as Carlyle. (Pinsky Decl. ¶ 42). It also and acts as advisors to firms such as Carlyle seeking to buy and sell investments.[2] (Pinsky Decl. ¶ 42). But,

---

[2] Indeed, Carlyle and Jefferies do business together. "Jefferies acted as the exclusive financial advisor" for Yipit's Series E funding for Carlyle. Carlyle News Release, "YipitData raises up to $475 million in Series E funding from Carlyle," December 6, 2021

whatever Yipit's reasons, the public interest does not support making Pinsky the representative and scapegoat for the alleged acts of M Science, its CEO, its Chief Revenue Officer, its head of Product Intelligence, and numerous other employees.

If Yipit was genuinely interested in stopping some sort of future harm, it would have pursued the most senior alleged actors, as well as M Science itself, and not try to make an example of Pinsky who has not caused Yipit to lose any business.

## STATEMENT OF FACTS

### Background

Pinsky is an individual living in New Jersey. (Pinsky Decl. ¶ 3). He is 37 years old. (Pinsky Decl. ¶ 3). Pinsky is married with two children, a son aged two years and two months, and a ten month-old daughter. (Pinsky Decl. ¶ 3). His wife is a stay-at-home mother. (Pinsky Decl. ¶ 35). As a result of this lawsuit, Pinsky is unemployed. (Pinsky Decl. ¶ 34).

Moreover, as a result of this lawsuit, Pinsky is unemployable in this industry, the only field he has worked in since graduating from college in 2010. (Pinsky Decl. ¶¶ 4, 34-35). Thus, Pinsky and his family with an infant and a toddler, now have no employment income – and without employment prospects – are facing financial hardship. (Pinsky Decl. ¶ 35).

---

(https://www.carlyle.com/media-room/news-release-archive/yipitdata-raises-475-million-series-e-funding-carlyle)). In another recent publicly-available example, Carlyle engaged Jefferies to explore the sale of one of its worldwide portfolio companies. Mergermarket, "DEPT owner Carlyle taps Morgan Stanley and Jefferies to explore 2023 sale – sources," November 25, 2022 (https://ionanalytics.com/insights/mergermarket/dept-owner-carlyle-taps-morgan-stanley-and-jefferies-to-explore-2023-sale-sources/).

Since graduating from college in 2010, Pinsky has worked in providing resources to the financial services industry, principally to the asset management industry. (Pinsky Decl. ¶ 4). From August 2019 to December 2022, Pinsky was a sales manager at Yipit. (Pinsky Decl. ¶ 5). Then, from 2023 until October 2024, Pinsky worked at M Science. (Pinsky Decl. ¶ 5). Yipit does not, and cannot, assert any claims based on Pinsky's move to M Science.

Originally, Pinsky was the Head of Client Strategy at M Science. (Pinsky Decl. ¶ 5). In February 2024, the Vice President of Sales left M Science, and Pinsky was promoted into that role. (Pinsky Decl. ¶ 5).

**In 2024, M Science Interviewed Numerous Candidates
for a Sales Position, Including Emmett**

Yipit claims that M Science hired Emmett as part of a grand conspiracy to steal customers from Yipit. (Compl. ¶ 40). That is false and unsupported. There was nothing out of the ordinary about M Science hiring Emmett.

M Science had already been seeking a salesperson prior to Pinsky's February 2024 promotion. (Pinsky Decl. ¶ 6). It interviewed at least ten candidates. (Pinsky Decl. ¶ 6). Other than Emmett, none had a relationship with Yipit. (Pinsky Decl. ¶ 6). M Science originally identified a candidate from outside the industry and M Science nearly extended an offer to that person. (Pinsky Decl. ¶ 7). Instead, M Science's CEO and COO indicated that they would prefer to hire someone who knew the industry. (Pinsky Decl. ¶ 7). Then M Science informally extended an offer to another person (not related to Yipit) but that offer fell through due to concerns raised late in the process about her employment history. (Pinsky Decl. ¶ 7). After several additional months went by without finding a suitable candidate, Pinsky suggested that M Science representatives speak with Emmett, whom Pinsky knew from when they worked together at Yipit. (Pinsky Decl. ¶ 7).

