UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YIPIT, LLC d/b/a YipitData,<br><br>Plaintiff,<br><br>-v-<br><br>ZACHARY EMMETT, ALEXANDER PINSKY, and JOHN DOES 1-10,<br><br>Defendants. | Case No. 24 Civ. 7854 (JGK)<br><br><br><br>[REDACTED VERSION] |

### DECLARATION OF ALEXANDER PINSKY IN OPPOSITION TO YIPIT, LLC'S MOTION FOR A PRELIMINARY INJUNCTION

I, ALEXANDER PINSKY, being duly sworn, depose and state under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am one of the Defendants in the above-referenced action. I submit this Declaration in opposition to Plaintiff Yipit, LLC's ("Yipit") motion for a preliminary injunction.

2. This Declaration is based on my personal, first-hand knowledge.

3. I am 37 years old. I am married, and my wife and I have two children. We have a son who is 2 years and 2 months old and a daughter who is 10 months old. We live in New Jersey.

4. Attached hereto as Exhibit A is a true and correct copy of my resume. My resume accurately reflects my education and employment history. Since graduating from college in 2010, I have worked only in the industry that provides resources to the financial services industry, principally to the asset management industry (other than a minor four-month stint working on a political campaign immediately after college).

1

5. From August 2019 to December 2022, I was a senior sales executive and then a sales manager at Yipit. Then, from January 2023 until October 2024, I worked at M Science. When I first started at M Science, I was the Head of Client Strategy at M Science. In February 2024, the Vice President of Sales left M Science, and I was promoted into that role.

6. Prior to my promotion, M Science had already been seeking to add a manager to its sales team. M Science interviewed at least ten candidates to my knowledge. Other than Defendant Zachary Emmett ("Emmett"), none of the candidates had a relationship with Yipit.

7. Among the candidates interviewed, M Science nearly extended an offer to a candidate from outside the industry. Instead, however, M Science's CEO (Michael Marrale) and Chief Operating Officer (Joseph Napoli) indicated that they would prefer to hire someone who knew the industry. Then M Science interviewed and informally extended an offer to one person (not related to Yipit), but that offer fell through due to concerns raised late in the process about her employment history. After several additional months went by without finding a suitable candidate, I suggested that M Science representatives speak with Emmett, whom I knew from when we worked together at Yipit.

8. I did not interview Emmett and was not the ultimate decision-maker on hiring Emmett.

9. At no point in the hiring process, or ever, did I ask Emmett to take any Yipit files. Nor was I aware that Emmett took any Yipit information at the time he apparently did so.

10. Yipit's motion papers mention a request that I made for Emmett's resume and for a reference as a formality. With Emmett having successfully interviewed with five M Science personnel (but not me), M Science's human resources conducted a final reference check as it does

for all employees which is typically a mere formality. The process was the same for Emmett as it was for all other M Science hires.

11. At some point after M Science extended Emmett an offer of employment, Emmett informed me that he had access to some of Yipit's files through his Facebook account. Emmett did not disclose the extent of the information, just that he "saved a few things" on Facebook. I did not know that a user could even use Facebook to save files until Emmett informed me that he had done so.

12. I have not used Facebook for years. I had not logged into my Facebook account from approximately 2020 until after this action was filed on October 16, 2024. Attached hereto as Exhibit B is a true and correct copy of the Facebook activity that I was able print from Facebook's records. As part of M Science's investigation, I gave M Science's counsel my Facebook log-in information. The log-in activity on September 23-24, 2024 is presumably M Science's counsel accessing my Facebook account – it was not me.

13. Since leaving Yipit in 2022, I never possessed or accessed any Yipit files.

14. Upon learning that Emmett had Yipit information, numerous people at M Science – from lower-level salespeople up to the Chief Executive Officer – began asking Emmett, either directly or indirectly, for information. For example, M Science's CEO, Michael Marrale, asked me to request information from Emmett about how Yipit packages some of its products.

15. Attached hereto as Exhibit C is a true and correct copy of a Microsoft Teams message (apparently compiled using Bloomberg) dated May 16, 2024 that Yipit produced in this case bearing the Bates numbers YIP0000327 to YIP0000330. The redactions appear in the original produced by Yipit. In addition to myself and Mr. Marrale, the Teams messages includes:

- Valentin Roduit, M Science Chief Revenue Officer (who reported directly to Mr. Marrale and was my direct supervisor), and

- Sante Faustini, M Science's Head of Product Intelligence who reported directly to Mr. Roduit (and who was not in my reporting line).

