**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| YIPIT, LLC d/b/a YipitData | |
|                Plaintiff, | |
| | Case No. 1:24-cv-07854-JGK (RFT) |
|    v. | |
| | **JURY TRIAL DEMANDED** |
| ZACHARY EMMETT, ALEXANDER PINSKY, VALENTIN RODUIT, MICHAEL MARRALE, M SCIENCE LLC, and JOHN DOES 1-10, | **[REDACTED VERSION]** |
|                Defendants. | |

**PLAINTIFF YIPIT'S MEMORANDUM OF LAW**
**<u>IN SUPPORT OF PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Page(s)

I.  INTRODUCTION ........................................................................................................1

II.  FACTUAL BACKGROUND ......................................................................................3

    A.  Yipit's Business and Trade Secrets.................................................................3

    B.  Defendants' Extensive Misappropriation ................................................5

    C.  Yipit's Efforts to Recover its Trade Secrets ...........................................11

III.  ARGUMENT .............................................................................................................12

    A.  Yipit Is Highly Likely to Succeed on its Trade Secret Claims............................13

        1.  Yipit Owns Protectable Trade Secrets. ....................................................13

        2.  M Science, Marrale, and Roduit Misappropriated Yipit's Trade Secrets. ...................................................................................................16

    B.  Yipit Will Suffer Irreparable Harm Without an Injunction. ..................................20

    C.  The Balance of Hardships Strongly Favors Yipit.................................................22

    D.  The Public Interest Favors a Preliminary Injunction. ............................................24

    E.  The Court Should Not Require Yipit to Post a Bond..............................................24

IV.  CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

FEDERAL CASES

*725 Eatery Corp. v. City of New York*,
    408 F. Supp. 3d 424 (S.D.N.Y. 2019)....................................................................13

*Airbnb, Inc. v. City of New York*,
    373 F. Supp. 3d 467 (S.D.N.Y. 2019)....................................................................20

*Ayco Co., L.P. v. Feldman*,
    No. 1:10-CV-1213 GLS/DRH, 2010 WL 4286154 (N.D.N.Y. Oct. 22, 2010) ................14, 23

*Ayco Co., L.P. v. Frisch*,
    795 F. Supp. 2d 193 (N.D.N.Y. 2011)................................................................20, 21

*BaseCap Analytics Inc. v. Amenn*,
    No. 1:23-CV-09370-MKV, 2023 WL 8113524 (S.D.N.Y. Nov. 22, 2023) ...........................24

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015)...............................................................12, 20, 23, 24

*Brainwave Sci., Inc. v. Arshee, Inc.*,
    No. 21-CV-4402 (BMC), 2021 WL 6211630 (E.D.N.Y. Dec. 14, 2021) .............................24

*Bulman v. 2BKCO, Inc.*,
    882 F. Supp. 2d 551 (S.D.N.Y. 2012)......................................................................21

*Capstone Logistics Holdings, Inc. v. Navarrete*,
    No. 17-cv-4819 (GBD), 2018 WL 6786338 (S.D.N.Y. Oct. 25, 2018),
    aff'd and remanded in part, 796 F. App'x 55 (2d Cir. 2020)............................................20, 22

*Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*,
    602 F. Supp. 3d 663 (S.D.N.Y. 2022)..................................................................14, 15

*Citizens Sec., Inc. v. Bender*,
    No. 1:19-CV-916, 2019 WL 3494397 (N.D.N.Y. Aug. 1, 2019) ...........................................22

*Clarkson Co., Ltd. v. Shaheen*,
    544 F.2d 624 (2d Cir. 1976)...............................................................................24

*Coastal Distrib., LLC v. Town of Babylon*,
    No. 05 CV 2032 JS ETB, 2006 WL 270252 (E.D.N.Y. Jan. 31, 2006), aff'd as
    modified, 216 F. App'x 97 (2d Cir. 2007)................................................................21

*Credit Suisse Sec. (USA) LLC v. Ebling*,
    No. 06 CIV. 11339 (RCC), 2006 WL 3457693 (S.D.N.Y. Nov. 27, 2006) ...........................23

*In re Dana Corp.*,
    574 F.3d 129 (2d Cir. 2009)............................................................................14

*Doctor's Assocs., Inc. v. Stuart*,
    85 F.3d 975 (2d Cir. 1996)............................................................................24

*eShares, Inc. v. Talton*,
    727 F. Supp. 3d 482 (S.D.N.Y. 2024)............................................................14

*ExpertConnect, L.L.C. v. Fowler*,
    No. 18 CIV. 4828 (LGS), 2019 WL 3004161 (S.D.N.Y. July 10, 2019) ..............16

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)............................................................................21

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
    730 F.2d 61 (2d Cir. 1984) (per curiam)........................................................20

*Golden Krust Patties, Inc. v. Bullock*,
    957 F. Supp. 2d 186 (E.D.N.Y. 2013) ............................................................25

*Hirschfeld v. Stone*,
    193 F.R.D. 175 (S.D.N.Y. 2000) ....................................................................20

*Iacovacci v. Brevet Holdings, LLC*,
    437 F. Supp. 3d 367 (S.D.N.Y. 2020).....................................................13, 15

*IDG USA, LLC v. Schupp*,
    416 F. App'x 86 (2d Cir. 2011) ....................................................................22

*IME Watchdog, Inc. v. Gelardi*,
    732 F. Supp. 3d 224 (E.D.N.Y. 2024) ............................................................14

*Intertek Testing Servs., N.A., Inc. v. Pennisi*,
    443 F. Supp. 3d 303 (E.D.N.Y. 2020) ..............................................20, 22, 24

*KCG Holdings, Inc. v. Khandekar*,
    No. 17-CV-3533 (AJN), 2020 WL 1189302 (S.D.N.Y. Mar. 12, 2020) ..............22

*Liberty Power Corp., LLC v. Katz*,
    No. 10-CV-1938 NGG CLP, 2011 WL 256216 (E.D.N.Y. Jan. 26, 2011) ............14

*MacDermid, Inc. v. Selle*,
    535 F. Supp. 2d 308 (D. Conn. 2008)............................................................22

*Medidata Sols., Inc., v. Veeva Sys. Inc.*,
    No. 17 CIV. 589 (LGS), 2018 WL 6173349 (S.D.N.Y. Nov. 26, 2018)................18

*Medtech Prods. Inc. v. Ranir, LLC*,
   596 F. Supp. 2d 778 (S.D.N.Y. 2008) ................................................................18

*Mercer Health & Benefits LLC v. DiGregorio*,
   307 F. Supp. 3d 326 (S.D.N.Y. 2018) ................................................................23

*Mission Cap. Advisors LLC v. Romaka*,
   No. 16 CIV. 5878 (LLS), 2016 WL 11517104 (S.D.N.Y. July 29, 2016) ............23