Pinsky had little to no responsibility or role in Emmett's hiring. (Pinsky Decl. ¶ 8). Candidates for the role, including Emmett, interviewed with: (1) M Science's CEO, Michael Marrale (2) Pinsky's supervisor, Valentin Roduit (Chief Revenue Officer reporting to the CEO), (3) M Science's Director of New Business, Shelby Yoshida, (4) A Head of Sales at M Science, Whitney Masters, and, (5) M Science's Chief Operating Officer, Joseph Napoli. (Bortnick Decl. Ex. A at YIP0000241). Pinsky did not interview Emmett and was not the decision-maker. (Pinsky Decl. ¶ 8). At no point in that process, or ever, did Pinsky ask Emmett to take any Yipit files. (Pinsky Decl. ¶ 9). Nor was Pinsky aware that Emmett took any Yipit information when Emmett allegedly did so.[3] (Pinsky Decl. ¶ 9).

**After Receiving an Offer, Emmett Informed M Science that He Had Saved Some Yipit Information on His Personal Facebook Account – Pinsky Never Accessed or Viewed that Information**

At some point after M Science extended Emmett an offer of employment, Emmett informed M Science that he had access to some of Yipit's files through his Facebook account. (Pinsky Decl. ¶ 11). Emmett did not disclose the extent of the information, just that he "saved a few things" on Facebook. (Pinsky Decl. ¶ 11).

Pinsky himself has not used Facebook for years. (Pinsky Decl. ¶ 12). He had not logged into his Facebook account from approximately 2020 until after this action was filed on October 16,

---

[3] Yipit makes much of a request that Pinsky made for Emmett's resume and for a reference as a formality. (Compl. ¶ 41). The text messages are neither surprising nor inappropriate. With Emmett having successful interviews with five M Science personnel (but not Pinsky), the "formality" of dotting the last "I's" is natural and expected. (Pinsky Decl. ¶ 10).

2024. (Pinsky Decl. ¶ 12 and Ex. B). Nor did Pinsky know that a user could use Facebook to save files until Emmett informed Pinsky that Emmett had done so.[4] (Pinsky Decl. ¶ 11).

Yipit nevertheless alleges "Yipit has strong evidence that Mr. Emmett disclosed Yipit's trade secrets by sending a misappropriated file . . . to Pinsky over Facebook." (Yipit MOL at 16). There is absolutely no evidence to back up this false allegation, and as noted, the evidence is undisputable that Pinsky never even accessed his Facebook account during the relevant time. Simply, Pinsky *never* possessed or accessed any Yipit files. (Pinsky Decl. ¶ 13).

Stripped of the allegations that Pinsky accessed the files at issue, Yipit can only point to a handful of text messages that Emmett sent Pinsky disclosing high-level, generic price information. This is the same sort of general pricing information that ***Yipit itself*** often sought regarding its competitors. (Pinsky Decl. ¶ 12). Moreover, Yipit itself maintains a database that includes the M Science pricing and subscription expiration data that it obtains. (Pinsky Decl. ¶ 12). From Pinsky's time at Yipit, he is aware of Yipit employees Jamie Melzer and Dara Moreno seeking pricing and customer account information regarding Gerson Lehrman Group, Inc., one of Yipit's other competitors.[5] (Pinsky Decl. ¶ 12).

---

[4] During M Science's forensic investigation of Pinsky's electronic data (described below), Pinsky provided M Science's counsel with his Facebook login credentials. The September login was not made by Pinsky but by counsel for M Science as part of that forensic investigation. (Pinsky Decl. ¶ 12).

[5] Notably, the press covering this matter noted that "'Never put this kind of stuff in writing,' one data sales executive told B[usiness] I[nsider]," further indicating that such price information is

Emmett joined M Science in June 2024. (Compl. ¶ 71).

**Pinsky Fully Cooperated in M Science's Investigation Demanded by Yipit**

On July 15, 2024, counsel for Yipit sent M Science a letter regarding Emmett, as well as a letter to Emmett personally. (Smolowe Decl. Exs. 1 and 2). The letters allege that Emmett had "misappropriated Yipit's confidential and proprietary information." (Smolowe Decl. Ex. 1 at 2). The letters do not mention Pinsky, and M Science never shared them with Pinsky. (Pinsky Decl. ¶ 18). The letter, among other things, demanded that M Science undertake a full forensic investigation. (Smolowe Decl. Ex. 1 at 2). Thereafter, M Science retained counsel (for itself and Emmett) and commenced an investigation. (Pinsky Decl. ¶ 18).