16. In the documents produced by Yipit in this case alone, I have seen at least ten M Science employees that received Yipit information from Emmett, many without my involvement at all. Just those individuals who are mentioned in documents would equate to approximately 20-25% of M Science's sales force in the mid-2024 time frame.

17. Yipit mentions a handful of texts where Emmett provided me with high-level, generic price information for some of Yipit's customers. The information shared with me is often shared in the industry (I have no comment on anything not shared with me and/or allegedly taken by Emmett as it is not relevant to me). When I was employed at Yipit, Yipit's employees often obtained this type of information. During my time at Yipit, I was aware of Yipit employees Jamie Melzer and Dara Moreno seeking pricing and customer account information regarding Gerson Lehrman Group, Inc., one of Yipit's other competitors and their former employer. When I was employed at Yipit, Yipit itself also maintained (and presumably still maintains) a database containing M Science pricing and other M Science information, such as customer subscription expiration dates.

18. Yipit's motion papers in this case include two letters dated July 15, 2024 that counsel for Yipit sent M Science's general counsel regarding Emmett, as well as a letter to Emmett personally. M Science never shared the letters with me. After receiving the letters, M Science commenced an investigation through an outside counsel.

19. Yipit's motion papers also include a letter dated August 14, 2024 mentioning me and excerpting a purported text message between myself and Emmett. M Science did not share the letter with me and intentionally limited my knowledge of the letter to viewing very limited excerpts over "share screen" while M Science's counsel (M Science's external counsel as well as Jefferies internal counsel) interviewed me. I did not know that I was a potential target of any investigation and that Yipit explicitly threatened litigation against myself, as well as Emmett and M Science. I understand from the context of this litigation, that counsel for M Science led counsel for Yipit to believe I was represented by it. I was not.

20. Counsel for M Science contacted me and numerous other M Science employees as part of its investigation. I fully cooperated in that investigation, including by providing access to my work laptop and personal mobile telephone (which contained my personal emails, text messages, and social media apps), my login credentials for my years-long dormant Facebook account, and my LinkedIn login credentials. At counsel for M Science's direction (purportedly based on instructions from Yipit), I removed all Yipit information in my possession – which consisted of the text messages at issue in this matter. Thus, I no longer have access to any of the information that is the subject of this action (and have not had such access since approximately September 2024).

21. In its motion papers, Yipit identifies five clients that it claims reduced their expenditures at Yipit. I never spoke, directly or indirectly, with any of the five identified clients during the timeframe after information had allegedly been stolen by Emmett and passed to M Science.

22. With respect to the first specific customer that Yipit identifies, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, that customer stopped being a customer of M Science in late

2023 or early 2024, well before any of the allegations here. It did not return as a client. My understanding is that ▇▇▇▇ is struggling as a fund.

23. With respect to the second specific customer that Yipit identifies, ▇▇▇▇▇▇▇▇▇▇▇▇, business from ▇▇▇ is specific to the individual fund managers (also known as "teams"). Yipit cites a text message in which I asked Emmett about ▇▇▇ teams. Emmett responds that Yipit only has one client of the ▇▇▇ teams, ▇▇▇▇▇. However, as I accurately stated in the text message, I asked Emmett about ▇▇▇ because M Science was talking to a different team from ▇▇▇▇▇▇▇▇▇▇▇ represents a different ▇▇▇ team.

24. Moreover, I never pitched any ▇▇▇ business myself and I did not pass along any of the ▇▇▇ information Emmett sent to me (which was only about the ▇▇▇▇▇ team regardless). As such, no Yipit information played any role in either M Science getting business from the ▇▇▇ team at ▇▇▇ or Yipit losing business at ▇▇▇ (which could only involve the ▇▇▇ group at ▇▇▇ – Yipit's only client).

25. With respect to the third customer, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, I never learned any information from Emmett about ▇▇▇▇.

26. Yipit and M Science are competitors. Customers would often disclose to M Science how much they were paying Yipit specifically, because they wanted to encourage competition. Independent of any claims in this case, sometimes M Science's pricing was better. Here, it appears that M Science was less expensive for ▇▇▇▇ due to natural business competition. Also, Yipit and M Science's products are not identical and some clients valued one company's product over the other.

27. I did not pitch ▇▇▇▇, nor was I involved at all in the sales process.

28. With respect to the fourth customer from whom Yipit claims damage, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ was a client of M Science at all times relevant and increased their use of M Science in 2023, well before any of the claims at issue here. To the extent ▇▇▇▇ did indeed reduce their expenditure at Yipit "recently" as Yipit claims, it appears to be the product of natural competition for years when ▇▇▇▇ signed on with M Science and upgraded its spend in 2023. I did not pitch ▇▇▇▇.