*N. Atl. Instruments, Inc. v. Haber*,
   188 F.3d 38 (2d Cir. 1999) ................................................................................20

*Plaza Motors of Brooklyn, Inc. v. Bogdasarov*,
   No. 21-CV-6545 (KAM), 2021 WL 5630910 (E.D.N.Y. Dec. 1, 2021) .........23, 24

*Salinger v. Colting*,
   607 F.3d 68 (2d Cir. 2010) ................................................................................12

*Shamrock Power Sales, LLC v. Scherer*,
   No. 12-CV-8959 (KMK), 2015 WL 5730339 (S.D.N.Y. Sept. 30, 2015) ............15

*Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*,
   No. 15 CIV. 211 (LGS), 2021 WL 1553926 (S.D.N.Y. Apr. 20, 2021),
   aff'd in part, vacated in part on other grounds, 68 F.4th 792 (2d Cir. 2023) ........24

*TileBar v. Glazzio Tiles*,
   723 F. Supp. 3d 164 (E.D.N.Y. 2024) ................................................................17

*Webcraft Techs., Inc. v. McCaw*,
   674 F. Supp. 1039 (S.D.N.Y. 1987) ...................................................................14

*Yang v. Kosinski*,
   960 F.3d 119 (2d Cir. 2020) ..............................................................................23

STATE CASES

*Marcone APW, LLC v. Servall Co.*,
   85 A.D.3d 1693 (4th Dep't 2011) ......................................................................21

*Minn. Min. & Mfg. Co. v. Tech. Tape Corp.*,
   23 Misc. 2d 671 (N.Y. Sup. Ct. 1959), aff'd, 15 A.D.2d 960 (N.Y. App. Div.
   1962) ............................................................................................................17, 18

FEDERAL STATUTES

18 U.S.C. § 1836(b)(1) ............................................................................................13

18 U.S.C. § 1839(3) ...........................................................................................14, 15

18 U.S.C. § 1839(5) ................................................................13, 16, 17, 19

18 U.S.C. § 1839(6)(A) ...................................................................17, 19

**FEDERAL RULES**

Fed. R. Civ. P. 65(c) ...............................................................................24

## I. INTRODUCTION

Yipit, LLC ("Yipit") originally brought this case against two of its former employees, Zachary Emmett ("Emmett") and Alexander Pinsky ("Pinsky"), after discovering that they extensively misappropriated Yipit's trade secrets and used them to benefit their new employer, M Science LLC ("M Science"). Since then, Yipit has obtained additional evidence proving that the misappropriation extended *far* beyond these two individuals. More than a dozen M Science employees (which equates to about 25% of its sales force) received or used Yipit's trade secrets. The highest levels of M Science's leadership—including its then-Chief Revenue Officer, Valentin Roduit ("Roduit"), and its current CEO, Michael Marrale ("Marrale")—directed, ratified, and/or actively participated in this misappropriation. Yipit made every effort to recover its trade secrets and resolve its dispute with M Science without resorting to litigation. When those efforts failed, Yipit swiftly amended its complaint to name M Science, Roduit, and Marrale as defendants and now moves for a preliminary injunction against them on Counts 1 and 2 of the Second Amended Complaint.[1]

The Court should grant this relief, as Yipit readily meets all four requirements for a preliminary injunction. ***First***, Yipit is highly likely to succeed on its trade secret misappropriation claims against M Science, Roduit, and Marrale. The misappropriated

---

[1] Yipit previously moved for preliminary injunctive relief against Emmett and Pinsky, *see* Dkt. No. 12, but the hearing was stayed pending settlement negotiations, and would be mooted by the contemplated settlements in principle, which include permanent consent injunctions, *see* Dkt. No. 76. Should settlement discussions fall apart, Yipit will promptly seek to reinstate the hearing on that motion.

information—including comprehensive lists of customer preferences and contract terms, Yipit's proprietary pricing strategies, and details about Yipit's deals with third-party data vendors—constitutes some of Yipit's most competitively sensitive assets. Yipit safeguards this information carefully. Nonetheless, M Science, Roduit, and Marrale improperly acquired these trade secrets from Emmett and Pinsky, disclosed them to many of M Science's executives and sales employees, and used them to unfairly recruit Yipit's customers to M Science.

*Second*, Yipit faces an imminent risk of irreparable harm from the disclosure and use of its trade secrets. M Science, Roduit, and Marrale already stole some of the most important and competitively useful trade secrets in Yipit's business. As it stands, *nothing* prevents them from continuing to use this information to target Yipit's customers, undermine Yipit's relationships with its data vendors, or get a head start on improving its own competing products. Without an injunction, there is a substantial and urgent risk that Yipit will lose customers and/or beneficial contractual arrangements (indeed, evidence suggests it already has), miss out on long-term growth, and suffer the diminution of its goodwill and reputation in a competitive market. Moreover, Roduit has left M Science and obtained new employment, and there is an immediate risk that Roduit will further disseminate Yipit's secrets in his new position.

*Third*, the balance of the equities tips decisively in Yipit's favor. In sharp contrast to the profound harm that Yipit would face without an injunction, M Science, Roduit, and Marrale would face no hardships from an injunction. As to M Science and Marrale, Yipit's requested relief would merely prevent them from further misappropriating Yipit's trade secrets, which they are not entitled to do, and require them to return Yipit's secrets, which they have no right to possess. Yipit requests an additional provision as to Roduit, who is no longer employed by M Science, to prohibit him from returning to work for M Science or working for any other company

to whom he has disclosed Yipit's trade secrets.  But this restriction will impose no undue hardship.  So long as Roduit has not disclosed or used Yipit's trade secrets in his new job, this provision will simply preserve the status quo—and if he *has* disseminated Yipit's trade secrets to his new employer, any resulting hardship is of his own making.

*Last*, but not least, a preliminary injunction would further the public's interest in protecting trade secrets and fostering innovation.  For the reasons described herein and in the declarations submitted herewith and previously (*see* Dkt. Nos. 8, 13-15, 68), this Court should grant Yipit's requested preliminary injunction.

## II.    FACTUAL BACKGROUND

### A.    Yipit's Business and Trade Secrets

Yipit is a leading market research firm that specializes in alternative data, such as credit card data, consumer receipts, mobile device data, social media data, and web scraping data.  Dkt. No. 13 ("First Melzer Decl.") ¶¶ 3-5.  Yipit compiles alternative data into over 100 research reports, which are then divided into two primary data feeds and several core packages (including the "red," "blue," "green," "cloud," "medtech," and "consumer" packages).  *Id.* ¶ 6.  Yipit's customers choose which products to receive, and Yipit offers individualized pricing based on those selections and the attributes of each customer.  *Id.*  Yipit has more than 500 customers worldwide, most of which are investment companies.  *Id.* ¶ 4.