On August 14, 2024, well after M Science retained counsel for itself and Emmett (Smolowe Decl. Ex. 3), counsel for Yipit sent a letter to counsel for M Science for the first time mentioning Pinsky and excerpting an alleged text message between Pinsky and Emmett, (Smolowe Decl. Ex. 4). M Science did not share the letter with Pinsky and intentionally limited his knowledge of the letter to viewing very limited excerpts over "share screen" while he was being interviewed. (Pinsky Decl. ¶ 19). Pinsky did not know that he was a potential target of any investigation. (Pinsky Decl. ¶ 19). Yet by that time counsel for M Science led counsel for Yipit believe that it represented Pinsky. (Bortnick Decl. ¶ 3). Accordingly, Pinsky was in the dark. He did not even know that Yipit in writing threatened litigation against himself, Emmett, and M Science itself. (Smolowe Decl. Ex. 4 at 9; Pinsky Decl. ¶ 19).

---

often shared in the industry. Saacks, Bradley, "Inside the trade secret lawsuit that has the alternative data industry buzzing," Business Insider, Nov. 15, 2024 ([https://www.msn.com/en-in/money/news/inside-the-trade-secrets-lawsuit-that-has-the-alternative-data-industry-buzzing/ar-AA1ua9Xo](https://www.msn.com/en-in/money/news/inside-the-trade-secrets-lawsuit-that-has-the-alternative-data-industry-buzzing/ar-AA1ua9Xo)).

Counsel for M Science contacted Pinsky and numerous other M Science employees as part of its investigation. (Pinsky Decl. ¶ 20). Pinsky fully cooperated in the investigation, including by providing access to his work laptop and his mobile telephone (which contained his personal emails, text messages, and social media apps), his login credentials for his years-dormant Facebook account, and his LinkedIn login credentials. (Pinsky Decl. ¶ 20). Notably, at M Science's direction (based on instructions from Yipit (Smolowe Decl. Ex. 8)), Pinsky removed all Yipit information from Pinsky's devices – which consisted of the text messages at issue in this matter. (Pinsky Decl. ¶ 20). Thus, Pinsky no longer has access to any of the information that is the subject of this action (and has not had such access since September 2024). (Pinsky Decl. ¶ 20).

**Yipit Singles Out Pinsky and Omits M Science and its Other Employees**

Counsel for Yipit and M Science regularly communicated about the status of the investigation through at least October 10, 2024. (Smolowe Decl. Ex. 9). On October 23, 2024, M Science provided Yipit with the results of its forensic investigation (as least through that date). (Bortnick Decl. Ex. A). Included in the results was the above-noted certification executed by Pinsky on October 16, 2024 (before he learned of this action) that he possessed no Yipit information. (Pinsky Decl. Ex. E). A similar certification executed by Mr. Roduit was also provided. (Bortnick Decl. Ex. A at YIP0000243). Notably absent was the certification of M Science itself to be executed by its CEO as demanded by Yipit. (Smolowe Decl. Ex. 4 at 6). M Science expressly refused to do so, not even to the extent of certifying upon its best knowledge after a thorough forensic investigation. (Bortnick Decl. Ex. A at YIP0000241).

Ironically, on the same day that Pinsky signed the certification demanded by Yipit (October 16, 2024), Yipit commenced this action against Emmett, Pinsky, "and John Does 1-10."

Yipit's use of "John Does" is at best misleading. At the time of filing, the documents Yipit has revealed in this action demonstrate it admittedly knew the identities of many of the "John Does, including Mr. Roduit and Aaron Fuchs (a senior account executive still employed at M Science and a former Yipit employee).[6] (Smolowe Decl. Ex. 7; Bortnick Decl. Ex. B; Pinsky Decl. ¶ 43 and Ex. C). And since it commenced this action, if not before but yet not shared, Yipit learned that M Science's own CEO, it Head of Product Intelligence, as well as Shelby Yoshida, Kelley Jeffries, Stephanie van der Luft, and Natalie Green possessed Yipit information. (Bortnick Decl. ¶ 4).[7] While this perhaps explains why M Science refused to execute the certification demanded by Yipit, it raises troubling questions as to why M Science and the other known individuals were not named as defendants but instead identified as "John Does." It also raises troubling questions as to why, after M Science provided the names of the individuals a month ago – and none of whom have executed certifications – Yipit neither added them as defendants nor included them in the requested preliminary injunction.