29. With respect to the fifth customer from whom Yipit claims damage, ▇▇▇▇▇▇▇ and its fund manager ▇▇▇▇▇▇, I did not receive any Yipit information about that customer.

30. Yipit's motion papers discuss "churn rate" which in our industry means the rate at which customers end their relationship over time.

31. In 2024, Yipit was experiencing serious issues with its reports. Yipit sent an email to its customers stating "Due to a broader technical disruption with a core vendor, we are temporarily delaying publishing for most products." Such technical issues and delays compounded serious errors at Yipit, such as Yipit publishing a report about Shopify, incorrectly stating that Shopify was "▇▇▇▇▇▇." Yipit had to issue a correction the next day stating that, in fact, Shopify was "▇▇▇▇." From publicly-available sources (such as the true and correct copies of articles attached hereto as Exhibit D), I am aware that clients trade on the information Yipit provides. Mistakes such as the Shopify error could directly lead to client trading losses and, of course, a lack of trust in Yipit.

32. Yipit allegations discuss a text exchange between Emmett and myself regarding one of Yipit's customers, ▇▇▇▇▇. Emmett describes his contact at ▇▇▇▇▇ as "[m]aybe the biggest a-hole in the entire industry." Emmett then blows off steam and complains about ▇▇▇▇▇ as a

customer. In response, I made the joke that ▮▮▮▮ "can be [Emmett's] first" client when he joins M Science. It is clear from the context that I was joking – Emmett clearly does not believe that ▮▮▮▮ is a good customer and would not want to work with the contact there anymore. There is nothing inappropriate about the exchange and, to the extent confidential information was disclosed, I did not use any such information.

33. On October 22, 2024, I resigned my employment with M Science.

34. I have been trying to find new employment since I resigned from M Science, but I have found it impossible due to this matter and the press attention that it has received.

35. As a result of my lack of employment prospects (compounded by the press publications), myself and my family are facing financial hardship. I have no employment income, and my wife is a stay-at-home mother to our infant and toddler.

36. I do not currently have any Yipit information. M Science, at Yipit's demand, forensically reviewed my work laptop and my mobile telephone which contained, among other things, my personal email, text messages, and social media. Also, at Yipit and M Science's demand, we wiped all potentially problematic information from my device, including scrubbing my text messages (which is the only way that Emmett and I communicated with respect to the information at issue in this action). At least two others M Science employees went through the same process.

37. Before I learned of the action or resigned from M Science, through M Science's counsel, Yipit demanded that M Science provide a "Certification" from me attesting that all of the information at issue here had been removed. I provided that certification. A true and correct copy of the certification is attached hereto as Exhibit E, which Yipit produced in this matter with Bates number YIP0000244.

38. Apart from the documents produced by Yipit in this action, I am unable to generate any kind of "list" from memory or any other source as demanded by Yipit. I could not have even generated a "list" without reference to documents underlying Yipit's production prior to this action.

39. Yipit's parent company is the global private equity firm The Carlyle Group LP ("Carlyle").

40. M Science's parent company is global investment firm Jefferies Financial Group ("Jefferies").

41. Carlyle is what is known as a "buy side" firm – it primarily purchases investments in companies sourced by outside investment bankers or through its internal research. It thereafter sells such companies.

42. Jeffries, on the other hand, is known as a "sell side" firm. With respect to its investment banking division, it sources deals and sells them to investors such as Carlyle. It also and acts as advisors to firms such as Carlyle seeking to buy and sell investments.

43. In order to identify the M Science employees listed in the documents provided by Yipit or otherwise referenced in this application, their names/titles are as follows:

   a. Michael Marrale, Chief Executive Officer
   b. Valentin Roduit, former Chief Revenue Officer reporting directly to the Chief Executive Officer
   c. Joseph Napoli, Chief Operating Officer reporting directly to the Chief Executive Officer
   d. Sante Faustini, Head of Product Intelligence reporting to Mr. Roduit
   e. Shelby Yoshida, Head of New Business
   f. Natalie Green, New Business
   g. Defendant Zachary Emmett, former Head of Account Management (also a former Yipit employee)
   h. Aaron Fuchs, Account Management (also a former Yipit employee)
   i. Kelley Jefferies, Account Management
   j. Stephanie van der Luft (formerly in M Science Account Management)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 22, 2024
       Bernardsville, New Jersey

                                                                            _____
                                                                               ALEXANDER PINSKY