To run its business, Yipit develops, maintains, and continuously uses a variety of trade secrets, such as:

- ***Proprietary data sources*** that underlie Yipit's product offerings, including the identities of third-party data vendors and the terms of Yipit's contracts with those vendors;

- ***Comprehensive customer lists***, which include the names, contact information, subscriptions, pricing details, and contract renewal dates for Yipit's customers;

- ***Customer analyses***, which include, among other things, assessments of the health of Yipit's customer accounts, analyses on customer engagement, notes about Yipit's customer interactions, the strengths and weaknesses in Yipit's customer relationships, any long-term threats to those relationships, opportunities for expansion, and the risk that customers will "churn," *i.e.*, decide not to renew their contracts with Yipit;

- ***Proprietary pricing information***, as well as guidance for employees on any applicable discounts and pricing strategies; and

- ***Historical accuracy reports*** measuring the current and historical accuracy of Yipit's data product reporting.

*See id.* ¶ 8; Dkt. No. 68 ("Second Melzer Decl.") ¶ 10-11.

Yipit takes great pains to protect these trade secrets from disclosure, including through sophisticated technical and physical security measures, robust data use policies, regular employee training, and mandatory confidentiality agreements. *See* Dkt. No. 14 ("Pasquale Decl.") ¶¶ 7-8; Dkt. No. 8 ("Frawley Decl.") ¶¶ 4, 8, 12. Yipit uses additional measures to protect its data sources, which are "some of the most highly sensitive and confidential information in its business." Second Melzer Decl. ¶ 11. In almost all cases, Yipit is contractually obligated to keep the names of its third-party data vendors and the deals' terms confidential. *Id.* Yipit also uses code names for its data vendors to prevent even its own employees who work on the data sets from knowing their source. *Id.*

## B. Defendants' Extensive Misappropriation

M Science has engaged in a longstanding, concerted scheme to recruit Yipit employees—including former Yipit employees Alexander Pinsky, Zachary Emmett, Aaron Fuchs, and many others—and misappropriate Yipit's trade secrets in the process. As a key example, no later than March 2024, M Science (through Pinsky, its then-VP of Sales; its then-CRO Valentin Roduit; its CEO Michael Marrale; and others) began recruiting Emmett, who was then a Director of Business Development at Yipit, to be its Head of Account Management. Over the next several months, Emmett served as a self-described "mole" "[f]or mscience." Declaration of Taylor Benninger in Support of Preliminary Injunction (January 30, 2025) ("Benninger Decl."), Ex. 2 at YIP0000423.

From the outset, M Science recruited Emmett based on his knowledge of and willingness to disclose Yipit's trade secrets. On March 13, 2024, Pinsky and Roduit exchanged text messages in which Roduit asked for "a confident guide" about one of Yipit's customers, ███. *Id.* at YIP0000361. Pinsky responded that he's "got my boy Zach [Emmett]," who was "in to work" at M Science. *Id.* Within minutes, Pinsky texted Emmett asking for confidential, trade secret details about ███, and Emmett responded with Yipit's exact pricing information for this customer, which Pinsky immediately sent to Roduit. *Id.* at YIP0000272, 274, 362. Less than an hour later, Pinsky obtained trade secret information about another Yipit customer, ███████████████████████, from Emmett. *Id.* at YIP0000275-76. Pinsky sent screenshots of Emmett's illicit disclosures to Roduit, remarking: "This alone is hirable." *Id.* at YIP0000362-63, 366-67. Clearly agreeing with Pinsky that Emmett could provide the trade secrets M Science was seeking, Roduit responded: "Bring him [in]." *Id.* at YIP0000363. Roduit interviewed Emmett the next day. Benninger Decl., Ex. 1 at 2.

Yipit's trade secrets remained front and center throughout M Science's recruitment of Emmett. On April 10, for example, Emmett, Pinsky, Roduit and Marrale met informally for drinks—where they planned to discuss the proprietary methodology underlying Yipit's AAPL ticker report (another of Yipit's trade secrets). *See id.*; Pasquale Decl., Ex. 9 at 3-4. A few weeks later, Emmett was already negotiating a bespoke compensation package from M Science, and after musing whether he was "demanding too much," he solved that problem by immediately providing sensitive, trade secret information about yet another Yipit customer. Pasquale Decl., Ex. 9 at 12. Notably, all of this occurred before Emmett had even sent M Science his resume. Once he finally provided it, Emmett had an offer from M Science within days. *See id.* at 14 (Emmett reports sending resume on April 25); Benninger Decl., Ex. 1 at 2 (M Science made offer on April 27).

Meanwhile, Emmett fulfilled his role as a "mole" for M Science. Between March and May 2024, he exfiltrated at least eight files containing Yipit's trade secret information, including comprehensive customer lists of Yipit's investor customers and details about Yipit's proprietary AAPL ticker report, for his later use at M Science. Pasquale Decl. ¶ 11; First Melzer Decl. ¶ 17. Emmett also transmitted at least one file containing Yipit's trade secrets for immediate use at M Science. On May 1, Pinsky texted Emmett requesting a "general guide" on two of Yipit's customers (███████████) if Emmett had "facebook open." Pasquale Decl., Ex. 9 at 18. Less than an hour later, Emmett uploaded a file called "████ Overlap"—which contained information about ███████████, and many other Yipit customers—to Facebook's file-sharing or messaging platform. *Id.* ¶¶ 11, 26-27. "This sequence of events indicates that Mr. Emmett sent the '████ Overlap' file to Mr. Pinsky over Facebook." *Id.* ¶ 27.

In addition to sending files, Emmett also repeatedly provided M Science with confidential information about Yipit's customers by texting and calling Pinsky (M Science's VP of Sales) and another former Yipit employee who defected to M Science, Aaron Fuchs ("Fuchs"). Between March and June 2024, Pinsky solicited Yipit's trade secret information from Emmett, and Emmett provided it, no fewer than 18 times. Pasquale Decl. ¶¶ 17, 20-22, Ex. 9. Those trade secrets included sensitive details about specific Yipit customers, such as their exact contract prices and renewal dates, the identities of Yipit employees who managed the accounts, details about Yipit's interactions with the customers, and approaches M Science might take to steal those customers. *See id.* Ex. 9; First Melzer Decl. ¶¶ 22-26. By May 24, Emmett was also providing similar trade secrets to Fuchs, who on several occasions immediately used that information to help M Science target Yipit's customers. *See* Benninger Decl., Ex. 2 at YIP0000410-35.