---

[6] Since many of the communications Yipit identifies are between Emmett and other M Science employees without Pinsky involved, it is clear that Yipit knows the identities of "John Does" via the communications it has shared thus far in this action.  Only through discovery will we know the full extent of Yipit's knowledge prior to the commencement of this action.

[7] Mr. Yoshida is M Science's Head of New Business, Ms. Jeffries and Ms. Van der Luft are in M Science's sales department, and Ms. Green is in M Science's New Business department. (Pinsky Decl. ¶ 43)

On October 22, 2024 (after M Science had been speaking with Yipit about him without his knowledge and had led Yipit to believe it had provided him with counsel – who certainly acted without Pinsky's best interest in mind), Pinsky resigned his employment with M Science. (Bortnick Decl. ¶ 3, Pinsky Decl. ¶ 33). As set forth above, Pinsky is currently unemployed and has no job prospects in the only industry in which he has ever worked. Indeed, a news story targeting Pinsky was been published by Business Insider and thereafter widely syndicated and now appears as the first two hits on Google news searches of his name. The article states that this action "is the talk of the alternative data industry" and that "'Yipit is making sure these guys don't work in alt data ever again." Saacks, Bradley, "Inside the trade secret lawsuit that has the alternative data industry buzzing," Business Insider, Nov. 15, 2024 ([https://www.msn.com/en-in/money/news/inside-the-trade-secrets-lawsuit-that-has-the-alternative-data-industry-buzzing/ar-AA1ua9Xo](https://www.msn.com/en-in/money/news/inside-the-trade-secrets-lawsuit-that-has-the-alternative-data-industry-buzzing/ar-AA1ua9Xo)).

**<u>Yipit's Claimed Damages are Base Speculation and Untrue</u>**

Yipit claims that five customers reduced their business with Yipit as the result of Pinsky's conduct. (Yipit MOL at 9). Yet Yipit does not provide *any* evidence that the five customers reduced their business *because of* the alleged confidential information at issue here. Yipit ignores that other factors could, and in fact did, cause any alleged business loss.

First, assuming for this purpose Pinsky engaged in wrongdoing, Yipit's causation theory is nonsense on its face. It identifies ███████████████████████████ ████████████[8] (Yipit MOL at 9). Yipit also alleges that Emmett took an *entire* customer list.

---

[8] Despite obviously not being confidential, Yipit redacted the quoted section from the public version of its motion papers.

(Melzer Decl. ¶ 19(a)). Obviously there can be no correlation that that these ████████ ████████████████████████████████████████████████. Yipit must present evidence that the allegedly stolen information *was used* in a manner that caused a reduction or loss of business. Yipit provides no such evidence.

Second and critically, Pinsky never spoke, directly or indirectly, with any of the five identified clients after information had allegedly been stolen by Emmett and passed to M Science. (Pinsky Decl. ¶ 21). There is no evidence to the contrary. Accordingly, Yipit's claim that Pinsky damaged it is misplaced.

Third, in each of the five clients Yipit cites, it is simply wrong or provides no evidence. With respect to the first specific customer that Yipit identifies, ████████████████████ ███████████████, that customer stopped being a customer of M Science in 2023, well before any of the allegations here. (Pinsky Decl. ¶ 22). It did not return as a client. (Pinsky Decl. ¶ 22). Thus any reduction in ██████████ business with Yipit was not due to competition from M Science at all. In fact, according to publicly-available sources, the fund is struggling as a business – its assets under management have fallen precipitously in the past year. (Bortnick Decl. Ex. C). Its reduction in business with Yipit results from issues completely unrelated to the issues here.