These trade secrets quickly spread through the ranks at M Science. Frequently, Pinsky sent the information he received from Emmett to Roduit (M Science's CRO). *See, e.g.*, *id.* at YIP0000387-88, 396-97, 405-06, 409. On several occasions, the two executives strategized in response, and on at least one occasion, Roduit expressly endorsed Emmett's "oversharin[g]." *Id.* at YIP0000405-06. Pinsky also conveyed Yipit trade secrets he acquired from Emmett to M Science's highest executives, including Marrale (the CEO) and Sante Faustini, M Science's Vice President of Product Intelligence. *Id.* at YIP0000327-29. Among other things, Pinsky disclosed highly sensitive information about Yipit's contract with a key data provider:



```
05/16/2024 07:24:40 UTC alex.pinsky (alex.pinsky@mscience.com) posted: (Network Message
ID: 29a0934d3caeade9e47edb4742902edc9bd1eafb1956a5109f8d86fcb1620c2e___1715858680572)
Spoke to Zach last night to just catch up.
They don't sell        outside of regular pricing but have a           (industry type
note) that is separate and more $
Only individual ticker higher priced is
Also said launching on        next week
Q3 will be first          product launches        and        most likely
They just signed  year extension with           , says panel helpful for
data
```

*Id.* at YIP0000328. Far from expressing surprise, dismay, or discouragement at this illicit disclosure, Marrale clearly expected, welcomed, and ratified it, discussing the stolen trade secrets with the other M Science executives and asking follow-up questions about Yipit's "Apple methodology" (*i.e.*, the proprietary data and methodology underlying Yipit's AAPL product, another Yipit trade secret). *Id.* at YIP0000328.

Once Emmett officially joined M Science, he continued to misappropriate Yipit's trade secrets on M Science's behalf. Emmett started at M Science on June 17, 2024, while he was still a Yipit employee. Benninger Decl., Ex. 1 at 3; Frawley Decl. ¶ 7. He logged into his Yipit account that same day, apparently from M Science's New York office. Pasquale Decl. ¶ 28, Ex. 9 at 49, Ex. 10. He also did a "cross check" of M Science's and Yipit's accounts using the trade secret files he stole, to look for potential new business for M Science. *Id.* Ex. 9 at 50. On his second day, Emmett again used the trade secrets he stole to create a list of customer accounts that underpaid at M Science compared to Yipit. *Id.* at 52. Emmett, Pinsky, and Roduit reviewed this list (over screenshare, to hide their misdeeds) and plotted to "share" it throughout M Science and "attack" the information for M Science's benefit, *id.*:



Emmett and Pinsky later continued to reference "the list" in their efforts to steal Yipit's customers for M Science. Benninger Decl., Ex. 2 at YIP0000349.

M Science also misappropriated (at least) one of Yipit's trade secret customer lists wholesale. As described above, Emmett saved Yipit's customer lists to his Facebook account, which he could access on his phone. Roduit, in his capacity as M Science's CRO, asked Emmett if he could review a Yipit customer list. Emmett agreed and gave his phone to Roduit, who walked away with it. From there, Roduit had ample motivation and opportunity to take screenshots, make copies, or send the list to himself or others. Afterwards, Roduit suggested that Emmett print out the list, which would enable its easy and surreptitious distribution at M Science. *See* Dkt. No. 84 ¶¶ 9, 111.

In the days and weeks thereafter, Yipit's trade secret information spread rampantly throughout M Science. Indeed, Pinsky admitted in his sworn declaration that "numerous people at M Science—from lower-level salespeople up to the Chief Executive Officer—began asking

Emmett, either directly or indirectly, for [Yipit's] information" and that "[j]ust those individuals who are mentioned in documents would equate to approximately 20-25% of M Science's sales force."  Dkt. No. 53 ("Pinsky Decl.") ¶¶ 14-16.  For example:

- On June 18, 2024, Emmett sent Pinsky and M Science's Director of New Business, Shelby Yoshida ("Yoshida"), a list of "funds that have ability to spend" "in rough order," which were "new biz" opportunities.  Benninger Decl., Ex. 2 at YIP0000475.

- On June 20, Emmett disclosed information about Yipit customers to Stephanie Von Der Luft, a Senior Sales and Account Manager at M Science, who responded, "I love all the intelligence – adding value week 1!"  *Id.* at YIP0000462-63.

- On June 21, Emmett disclosed a "[s]uper secretive" Yipit customer, █████, to Pinsky, Roduit, and Yoshida; Roduit started a separate thread for Emmett to pursue that customer.  *Id.* at YIP0000469.

- On July 10, Yoshida asked Emmett if he knew "what [YipitData] had in front of ████," a prospective Yipit customer, and Emmett responded with details about ████ status when he left Yipit.  *Id.* at YIP0000246.

M Science's extensive misappropriation has already caused Yipit considerable harm.  By October 2024, Yipit had identified at least five customers—███████████████████████████████████████████████████████████████—that unexpectedly "churned," *i.e.*, declined to renew their contracts with Yipit, apparently in connection with M Science's misappropriation.  *See* First Melzer Decl. ¶¶ 26, 30.  Given the nature of Yipit's business, the loss of *any* customer constitutes irreparable harm due to lost growth opportunities and lost goodwill.  *See id.* ¶¶ 29-31.

### C.     Yipit's Efforts to Recover its Trade Secrets

Yipit began investigating Emmett's misappropriation in July 2024, after learning that Emmett, contrary to his prior representations, had accepted a position at M Science.  Pasquale Decl. ¶¶ 9-10.  That investigation revealed Emmett's exfiltration of at least eight trade secret files.  *Id.* ¶ 11.  Yipit promptly retained outside counsel, who sent letters to Emmett and M Science outlining Yipit's initial findings.  Dkt. No. 15 ("Smolowe Decl.") ¶¶ 2-3, Exs. 1-2. Subsequently, Emmett returned his Yipit laptop, and upon inspecting that device, Yipit discovered months of saved text messages with smoking-gun evidence of Emmett and Pinsky's misappropriation.  Pasquale Decl*.* ¶¶ 17-24, Ex. 9.  Yipit sent additional letters to M Science; in response, M Science represented it would conduct an investigation.  *See* Smolowe Decl., Ex. 5 at 1.  But although M Science kept promising to return Yipit's information, it repeatedly delayed doing so.  *Id.* at ¶¶ 10-13.  Accordingly, Yipit sued Emmett and Pinsky to protect its secrets, while continuing its broader investigation into M Science.