With respect to ██████████████████████, Yipit appears to be playing a shell game to claim damages. Business from ████ is specific to the individual fund managers (also known as "teams"). (Pinsky Decl. ¶ 23). Yipit cites a text message in which Pinsky asked Emmett about ████ teams. Emmett responds that only one ████ team is a Yipit client, ██████████. (Pasquale Ex. 9 at 46-47). However, as the text message makes clear, Pinsky asked about ████ because M Science was talking to a different team from ████████████. (Pasquale Decl. Ex. 9

at 46-47 ("███████ wants a lot of product for ██."); Pinsky Decl.¶ 23). ███████ represents a

*different* ████ team. (Pinsky Decl. ¶ 23). No Yipit information played any role in either M Science

getting business from the ██████ team at █████ or Yipit losing business at █████ (which could

only involve the ██████ team at █████ – Yipit's only client). (Pinsky Decl. ¶ 24).

    With respect to the third customer, ███████████████████████████████,

Pinsky never learned any information from Emmett about ██████. (Pinsky Decl. ¶ 25). Yipit's

evidence is baseless rank hearsay that ███████ "notified Yipit that it would not renew its contract

because M Science had offered a better price."[9] (Yipit MOL at 9).

    The hearsay "notification" from ██████ does not provide any evidence that some sort of

confidential information was the reason that M Science provided a better price. Yipit and

M Science are competitors and, independent of any claims in this case, sometimes M Science's

pricing was better. (Pinsky Decl. ¶ 26). Further, customers would often disclose to M Science how

much they were paying Yipit specifically to encourage competition. (Pinsky Decl. ¶ 26). Also,

Yipit and M Science's products are not identical and some clients valued one company's product

over the other. (Pinsky Decl. ¶ 26). This natural competition is exactly what occurred here. Pinsky

did not pitch ██████, nor was he involved at all in the sales process. (Pinsky Decl. ¶ 27). There

is no document in which Emmett or anyone else conveyed Yipit information to Pinsky concerning

██████.

---

[9] While hearsay is admissible in a preliminary injunction hearing, the Court can should give such

evidence no weight as there has been no identification of the date, speaker, or context. *Mullins v.*

*City of New York*, 626 F.3d 47, 52 (2d Cir. 2010) ("The admissibility of hearsay under the Federal

Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage.").

With respect to the fourth customer from whom Yipit claims damage, ███████████ ███████████ was a client of M Science at all times relevant and increased their use of M Science in 2023, well before any of the claims at issue here. (Pinsky Decl. ¶ 28). To the extent ██████ did indeed reduce their expenditure at Yipit "recently" as Yipit claims, it was the product of natural competition for years when it signed on with M Science and upgraded its spend in 2023. (Pinsky Decl. ¶ 28). Pinsky did not pitch ██████. (Pinsky Decl. ¶ 28). There is no document in which Emmett or anyone else conveyed Yipit information to Pinsky concerning ██████.

With respect to the fifth customer from whom Yipit claims damage, ██████████████ and its fund manager ███████, Pinsky did not receive any Yipit information about that customer. (Pinsky Decl. ¶ 29). In fact, there is a lengthy text-message conversation between Emmett and M Science employee Aaron Fuchs (who is not a defendant), produced by Yipit, extensively discussing ███████.[10] (Bortnick Decl. Ex. B).

---

[10] Yipit spends a significant portion of its allegations discussing a text exchange between Emmett and Pinsky regarding one of Yipit's customers, ██████. Emmett describes the contact at ██████ as "[m]aybe the biggest a-hole in the entire industry." (Compl. ¶ 43). Emmett then blows off steam and complains about ██████ as a customer. In response, Pinsky makes the joke that ██████ "can be [Emmett's] first" client when he joins M Science – it is clear from the context that Pinsky is joking, and that Emmett does not believe ██████ is a good customer and does not want to work with the contact there anymore. (Pinsky Decl. ¶ 32) There is nothing nefarious about the exchange and, to the extent confidential information was disclosed (we assume Yipit does not claim that someone being the "biggest a-hole in the entire industry" was a Yipit trade secret), Pinsky did not use any such information. (Pinsky Decl. ¶ 32).