After Yipit initiated this suit, M Science finally gave Yipit the results of its "investigation," which consisted of one 240-page PDF with roughly 80 pages of redactions. Benninger Decl., Ex. 2.  That production revealed approximately a dozen M Science employees and executives—including Marrale, Roduit, Sante Faustini (M Science's VP of Product Intelligence), Shelby Yoshida (its Director of New Business), and many others—who were active participants in the misappropriation.  Further, Pinsky subsequently submitted a declaration confirming that, "[u]pon learning that Emmett had Yipit information, numerous people at M Science – from lower-level salespeople up to the Chief Executive Officer – began asking Emmett, either directly or indirectly, for [that] information," and that "[j]ust those individuals who are mentioned in documents would equate to approximately 20-25% of M Science's sales force."  Pinsky Decl. ¶¶ 14, 16.  Pinsky's declaration also provided new evidence that "M

Science's CEO, Michael Marrale, asked [Pinsky] to request information from Emmett about how Yipit packages some of its products." *Id.* ¶ 14.

Given this extensive evidence, it became abundantly clear that M Science's response was woefully inadequate, and its "investigation" incomplete. M Science inspected the phones of only three employees (Pinsky, Roduit, and Fuchs), despite obtaining proof that several others had Yipit information on their phones. Benninger Decl., Ex.1 at 1. It reviewed the Facebook and LinkedIn accounts of only two employees (Emmett and Pinsky). *Id.* It apparently did *not* inspect any of its employees' personal email addresses or cloud storage accounts *at all*. *See id.* And despite purportedly conducting a "thorough search," it was "not willing" to certify that M Science no longer possessed Yipit's information. *Id.* at 1-2.

Yipit continued its attempts to resolve its dispute with M Science and obtain sufficient protections for its trade secrets outside of court. But on January 16, Yipit's negotiations with M Science failed. Concerned about the further misappropriation by M Science, Marrale, and Roduit, Yipit immediately sought permission to add these defendants to this case, *see* Dkt. No. 79, and then, within one day of filing the amended pleading, sought a preliminary injunction.

## III.   ARGUMENT

"A party seeking a preliminary injunction must demonstrate: (1) 'a likelihood of success on the merits . . . '; (2) a likelihood of 'irreparable injury in the absence of an injunction'; (3) that 'the balance of hardships tips in the plaintiff's favor'; and (4) that the 'public interest would not be disserved' by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (quoting *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010)). Yipit meets every one of these requirements.

### A.    Yipit Is Highly Likely to Succeed on its Trade Secret Claims.

To meet the first requirement for injunctive relief, Yipit needs to show that it is "more likely than not to succeed" "on the merits of at least one of [its] claims." *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019) (citations omitted).  Yipit's trade secret claims (Counts 1 & 2) easily meet this standard.[2]  The facts and law establish that (1) Yipit owns protectable trade secrets, and (2) M Science, Roduit, and Marrale misappropriated those secrets.  *See* 18 U.S.C. § 1839(5) (defining trade secret misappropriation under Defend Trade Secrets Act ("DTSA")); *see also Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (the "elements for a misappropriation claim under New York law are fundamentally the same" as a DTSA claim).[3]

### 1.    Yipit Owns Protectable Trade Secrets.

The highly confidential and competitively sensitive Yipit information and files at issue— including detailed customer lists; customer-specific pricing, subscription, and renewal information; the terms of Yipit's contracts with third-party data vendors; and proprietary details about Yipit's products—all constitute Yipit's trade secrets under the DTSA and New York common law.  *See* First Melzer Decl. ¶¶ 8-9, 16-23.

---

[2] Yipit is likely to succeed on all of its claims, but this brief focuses on those causes of action for which Yipit seeks preliminary injunctive relief.

[3] A DTSA claim has an additional element: that the trade secrets "relate to products and services used in interstate commerce."  18 U.S.C. § 1836(b)(1).  Yipit's secrets meet this requirement because they underlie Yipit's data feeds and packages and enable Yipit to provide these products to customers across the country and worldwide.  *See* First Melzer Decl. ¶¶ 3-7.

**First**, this information is the kind of "financial, business," "technical," or "economic" information protected by trade secret laws. 18 U.S.C. § 1839(3). Customer lists, for example, can qualify as "confidential information deserving protection." *Ayco Co., L.P. v. Feldman*, No. 1:10-CV-1213 GLS/DRH, 2010 WL 4286154, at *11 (N.D.N.Y. Oct. 22, 2010). This is particularly true where, as here, it is a "difficult process to educate and convert a prospective customer" into an actual customer, *Webcraft Techs., Inc. v. McCaw*, 674 F. Supp. 1039, 1045 (S.D.N.Y. 1987), and where "the identity of customers is . . . kept in confidence," *IME Watchdog, Inc. v. Gelardi*, 732 F. Supp. 3d 224, 239 (E.D.N.Y. 2024); *see* First Melzer Decl. ¶¶ 5-9, 19-20, 31. Likewise, "customer-specific data such as pricing arrangements and contract renewal dates" can "constitute[] trade secrets." *Liberty Power Corp., LLC v. Katz*, No. 10-CV-1938 NGG CLP, 2011 WL 256216, at *2 (E.D.N.Y. Jan. 26, 2011) (collecting cases); *accord In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009) (similar). The same is true of Yipit's internal product information, including its proprietary data sourcing and methodologies. *See, e.g.*, *eShares, Inc. v. Talton*, 727 F. Supp. 3d 482, 492 (S.D.N.Y. 2024) (treating "proprietary methodologies" as trade secrets).

**Second**, Yipit takes "reasonable measures" to maintain the secrecy of its information. 18 U.S.C. § 1839(3)(A); *see Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 672 (S.D.N.Y. 2022) ("the 'most important consideration'" under New York law "is 'whether the information was secret'" (citation omitted)). Yipit's supporting declarations describe these measures in depth. *See* Pasquale Decl. ¶¶ 7-8; Frawley Decl. ¶¶ 4, 8, 12; Second Melzer Decl. ¶ 11. To summarize, Yipit uses an array of technical tools, including company-managed laptops, password-protected accounts, endpoint protection, intrusion detection, and data loss protection tools. Pasquale Decl. ¶ 7. It also contractually requires its employees to keep its

trade secrets confidential, Frawley Decl., Exs. 1-2 § 1.1-1.2, and provides detailed guidance for employees in its Compliance Manual and Information Security Policy, Pasquale Decl. ¶ 8(b), Exs. 4-5. Yipit even uses code names for its third-party data vendors to keep their identities secret from Yipit employees who work on the data sets. Second Melzer Decl. ¶ 11; *see also Iacovacci*, 437 F. Supp. 3d at 380 (considering "the extent to which [information] is known by employees" in determining whether information is trade secret (citation omitted)). "These measures are in line with those found by courts to reasonably guard the secrecy of information warranting trade secret protection." *Catalyst Advisors*, 602 F. Supp. 3d at 676 (collecting cases).