Fourth, as further evidence of Yipit's speculation about damages, Yipit fails to disclose its own normal "churn rate" – how often customers end their relationship over time. (Pinsky Decl. ¶ 30) This is an obvious and critical piece of missing information concerning causation. It could well be that for the relevant time period Yipit's churn rate was normal or below normal. If so, then any lost or reduced business likely would have been the result of normal "churn" and had nothing to do with the issues in this action.

Fifth, Yipit does not disclose if anything else about the business of those customers changed. We know that ███████, for example, was declining as a fund which is a more probable reason (and, in fact, likely the actual reason) that it would reduce its expenditure at Yipit. (Bortnick Decl. Ex. C).

Sixth, in 2024, Yipit was experiencing serious issues with its reports. Yipit sent an email to its customers stating "Due to a broader technical disruption with a core vendor, we are temporarily delaying publishing for most products." (Pasquale Decl. Ex. 9 at 7-8). Such technical issues and delays compound a serious error when Yipit published a report about Shopify, incorrectly stating that Shopify was "███████" Yipit had to issue a correction the next day stating that, in fact, Shopify was "█████." (Pasquale Decl. Ex. 9 at 7-8). Since it is presumed that its clients trade on the information it provides, this could lead to client trading losses, in addition to a loss of trust in Yipit. (Pinsky Decl. ¶ 31 and Ex. D). There are yet more completely unrelated, valid business reasons that any of the above Yipit costumers could have decided to reduce their business or take it elsewhere.[11]

---

[11] Yipit redacts the Shopify texts from its filing, yet this is public information. (*See* Pinsky Decl. Ex. D at 1).

In short, it does not suffice for Yipit to merely claim "we lost business, it must be Pinsky's fault." There are numerous other factors that can, and apparently did, cause customers to spend less with Yipit.

## **ARGUMENT**

### I. **The Relief Yipit Requests is not Advanced by a Preliminary Injunction**

Yipit seeks five provisional remedies with respect to Pinsky. It asks that Pinsky be:

> 1. preliminarily enjoined from engaging in further misappropriation, dissemination, copying, and use of any of Yipit's proprietary, confidential, and/or trade secret information (including copies thereof) that they copied, saved, printed, or otherwise obtained from Yipit, . . .;
>
> 2. preliminarily enjoined from continuing to possess, and shall return to Yipit . . ., any and all of Yipit's proprietary, confidential, and/or trade secret information (including copies thereof) that they copied, saved, printed, or otherwise obtained from Yipit's computer systems, . . .;
>
> 3. preliminarily enjoined from destroying, deleting, transferring, copying, or downloading of any of Yipit's proprietary, confidential, and/or trade secret information in their custody or control, other than in accordance with Paragraph 5 below;
>
> 4. required to provide a detailed list of any and all of Yipit's proprietary, confidential, and/or trade secret information currently or formerly in their custody or control. . . ; [and]
>
> 5. required to permit the permanent removal, deletion, and destruction of all copies of Yipit's electronic files or information transmitted to Defendants' computers or personal accounts or otherwise in their possession . . .

(Dkt. No. 4 at 2-3).

The law does not support granting any relief against Pinsky. In addition, for the reasons as set forth in the statement of facts, none of the requested relief is even relevant any more.

At Yipit's direction, Pinsky no longer has any of the information at issue. As such, Requested Relief Nos. 1, 2, 3, and 5 have already been accomplished. (Pinsky Decl. ¶ 26) Pinsky no longer has any such information and cannot disseminate, return, destroy, or permit removal –

17

no further relief is necessary. As for Requested Relief No. 4, since he no longer has access to any information beyond what Yipit has provided in this action which is subject to a very strict protective order, Pinsky cannot generate a list (let alone "detailed") of information Emmett sent to him from memory. (Pinsky Decl. ¶ 38) And, of course, Yipit already has the list.

## II.    <u>Standard</u>

Yipit's heavy burden to receive a preliminary injunction is well-established and a high one. A preliminary injunction is "never awarded as of right," *Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 200 (N.D.N.Y. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)) "A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139-40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)) (emphasis in original). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore v. Consol. Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

"A plaintiff seeking a preliminary injunction must establish: [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 24.