*Third*, Yipit's information derives independent economic value from not being generally known to, or readily ascertainable by, others who can obtain economic value from it. *See* 18 U.S.C. § 1839(3)(B). The information at issue includes spreadsheets compiling *all* of Yipit's investor customers, the status of each account, their spending and subscriptions, precise renewal dates, and associated Yipit contacts. First Melzer Decl. ¶ 19, 21, 23. To develop this information, Yipit "devoted significant time, effort, and money to establishing relationships with its Customer Contacts over a number of years" and to learning "the purchasing needs and preferences of its Customers." *Shamrock Power Sales, LLC v. Scherer*, No. 12-CV-8959 (KMK), 2015 WL 5730339, at *26 (S.D.N.Y. Sept. 30, 2015) (collecting cases); *see* First Melzer Decl. ¶¶ 6-7, 9, 19, 21, 23, 30-31. There is no industry knowledge or public source from which a non-Yipit employee could replicate this information. First Melzer Decl. ¶¶ 6, 9, 17, 19.

Nor is there any public source from which a competitor could derive the identities of Yipit's customers and third-party data vendors, much less details about individual customers' subscriptions or the ways Yipit uses data from particular vendors. *Id.* ¶¶ 9. Indeed, in most cases, Yipit's contracts with its customers and data vendors expressly *preclude* Yipit from

revealing their identities or the terms of their contracts. *See id.* ¶ 9; Second Melzer Decl. ¶¶ 3, 11.

The secrecy of this information gives Yipit economic and competitive advantages in a highly competitive industry by allowing it to create more accurate and differentiated products, tailor those products for its customers, and strategically increase customer sales and loyalty. *See* First Melzer Decl. ¶¶ 5, 7, 9, 17-21, 23. Conversely, if this information were *not* secret, a competitor could use it to, *inter alia*, improve its own products, develop its own business plans, lure away Yipit's data providers and customers, target those customers at strategic times (*i.e.*, shortly before a renewal), undercut Yipit's pricing, and cross-sell products based on Yipit's vulnerabilities. *See id.* ¶¶ 7, 9, 17-21, 23, 25-26, 29; Second Melzer Decl. ¶ 12. Indeed, this is one reason M Science and its executives stole Yipit's information. Under these circumstances, courts regularly hold that "client and pricing information derives independent economic value from being kept secret." *Id.* (granting preliminary injunction); *cf. ExpertConnect, L.L.C. v. Fowler*, No. 18 CIV. 4828 (LGS), 2019 WL 3004161, at *5 (S.D.N.Y. July 10, 2019) (reaching similar conclusion on motion to dismiss).

### 2. M Science, Marrale, and Roduit Misappropriated Yipit's Trade Secrets.

It could not be clearer that M Science, Roduit, and Marrale acquired the Yipit trade secrets described above, disclosed them to others within the company, and used them to obtain an unfair competitive advantage over Yipit. *See* 18 U.S.C. § 1839(5) (defining misappropriation to include "acquisition," "disclosure[,] or use").

Beginning with M Science: Even at this early stage, the evidence is robust and unequivocal that M Science, acting through its executives and employees, improperly acquired, used, and disclosed Yipit's trade secrets. Much of the misappropriated trade secret information

that has been revealed to date originated from Emmett, who improperly disclosed it despite his duty of secrecy to Yipit.[4]  Those trade secrets then spread throughout M Science, whose employees shared them with each other and used them for the company's benefit.  A sizeable percentage of the company is implicated; Pinsky has admitted: "Just those individuals who are mentioned in documents would equate to approximately 20-25% of M Science's sales force in the mid-2024 time frame."  Pinsky Decl. ¶ 16.  M Science knew it should not have this information; indeed, its officers and employees went to great lengths to avoid leaving a paper trail.  *E.g.*, Benninger Decl., Ex. 2 at YIP0000345-55, 479.  Nonetheless, M Science's senior officers—including Marrale, its CEO; Roduit, its then-CRO; Yoshida, its Director of New Business; Sante Faustini, its VP of Product Intelligence; Pinsky, its then-VP of Sales; and Emmett himself, M Science's then-Head of Account Management—encouraged, directed, participated in, and ratified the misappropriation.  *See* § II.B, *supra*; Benninger Decl., Exs. 2-3.

What's more, M Science's "employment of [Emmett] was arranged for the specific purpose of having him divulge confidential information which he possessed . . . or could acquire in the course of his employment by [Yipit]."  *Minn. Min. & Mfg. Co. v. Tech. Tape Corp.*, 23

---

[4] *See* 18 U.S.C. § 1839(5)(A) (defining "misappropriation" to include "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means"); *see also id.* § 1839(6)(A) (defining "improper means" to include "breach or inducement of a breach of a duty to maintain secrecy"); Frawley Decl., Ex. 1 § 1.1-1.2 (imposing duty of secrecy); *TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 194 (E.D.N.Y. 2024) ("under New York law, an employee has an implied duty not to use confidential knowledge acquired in his employment in competition with his [or her] principal" (citation omitted)).

Misc. 2d 671, 677-78 (N.Y. Sup. Ct. 1959), *aff'd,* 15 A.D.2d 960 (N.Y. App. Div. 1962). This is obviously "wrongful" conduct, *id.*, and strongly supports a finding that M Science is liable for trade secret misappropriation. *See, e.g.*, *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 806 (S.D.N.Y. 2008) (finding misappropriation adequately alleged where defendant companies "systematically called upon and recruited various persons and companies . . . only because they had the confidential and proprietary information"). This conclusion is made even stronger by the fact that M Science "incentivized [Emmett] to disclose [Yipit's] trade secrets by paying him an outsized compensation package." *Medidata Sols., Inc., v. Veeva Sys. Inc.*, No. 17 CIV. 589 (LGS), 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018); *see* Pasquale Decl., Ex. 9 at 11-12.