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Bell & Howell; Mamiya Co. v. Masel Supply Co. Corp.*, 719 F.2d 42, 45 (2d Cir. 1983). There are two essential components to irreparable harm. First, "[i]t is well established that an irreparable injury is an injury that is not remote or speculative but actual and imminent[.]" *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (quotation omitted).

Second, irreparable harm is an "injury for which a monetary award cannot be adequate compensation." *Jayaraj v. Scappini*, 66 F.3d 36, 39 (2d Cir. 1995) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)). Notably, "a moving party possesses an adequate remedy at law if the act at issue threatens only a disruption in an ongoing business, and not its destruction." *Newport Tire & Rubber v. Tire & Battery*, 504 F. Supp. 143, 150 (E.D.N.Y. 1980) *accord USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491-92 (S.D.N.Y. 1989).

Yipit cannot establish any of the elements for a preliminary injunction as to Pinsky.

### III.    There is No Irreparable Harm – Pinsky Does Not Have Any of the Information at Issue and Could Not Use Such Information Even if He Did Have It

Pinsky no longer has any of the information at issue here. (Pinsky Decl. ¶ 36). He cannot harm Yipit at all.

Yipit relies on a misstatement of *FMC Corp. v. Taiwan Tainan Giant Indus. Co,* 730 F.2d 61, 63 (2d Cir. 1984) to claim that "the loss of trade secrets cannot be measured in money damages." (Yipit MOL at 19). But the Second Circuit itself has expressly rejected such a presumption of irreparable harm in trade secret cases.

With respect to that precise quote, the Second Circuit has stated:

> Some courts in this Circuit have read this passing observation to mean that a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated. . . . ***That reading is not correct***. A rebuttable presumption of irreparable harm ***might*** be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. Where a misappropriator seeks only to use those secrets--without further dissemination or irreparable impairment of value--in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury.

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118-19 (2d Cir. 2009) (emphasis

added) (As plaintiff failed to establish it "would suffer irreparable harm unless Wabtec was enjoined from disseminating its trade secrets, the District Court was without authority . . . to enjoin Wabtec from disclosing Faiveley's trade secrets . . . 'as a precautionary measure.'").

Here, there is no threat of harm from Pinsky. Pinsky does not possess *any* of the information at issue and no job (or prospects) at which to use such information even if he did. (Pinsky Decl. ¶¶ 34-36).[12]

"It is also clear that [Yipit] is chiefly concerned with harm to its business that could be rectified by money damages, and [Yipit] has not shown that alleged injuries to its market standing or client relations will be non-economic beyond making conclusory assertions." *Harley Marine NY, Inc. v. Moore*, No. 1:23-cv-00163 (AMN/CFH), 2023 U.S. Dist. LEXIS 92265, at *23 (N.D.N.Y. Mar. 24, 2023) (finding no irreparable harm where the defendant competitor recruited a tug captain away from the plaintiff and the tug boat captain allegedly "stole trade secrets and confidential information from [plaintiff] by downloading certain files from [plaintiff's] Dropbox" after his employment ended).

Further, Yipit has failed to show that there was any ***prior*** harm to it from the alleged misappropriation. Yipit only offers speculation that it lost business from five customers that it wrongly assumes resulted from the use of its confidential information. Such speculation is insufficient to meet Yipit's burden and is factually disproven here.

---

[12] Yipit attempts to invoke a contract provision to claim "irreparable harm" but the information here does not meet the contractual definition of Proprietary Information as it was information from 18 months after Pinsky's employment and, regardless, such provisions are "not dispositive." *Testing Servs., NA v. Pennisi*, 443 F. Supp. 3d 303, 332 (E.D.N.Y. 2020).

**IV.    Yipit Cannot Establish a Likelihood of Success on the Merits of Whether Pinsky Possessed Confidential Information or That it was Harmed**

Yipit cannot demonstrate that Pinsky (as opposed to Emmett) misappropriated any trade secrets. Yipit speculates that Pinsky accessed files that Emmett saved on Facebook because they were allegedly on Facebook at the same time. It is difficult to see how such "evidence" would ever suffice but, regardless, here, that claimed evidence is directly false – Pinsky had not accessed Facebook for years. (Pinsky Decl. ¶ 11-12 and Ex. B). Pinsky never accessed or possessed the files that Emmett allegedly took. (Pinsky Decl. ¶ 13).