The evidence is similarly voluminous and unambiguous that Roduit acquired Yipit's trade secrets (directly or indirectly) through Emmett's improper disclosures and used those trade secrets for M Science's benefit. Roduit repeatedly acquired trade secret information about Yipit customers, including █████████████████████████████████████████████████████████ █████, indirectly from Emmett vis-à-vis Pinsky. *See* Benninger Decl., Ex 2 at YIP0000261-63, 360-63, 366-68, 387-88, 396-97, 405, 409. Later, Roduit received information directly from Emmett about a "[s]uper secretive" Yipit customer, ████████████████; Roduit immediately helped Emmett use that information to M Science's advantage. *Id.* at YIP0000469. Roduit also acquired a list of "accounts that underpay," which Emmett created from Yipit's trade secrets, via "[s]creenshare," and conspired with Emmett and Pinsky to "attack and share" that information for M Science's benefit. Pasquale Decl., Ex. 9 at 52. He even solicited Yipit's comprehensive

list of investor customers, their subscriptions, their contract prices, and their renewal dates from Emmett, and acquired that list when Emmett gave Roduit his phone.[5]

Finally, the evidence shows that Marrale, M Science's highest officer, participated in, directed, and ratified the misappropriation of Yipit's trade secrets. The May 16, 2024, messages between Pinsky, Roduit, Marrale, and Sante Faustini provide an illustrative example. *See* Benninger Decl., Ex. 2 at YIP0000327-29. There, Pinsky revealed Yipit trade secrets that he had acquired from Emmett the night before, including the extremely sensitive terms of Yipit's contract with ▮▮▮▮▮▮▮▮ (one of its data providers) and the specific data sources underlying Yipit's ▮▮▮▮ package. *Id.* at YIP0000328-29. This is "some of the most highly sensitive and confidential information in [Yipit's] business." Second Melzer Decl. ¶ 11. Marrale knew that Emmett was a Yipit employee (having been intimately involved in his recruitment) and should not have divulged his employer's secrets. *See* 18 U.S.C. § 1839(5)(A), (6)(A). Nonetheless, Marrale expressed no alarm or surprise at the disclosure and instead launched into a discussion of Yipit's proprietary AAPL methodology, thereby (at a minimum) ratifying the conduct. *See* Benninger Decl., Ex. 2 at YIP0000328-29. On another occasion, Marrale had Pinsky do his dirty work: After Emmett joined M Science, "Marrale[] asked [Pinsky] to request information from Emmett about how Yipit packages some of its products." Pinsky Decl. ¶ 14. This, too, is a Yipit trade secret, *see* Second Melzer Decl. ¶¶ 2, 10(d), 11, yet Marrale directed and encouraged its misappropriation.

---

[5] These actions support Yipit's claims against both Roduit and M Science, because Roduit was at all relevant times a superior officer of M Science acting on its behalf. The same is true for Marrale's actions.

**B.      Yipit Will Suffer Irreparable Harm Without an Injunction.**

Given the severe and pervasive misappropriation discussed above, Yipit is likely to face "irreparable injury in the absence of an injunction." *Benihana*, 784 F.3d at 895.

"The disclosure of private, confidential information 'is the quintessential type of irreparable harm that cannot be compensated or undone by money damages.'" *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019) (quoting *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000)). Indeed, the Second Circuit has repeatedly observed that "the loss of trade secrets cannot be measured in money damages," as "[a] trade secret once lost is, of course, lost forever." *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam); *see also N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999).

In particular, "the use and disclosure of [Yipit's] confidential customer information and the possibility of loss of customers through such usage, constitutes irreparable harm." *Capstone Logistics Holdings, Inc. v. Navarrete*, No. 17-CV-4819 (GBD), 2018 WL 6786338, at *33 (S.D.N.Y. Oct. 25, 2018), *aff'd and remanded in part,* 796 F. App'x 55 (2d Cir. 2020); *accord Ayco Co., L.P. v. Frisch*, 795 F. Supp. 2d 193, 205 (N.D.N.Y. 2011) ("the loss of an employer's confidential customer information also constitutes irreparable harm"). Yipit can easily demonstrate the disclosure of its customer information and the associated probability of customer loss. Indeed, the evidence suggests that Defendants' misappropriation has *already* cost Yipit customers, *see* First Melzer Decl. ¶ 26, which of course bolsters Yipit's showing. *See, e.g.*, *Capstone Logistics Holdings, Inc.*, 2018 WL 6786338, at *34 (reinstating preliminary injunction where plaintiff "ha[d] already lost a long-time customer").

More relevant to this motion, Yipit also faces the threat of *future* customer loss, impaired vendor relationships, and lost goodwill. *See Intertek Testing Servs., N.A., Inc. v. Pennisi*, 443 F. Supp. 3d 303, 328 (E.D.N.Y. 2020) ("preliminary injunctive relief requires a *threat* of

irreparable harm, not that irreparable harm already have occurred" (citation omitted)). M

Science, Roduit, and Marrale misappropriated massive amounts of trade secret information—

including the terms of Yipit's contract with a key data vendor, █████, and "virtually all of

[Yipit]'s customer information"—making it likely that, absent an injunction, Yipit will "sustain a

loss of business impossible, or very difficult, to quantify." *Marcone APW, LLC v. Servall Co.*,

85 A.D.3d 1693, 1696 (4th Dep't 2011) (citations omitted) (affirming grant of preliminary

injunction). The misappropriation of Yipit's contractual terms with █████ creates a concrete risk

that M Science will "approach [█████] with a better deal or terms, and put Yipit's relationship

and deal at risk." Second Melzer Decl. ¶ 12. The theft of Yipit's customer information, and the

potential for customer losses, also constitute irreparable harm, especially because Yipit's

customers tend to "produce an indeterminate amount of business in years to come." *Ayco*, 795 F.

Supp. 2d at 205; *see* First Melzer Decl. ¶ 31. Similarly, defendants' misappropriation creates

"prospective loss of goodwill," which "alone is sufficient to support a finding of irreparable

harm." *Bulman v. 2BKCO, Inc.*, 882 F. Supp. 2d 551, 564 (S.D.N.Y. 2012) (cleaned up)

(citation omitted) (finding irreparable injury where "Plaintiffs ha[d] not claimed lost business,

sales, or revenues");[6] *see* First Melzer Decl. ¶ 31.

    Finally, Yipit's showing of irreparable harm is compounded by the risk that these

defendants "will disseminate [Yipit's] secrets to a wider audience" in the future. *Faiveley*

_____

[6] *See also, e.g.*, *Coastal Distrib., LLC v. Town of Babylon*, No. 05 CV 2032 JS ETB, 2006 WL

270252, at *3 (E.D.N.Y. Jan. 31, 2006) (finding "[l]oss of goodwill," "injury to reputation," and

"loss of business opportunities and relationships with clients" to be "irreparable harm"), *aff'd as*

*modified,* 216 F. App'x 97 (2d Cir. 2007)

*Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (permitting "rebuttable presumption of irreparable harm" in such circumstances); *accord IDG USA, LLC v. Schupp*, 416 F. App'x 86, 88 (2d Cir. 2011) ("Threatened dissemination of trade secrets generally creates a presumption of irreparable harm."). These defendants have not been shy about distributing Yipit's trade secrets to date, as evidenced by their rapid spread within M Science. And Roduit's departure from M Science only increases the potential scope of the dissemination. Absent injunctive relief, Roduit could repeat his misconduct and "disseminate the trade secrets he improperly acquired to . . . members of his new firm," which would further "impair the value of [Yipit's] secrets." *KCG Holdings, Inc. v. Khandekar*, No. 17-CV-3533 (AJN), 2020 WL 1189302, at *17 (S.D.N.Y. Mar. 12, 2020).