Stripped of the false claim that Pinsky accessed the files at issue, Yipit is left to argue that Pinsky's receipt of a handful of text messages about generic, high-level price information constitutes a misappropriation of trade secrets. Yipit, however, cannot establish that it is likely to prove that such information is a trade secret.

The text messages do not contain any details about pricing methodology or any algorithms that Yipit might use to determine a price. In addition, Yipit's pricing information is often shared with M Science by the customers themselves as part of the customer encouraging competition. (Pinsky Decl. ¶ 26). *See R.R. Donnelley & Sons Co. v. Fagan*, 767 F. Supp. 1259, 1266 n.6 (S.D.N.Y. 1991) (denying injunction and directing verdict in favor of former employee where, in part, the court could not determine whether pricing information was entitled to protection where "Fagan's uncontradicted testimony was that customers frequently tell printing firms the price that another printer has bid on a given job and that if a salesman wants to know what the competition is offering, he can simply ask a client.").

Further, for many of Yipit's claims against Pinsky, Yipit must demonstrate that Pinsky used that information or damaged Yipit. *See, e.g.*, *Tri-Star Lighting Corp. v. Goldstein*, 151 A.D.3d 1102, 1106 (2d Dep't 2017) ("The elements of a cause of action to recover damages for

misappropriation of trade secrets are: (1) possession of a trade secret; and (2) use of that trade secret by the defendant in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means") (quotation omitted). But here, as discussed above, Yipit does not have any evidence that Pinsky used any of the information or damaged Yipit. Yipit can only claim that it lost business from five customers and ignores the host of reasons that could have caused the customers to do so (such as natural competition, issues solely related to the customer, or annoyance over the numerous issues with Yipit's reports at the time).

Yipit cannot succeed by vaguely referring to the Defendants collectively. Yipit cannot demonstrate a likelihood of success as to Pinsky specifically and, as such, is not entitled to a preliminary injunction as to Pinsky.

## V.     A Preliminary Injunction Would be Counter to the Public Interest and Balance of Equities

Yipit has chosen to single out Pinsky from the eight other M Science employees currently known based on M Science's limited investigation, plus M Science itself. To do so, Yipit has gone so far as to not mention M Science in the complaint at all and to name ten "John Does" as defendants rather than identify the individuals known to it. Such conduct cannot be countenanced for a preliminary injunction.

The purpose of a preliminary injunction is to prevent an irreparable injury. But, assuming *arguendo* that Yipit could actually articulate such an injury *by Pinsky* (it cannot), the only way to prevent such an injury would be to enjoin *all* potential causes of it. In this regard, the absence of M Science, the alleged beneficiary of the information, as a defendant by itself defeats the logic of a preliminary injunction.

Instead, Yipit's interest is not stopping an injury at all. Yipit instead is trying to make a public example of Pinsky. It wants to broadcast this action as loudly and as widely as possible. It

wants to make Pinsky permanently unemployable in the only industry in which he has ever worked. It wants to destroy his life and that of his family. All the while Yipit itself has engaged in the same conduct for its own benefit. (Pinsky Decl. ¶ 17). *Grimes v. Green Point Sav. Bank*, 147 B.R. 307, 316 (Bankr. E.D.N.Y. 1992) ("one who seeks equity must do equity. . . . Plaintiff's unclean hands compel denial of her request for a preliminary injunction."). The equities clearly do not favor Yipit which cannot even demonstrate any loss.

## **CONCLUSION**

For the foregoing reasons, Pinsky respectfully requests that Yipit's request for a preliminary injunction against Pinsky be denied and for such other and further relief as the Court deems appropriate.

Dated: November 22, 2024
      New York, New York

                        Respectfully submitted,

                        RASCO KLOCK PEREZ & NIETO, LLC

                        By:   _____

                            Blaine Bortnick
                            James Halter
                        260 Madison Avenue, 16th Floor
                        New York, New York 10016
                        (646) 970-4770
                        *Counsel for Defendant Alexander Pinsky*

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to Paragraph II(D) of the Court's Individual Practices, I hereby certify that the total number of words in this memorandum of law, excluding the cover page, table of contents, table of authorities, and certification of compliance is 6,975.

_____
Blaine Bortnick