### C. The Balance of Hardships Strongly Favors Yipit.

Next, the balance of hardships tilts in Yipit's favor due to "the demonstrated value of preventing public disclosure of the confidential and proprietary information at issue in this case." *MacDermid, Inc. v. Selle*, 535 F. Supp. 2d 308, 317 (D. Conn. 2008). As explained above, Yipit "will continue to suffer substantial harm absent an injunction through Defendant's use of proprietary information to lure [its] clients to one of [its] direct competitors." *Citizens Sec., Inc. v. Bender*, No. 1:19-CV-916 (MAD/DJS), 2019 WL 3494397, at *5 (N.D.N.Y. Aug. 1, 2019). It is unsurprising, then, that courts in analogous situations regularly conclude that the balance of the equities supports the exact relief that Yipit now seeks. *See, e.g.*, *Intertek Testing Servs.*, 443 F. Supp. 3d at 347-48 (enjoining defendants from "disclos[ing] or disseminat[ing] any of plaintiff's confidential information or trade secrets"); *Capstone Logistics Holdings*, 2018 WL 6786338, at *1 (similar).

Conversely, Defendants have *no* legitimate interests that would be harmed by Yipit's requested injunction. "It is no hardship for [Defendants] to refrain from'" using Yipit's trade

secret, confidential, and proprietary information "to lure away [its] customers," as they have no legal right to take such actions. *Plaza Motors of Brooklyn, Inc. v. Bogdasarov*, No. 21-CV-6545 (KAM), 2021 WL 5630910, at *6 (E.D.N.Y. Dec. 1, 2021) (quoting *Benihana*, 784 F.3d at 897). Nor does returning Yipit's confidential, proprietary, and trade secret information unduly burden these defendants, as they "ha[ve] no legitimate interest in" that information in the first place. *Mission Cap. Advisors LLC v. Romaka*, No. 16 CIV. 5878 (LLS), 2016 WL 11517104, at *2 (S.D.N.Y. July 29, 2016). Courts regularly require defendants to return confidential and trade secret information to plaintiffs at this stage in the proceedings. *See, e.g.*, *Credit Suisse Sec. (USA) LLC v. Ebling*, No. 06 CIV. 11339 (RCC), 2006 WL 3457693, at *1 (S.D.N.Y. Nov. 27, 2006) (compelling "Respondent and all those acting in concert with him to return immediately to Credit Suisse all of Credit Suisse's confidential information and trade secrets"); *Ayco*, 2010 WL 4286154, at *1 (similar). This Court should order the same relief here.

Similarly, Yipit's request to prohibit Roduit from working for M Science or any other company to whom he has disclosed Yipit's trade secrets should not cause him any hardship. Roduit no longer works at M Science, so in that respect, the injunction would simply preserve the status quo. Nor would the proposed injunction jeopardize Roduit's new employment, so long as it is not tainted by any disclosure or use of Yipit's information. *Cf. Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 354-55 (S.D.N.Y. 2018) (finding balance of equities favored injunction that would not prevent "fair competition"). And if it *is* so tainted, any resulting hardship is the effect of Roduit's willful misconduct rather than "of the granting or withholding of the requested relief." *Yang v. Kosinski*, 960 F.3d 119, 135 (2d Cir. 2020) (citation omitted).

**D. The Public Interest Favors a Preliminary Injunction.**

The last factor, the public interest, also supports a preliminary injunction. To justify that relief, this Court need only determine that "the 'public interest would not be disserved' by" such relief. *Benihana*, 784 F.3d at 895 (citation omitted). Here, "an injunction is in the public interest because it upholds the law that protects . . . trade secrets and intellectual property rights, and thus encourages future investment in innovation." *Brainwave Sci., Inc. v. Arshee, Inc.*, No. 21-CV-4402 (BMC), 2021 WL 6211630, at *6 (E.D.N.Y. Dec. 14, 2021) (collecting cases); *accord Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, No. 15 CIV. 211 (LGS), 2021 WL 1553926, at *13 (S.D.N.Y. Apr. 20, 2021), *aff'd in part, vacated in part, remanded*, 68 F.4th 792 (2d Cir. 2023). In other words, Yipit's requested injunction would advance the "substantial public interest in the protection of trade secrets." *BaseCap Analytics Inc. v. Amenn*, No. 1:23-CV-09370-MKV, 2023 WL 8113524, at *4 (S.D.N.Y. Nov. 22, 2023) (citation omitted); *accord Intertek Testing Servs.*, 443 F. Supp. 3d at 347; *Plaza Motors of Brooklyn, Inc. v. Bogdasarov*, No. 21-CV-6545 (KAM), 2021 WL 5630910, at *7 (E.D.N.Y. Dec. 1, 2021).

**E. The Court Should Not Require Yipit to Post a Bond.**

Finally, the Court should grant the injunction without requiring Yipit to post a bond. In the typical case, after obtaining a preliminary injunction, "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, because the "amount of any bond . . . rests within the sound discretion of the trial court, the district court may dispense with the filing of a bond." *Clarkson Co., Ltd. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) (citations omitted). And here, it is "proper for the court to require no bond," as there is "no proof of likelihood of harm" to the non-movants. *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d

975, 985 (2d Cir. 1996) (citation omitted); *accord Golden Krust Patties, Inc. v. Bullock*, 957 F.

Supp. 2d 186, 202 (E.D.N.Y. 2013).

## IV. CONCLUSION

Yipit respectfully requests that this Court issue Yipit's proposed preliminary injunction to

protect its trade secrets and prevent Yipit from suffering further harm due to M Science's,

Roduit's, and Marrale's misappropriation.


Dated: January 30, 2025                         MUNGER, TOLLES & OLSON LLP

By: _____

Laura D. Smolowe
*Admitted pro hac vice*
Vincent Y. Ling
*Admitted pro hac vice*
Jennifer L. Bryant
*Admitted pro hac vice*
Matthew Miyamoto
*Admitted pro hac vice*
Taylor L. Benninger
*Admitted pro hac vice*
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Tel: (213) 683-9100
*Attorneys for Plaintiff*
*(Lead Counsel)*

YANKWITT LLP
Russell M. Yankwitt
Michael H. Reed
140 Grand Street, Suite 501
White Plains, New York 10601
Tel.: (914) 686-1500
*Attorneys for Plaintiff*
*(Local Counsel)*

**CERTIFICATION OF COMPLIANCE**

Pursuant to Paragraph II(D) of the Court's Individual Practices, I hereby certify that this brief complies with Judge Koeltl's formatting rules, and that the total number of words in this memorandum of law, excluding the cover page, table of contents, table of authorities, signature line, and certification of compliance is 6,994.

Laura D. Smolowe