<u>UNITED STATES DISTRICT COURT</u>
<u>SOUTHERN DISTRICT OF NEW YORK</u>

| | |
|---|---|
| **YIPIT, LLC d/b/a YipitData,** | |
| **Plaintiff,** | **Case No. 1:24-cv-07854** |
| **v.** | |
| **ZACHARY EMMETT,**<br>**ALEXANDER PINSKY,**<br>**VALENTIN RODUIT,**<br>**MICHAEL MARRALE; M**<br>**SCIENCE LLC, and JOHN DOES 1-10,** | |
| **Defendants.** | |

<u>**M SCIENCE'S MEMORANDUM OF LAW IN OPPOSITION TO YIPIT'S MOTION**</u>
<u>**FOR A PRELIMINARY INJUNCTION**</u>

## TABLE OF CONTENTS

**Page**

I.    Introduction .................................................................................................................. 1

II.    Background ................................................................................................................... 3

    A.    The Parties' Pre-Litigation Communications. ................................................ 3

    B.    M Science Responded in Good Faith To Yipit's Allegations, Taking Numerous Remedial Measures. .................................................................... 4

    C.    Yipit Failed to Take any Remedial Measures When its High-Level Employee Misappropriated M Science's Trade Secrets. ............................... 6

III.    Legal standard and burden ........................................................................................... 7

IV.    Argument ..................................................................................................................... 8

    A.    Yipit Cannot Establish Irreparable Harm. .................................................... 8

        1.    Yipit's Allegations of Past Harms Are Insufficient to Establish Irreparable Harm. ........................................................... 8

        2.    Yipit Cannot Show Likely Future Irreparable Harm. ............................... 9

        3.    Irreparable Harm Cannot Be Presumed or Found Here Under the Law. ........................................................................................ 11

        4.    Yipit Has Provided No Evidence of Lost Clients Resulting from the Alleged Misconduct But, Even If It Had, Yipit Has a Remedy at Law. ........................................................................................ 13

        5.    Yipit Delayed in Seeking Injunctive Relief Against M Science. .............. 15

    B.    Yipit is Not Likely to Succeed on the Merits of its Trade Secret Claims............ 17

    C.    Yipit Has Unclean Hands ............................................................................ 19

    D.    Neither the Balance of the Equities, Nor the Public Interest Favor Yipit ............ 20

    E.    Yipit's Proposed Injunction Order Is Not Sufficiently Specific. ......................... 21

V.    Conclusion ................................................................................................................. 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amimon, Inc. v. Shenzhen Hollyland Tech Co.,*
No. 20-CV-9170 (ER), 2023 WL 2478159 (S.D.N.Y. Mar. 13, 2023) .................................12

*Art and Cook, Inc. v. Haber,*
416 F.Supp.3d 191 (E.D.N.Y. 2017) .................................18

*Brown v. Gilmore,*
533 U.S. 1301 (2001).................................7

*Capstone Logistics Holdings, Inc. v. Navarrete,*
838 F. App'x 588 (2d Cir. 2020).................................21

*Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.,*
602 F. Supp. 3d 663 (S.D.N.Y. 2022).................................17

*Citibank, N.A. v. Citytrust,*
756 F.2d 273 (2d Cir. 1985).................................15

*Citigroup Inc. v. AT&T Services, Inc.,*
120 U.S.P.Q.2d 1888, 2016 WL 4362206 (S.D.N.Y. 2016) .................................15

*Corning Inc. v. PicVue Elecs., Ltd.,*
365 F.3d 156 (2d Cir. 2004).................................21, 22

*Do The Hustle, LLC. v. Rogovich,*
2003 WL 21436215 (S.D.N.Y. June 19, 2003) .................................7

*EFS Marketing, Inc. v. Russ Berrie & Co.,*
76 F.3d 487 (2d Cir. 1996).................................21

*ExpertConnect, LLC v. Parmar,*
773 F. App'x 651 (2d Cir. 2019) .................................22

*Eyewonder, Inc. v. Abraham,*
293 F. App'x 818 (2d Cir. 2008) .................................22

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
559 F.3d 110 (2d Cir. 2009).................................*passim*

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.,*
730 F.2d 61 (2d Cir. 1984) (per curiam).................................11

*Free Country Ltd. v. Dreenen,*
    235 F. Supp. 3d 559 (S.D.N.Y. 2016) ................................................................. 18

*Geritrex Corp. v. Dermarite Indus., LLC,*
    910 F. Supp. 955 (S.D.N.Y. 1996) ..................................................................... 14

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
    481 F.3d 60 (2d Cir. 2007).................................................................................. 7

*H. Meer Dental Supply Co. v. Commisso,*
    269 A.D.2d 662 (3d Dep't 2000) ........................................................................ 18

*Liberty Power Corp., LLC v. Katz,*
    2011 WL 256216 (E.D.N.Y. Jan. 26, 2011) ...................................................... 17

*Manrique v. State Farm Mut. Auto. Ins. Co.,*
    2021 WL 5745717 (S.D.N.Y. Dec. 2, 2021) ...................................................... 8

*Marietta Corp. v. Fairhurst,*
    301 A.D.2d 734 (3d Dep't 2003) ........................................................................ 19

*Marks Org., Inc. v. Joles,*
    784 F. Supp. 2d 322 (S.D.N.Y. 2011) ................................................................ 15

*Monowise Ltd. Corp. v. Ozy Media, Inc.,*
    17-CV-8028 (JMF), 2018 WL 2089342 (S.D.N.Y. May 3, 2018) ...................... 15

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.,*
    883 F.3d 32 (2d Cir. 2018)................................................................................... 8

*Nicosia v. Amazon.com, Inc.,*
    834 F.3d 220 (2d Cir. 2016)............................................................................ 9, 15

*Nikkal Indus., Ltd. v. Salton, Inc.,*
    735 F. Supp. 1227 (S.D.N.Y.1990)..................................................................... 19

*ParTech, Inc. v. Jackson,*
    No. 24-CV-9381 (JAV), 2025 WL 343215 (S.D.N.Y. Jan. 29, 2025) ................ 13

*Passlogix, Inc. v. 2FA Tech., LLC,*
    No. 08 Civ. 10986, 2010 WL 2505628 (S.D.N.Y. June 21, 2010)...................... 12

*Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.,*
    324 U.S. 806 (1945).......................................................................................... 19

*Production Resource Group, L.L.C. v. Oberman,*
    2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003) (Koeltl, J.)................................ 17

*Schmidt v. Lessard,*
    414 U.S. 473 (1974) ........................................................................................23

*Stokely-Van Camp, Inc. v. Coca-Cola Co.*,
    646 F. Supp. 2d 510 (S.D.N.Y. 2009) ...........................................................19

*TGG Ultimate Holdings, Inc. v. Hollett,*
    No. 16 CIV. 6289 (VM), 2016 WL 8794465 (S.D.N.Y. Aug. 29, 2016) ...........10, 12

*TomGal LLC v. Castano,*
    2022 WL 17822717 (S.D.N.Y. Dec. 19, 2022) .................................14, 15, 20, 21

*Walter Karl, Inc. v. Wood,*
    137 A.D.2d 22 (2d Dep't 1988) .....................................................................18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .........................................................................................20

M Science LLC ("M Science") submits this Memorandum of Law, and the supporting Declarations submitted herewith, in opposition to Yipit, LLC's ("Yipit") motion for a preliminary injunction (the "Motion").

## I.    **INTRODUCTION**

A preliminary injunction is an "extraordinary and drastic remedy," which is not warranted here, where Yipit's Motion is based on misappropriation of alleged trade secrets that occurred between nine and twelve months ago, and where there is no actual or imminent threat of future harm because of the remedial measures taken by M Science.

Beginning in July, 2024, Yipit advised M Science that Zachary Emmett ("Emmett"), an employee that M Science recently hired from Yipit, had shared information regarding Yipit's clients with other M Science employees in the period leading up to Emmett's June 2024 resignation from Yipit. M Science was surprised given Emmett's express agreements in his M Science employment contract *not* to retain any Yipit information or files, or disclose any Yipit confidential information to M Science.

Upon learning of the evidence, M Science took effective measures to remedy Emmett's conduct. First, it promptly severed its employment relationship with Emmett in August, 2024. Second, also in August, 2024, M Science instructed its sales force not to use any Yipit confidential information shared by Emmett. Third, it conducted a good-faith investigation to locate all Yipit client or business information that Emmett shared with any M Science employee. Fourth, M Science *voluntarily* returned that information to Yipit, regardless of whether the information could reasonably be considered legally confidential or proprietary. Notably, the returned documents were mostly personal text messages, rather than documents and communications on approved M Science business systems. Finally, in October of 2024, M Science parted ways with two M Science

managers, Alex Pinsky ("Pinsky") and Valentin Roduit ("Roduit"), the M Science employees with whom Emmett primarily shared information regarding Yipit's clients and business.

Some current M Science employees received limited documents with information regarding Yipit's business or clients from Emmett. Each has submitted a Declaration confirming that he/she no longer has the information in question, cannot and will not use or disclose it, and does not have any other documents from Emmett containing information regarding Yipit's business or clients.

In light of M Science's prompt and effective measures to remedy the unauthorized conduct of its former employees, Yipit does not come close to carrying its heavy burden to demonstrate a threat of irreparable harm, "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). Indeed, Yipit's Motion is based on conduct that took place nearly a year ago, and Yipit cannot demonstrate the required actual and imminent future harm necessary to obtain an injunction. Moreover, Yipit delayed too long in seeking injunctive relief to now claim it has an urgent need for speedy action to protect its rights.

Yipit also has failed to adduce any evidence that any alleged misappropriation of its trade secrets has caused damage. Rather, it merely states it lost five clients several months ago and speculates those lost clients may be related to its misappropriation allegations here. Even if this speculation were true, Yipit has an adequate remedy at law for any damage it claims to have suffered.

While the Court's analysis should begin and end with the lack of irreparable harm, there are numerous other reasons to deny Yipit's Motion: (1) Yipit is not likely to succeed on the merits of its trade secrets claims; (2) Yipit has unclean hands; (3) the balance of the equities and public

interest do not favor Yipit; and (4) Yipit's requested relief is not detailed enough to survive scrutiny under Second Circuit precedent.

## II.    BACKGROUND

### A.    The Parties' Pre-Litigation Communications.

On July 15, 2024, Yipit sent Emmett and M Science letters alleging that Emmett, who had joined M Science in June 2024, had "misappropriated Yipit's confidential and proprietary information," including by allegedly transferring such information to his personal LinkedIn and Facebook accounts. DKT 15-1, 15-2. Threatening legal action, Yipit demanded that M Science "investigate whether and to what extent Yipit's trade secret, confidential, and proprietary information was provided to or used by M Science," and respond within 20 days. DKT 15-1, p. 3.

On August 14, 2024, Yipit sent M Science a second letter, alleging that "Yipit's ongoing investigation continues to reveal additional alarming evidence – not only about Mr. Emmett, but also about M Science and its senior employees." DKT 15-4. Yipit alleged that it had "uncovered extremely concerning evidence that Mr. Emmett repeatedly shared Yipit's trade secret, confidential, and proprietary information, including its customer lists, contract process, and contract renewal dates, with M Science." *Id.* Again, threatening legal action, Yipit demanded, *inter alia*, that M Science respond with a "plan" for investigating Yipit's allegations and returning Yipit's alleged "trade secret, confidential, and proprietary information," information by August 21, 2024, and that M Science's CEO certify that M Science "no longer possesses or uses" such information. *Id.* M Science responded on August 21 and August 30, 2024. DKT 15-5, 15-6.

On September 13, 2024, Yipit again wrote to M Science, noting that it had been "nearly a month since Yipit's requests" and that M Science had not yet returned any Yipit information. DKT 15-7. After several calls between counsel in September and October 2024, on October 10, 2024, Yipit wrote to M Science "reiterating the need for Yipit to receive its information back" and

seeking certifications from Michael Marrale ("Marrale"), Pinsky, and Roduit, "that they no longer possess any Yipit information." DKT 15, ¶11. On October 16, 2024, Yipit initiated this lawsuit against Emmett and Pinsky only. DKT 1. Despite numerous references to a "Competitor," Yipit's Complaint did not name M Science. DKT 1.

On October 23, 2024, M Science provided Yipit with a summary and the results of its investigation, and returned the documents it located appearing to contain information regarding Yipit's business and clients, provided by Emmett to M Science personnel. DKT 92-1. On November 1, 2024, Yipit notified M Science that Yipit intended to "begin preparing an amended complaint in this action," and proposed mediation under the condition that M Science would agree not to use the mediation as a basis for asserting that Yipit delayed in seeking injunctive relief. Shapren Dec., ¶3. On November 11, 2024, M Science agreed to mediate, and that M Science would "not argue that the period of time from now through the mediation constitutes any delay in Yipit's assertion of its right." *Id.* at ¶4. However, M Science never agreed not to assert arguments regarding Yipit's delay in seeking injunctive relief against M Science *prior to* November 11, 2024. The mediation was unsuccessful. *Id.*

**B.    M Science Responded in Good Faith To Yipit's Allegations, Taking Numerous Remedial Measures.**

Prior to receiving Yipit's demand letters, M Science was unaware of Emmett's transferring Yipit information to his personal accounts or sharing Yipit client or business information with any M Science employee. *See* Marrale Dec., ¶14; Napoli Dec., ¶14. In fact, on May 3, 2024, in connection with his M Science offer letter, Emmett agreed that (1) he would not disclose to M Science any confidential or proprietary information belonging to any other employer, and (2) he had not, and would not, take or retain any documents or files from his prior employer. Napoli Dec., ¶13 and Ex. A.

Concerned by Yipit's allegations, M Science sought to ensure that any unauthorized conduct by Emmett, or any other M Science employee, ceased immediately. *See* DKT 15-5. M Science promptly severed its relationship with Emmett and directed its sales force not to use any Yipit information that it may have received from Emmett. *Id.*, Napoli Dec., ¶¶15-16 and Ex. C.

In addition, as requested by Yipit, M Science conducted an investigation to identify and collect any Yipit client or business information that Emmett may have provided to its employees. *See* DKT 15-5, 15-6, and 92-1. This review, directed by M Science's in-house and outside counsel, was extensive. Napoli Dec., ¶17. M Science's investigation did not locate any Yipit documents or files from Emmett, including the eight files Yipit alleges were "exfiltrated" by Emmett, on M Science's systems. *Id.*, ¶18. However, M Science's investigation revealed that Emmett had shared some information regarding Yipit's business and clients with M Science employees, primarily Pinsky and Roduit, conversationally via personal text or other electronic message. *See* DKT 92-2.

On October 23, 2024, M Science provided Yipit with a summary of its investigation and returned 67 documents located as a result of its investigation that contained, or appeared to contain, information regarding Yipit's business and clients provided by Emmett to M Science personnel.[1] *See* DKT 92-1. Pursuant to Yipit's request that M Science delete such information, M Science directed its employees who had been in possession of the returned documents to delete them from their possession. *See* DKT 92-1, p. 2; Napoli Dec., ¶20.

---

[1] However, M Science did not and does not concede that the information contained therein was confidential, proprietary or legally protectable. *See* DKT 92-1, p. 2. M Science was merely attempting to avoid unnecessary litigation.

The returned documents primarily consisted of text messages between Emmett and Pinsky, including many of the text messages that Yipit had already obtained from Emmett's Yipit laptop. *See* DKT 92-2.  The returned documents also included some messages involving Roduit, *see, e.g.,* DKT 92-2, at YIP0000256-259, and a few texts in which Emmett or Pinsky had also included other M Science employees.  *See, e.g.,* DKT 92-2, at YIP000245-246.  M Science also returned some Microsoft Teams chat messages and emails that it found on its systems.  *See e.g.,* DKT 92-2, at YIP0000331-333.

In late October 2024, M Science parted ways with both Pinsky and Roduit and advised Yipit of their separations.  *See* Marrale Dec., ¶¶16-17; *see also* DKT 92-1; Shapren Dec., Ex. A.

Even after October 23, 2024, M Science continued its good-faith investigation to address some outstanding issues and, on December 6, 2024, returned an additional ten pages of text messages discovered on its employees' personal phones.  *See* DKT 92, ¶3 and Ex 3.  In addition, M Science recently identified several additional text exchanges and Teams chats, which appeared to contain Yipit information provided by Emmett, but were not previously produced to Yipit.  Shapren Dec. ¶6-7.  M Science voluntarily produced those messages to Yipit on February 7 and March 7, 2025.  *Id.*

C.    <u>**Yipit Failed to Take any Remedial Measures When its High-Level Employee Misappropriated M Science's Trade Secrets.**</u>

M Science's response to Yipit's allegations regarding Emmett stands in stark contrast to Yipit's lack of response to more serious allegations of misappropriation made by M Science in the recent past.  Specifically, for at least a two-year period from April 2020 to April 2022, Yipit's Vice President of Product Development, Stephen Luban ("Luban"), systematically and without authorization, logged in to M Science's restricted research portal, to access M Science's research

reports and supporting proprietary data files.[2]  Napoli Dec., ¶¶22-43.  Luban accessed M Science's system using credentials he unlawfully retained after leaving his job at an M Science client for Yipit.  *Id.*  The only reason for Luban to access M Science's reports would be to use them in furtherance of assisting Yipit to compete with M Science.  *Id.*

M Science brought this issue to Yipit's attention in April 2022 and demanded that Yipit conduct a comprehensive investigation.  *Id.*  Far from taking the issue seriously, Yipit ignored M Science's demand for weeks.  Then, when Yipit finally addressed the issue, Yipit's General Counsel stated only that Luban "would not admit or deny" that he engaged in the alleged conduct. *Id.*

## III.    LEGAL STANDARD AND BURDEN

A preliminary injunction is "an extraordinary and drastic remedy," "that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).  Indeed, a preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies."  *Id.* (citation omitted).  Thus, one "should not be granted unless the rights of the parties are 'indisputably clear.'"  *Do The Hustle, LLC. v. Rogovich,* 2003 WL 21436215, at *8 (S.D.N.Y. June 19, 2003) (citing *Brown v. Gilmore,* 533 U.S. 1301, 1303 (2001)).

In the Second Circuit, "[a] party seeking a preliminary injunction must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is

---

[2] On January 21, 2025, before it was sued in this case, M Science filed a Complaint against Luban and Yipit, in this Court, captioned *M Science LLC and M Science Hong Kong Limited v. Stephen A. Luban and Yipit, LLC d/b/a YipitData*; Case No. 1:25-cv-00621.

in the public interest." *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).

## IV. ARGUMENT

For the following reasons, Yipit cannot carry its burden to show that it is entitled to the "extraordinary and drastic remedy" of a preliminary injunction.

### A. Yipit Cannot Establish Irreparable Harm.

First and foremost, Yipit cannot establish irreparable harm, "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley*, 559 F.3d at 118. To show irreparable harm, Yipit "must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id.* Here, Yipit cannot establish irreparable harm because (1) its allegations of past alleged harms are insufficient; (2) Yipit cannot show likely actual and imminent future irreparable harm; (3) Yipit's allegations of lost customers are speculative, but, even if they were not, Yipit has a remedy at law; (4) irreparable harm cannot be presumed or found here under applicable law; and (5) Yipit delayed in seeking injunctive relief.

### 1. Yipit's Allegations of Past Harms Are Insufficient to Establish Irreparable Harm.

First, Yipit cannot establish irreparable harm because its Motion solely relies on allegations of past harms. "[I]njunctive relief to redress past alleged harms" "is not permitted." *Manrique v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 5745717, at *9 (S.D.N.Y. Dec. 2, 2021). Indeed, "although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that [it] is likely to be harmed

again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016).

Here, Yipit's Motion is based on allegations of misconduct that took place in March through early July of 2024 - nine to twelve months ago. Yipit has proffered no evidence of any alleged misappropriation of its trade secrets since then or, more importantly, occurring now. For that reason alone, Yipit's Motion should be denied.

> 2. <u>Yipit Cannot Show Likely Future Irreparable Harm.</u>

Yipit also cannot credibly claim it is "likely to be harmed again in the future in a similar way." *Nicosia v. Amazon.com, Inc.*, 834 F.3d at 239. Not only is the evidence cited by Yipit seriously dated, but the remedial measures that M Science has voluntarily undertaken defeat any argument that Yipit will suffer any future harm.

First, Yipit's Motion is based primarily on alleged misconduct by Emmett, Pinsky, and Roduit, each of whom is no longer employed by M Science. Marrale Dec., ¶¶15-17. Therefore, Yipit cannot show that Emmett, Pinsky, or Roduit is imminently likely to use or disclose any Yipit trade secrets on behalf of M Science.

Two other M Science employees whose names appear on documents M Science voluntarily returned to Yipit, Stephanie Von Der Luft and Natalie Green, also no longer work for M Science. Marrale Dec., ¶¶18-19. Accordingly, neither is likely to use or disclose any Yipit trade secrets on behalf of M Science.

Second, much of Yipit's Motion focuses on eight files allegedly containing Yipit trade secrets that Yipit alleges Emmett "exfiltrated" for use at M Science. DKT 91, pp. 6, 11. Yipit alleges only that Emmett transferred those files to his **personal accounts.** DKT 14, ¶11. There is no evidence that any of those files are in the possession of M Science or any current M Science employee, or are imminently likely to be used or shared by M Science. To the contrary, M Science

searched its databases for those eight files, and did not locate any of them. DKT 92-1; 15-5; Napoli Dec., ¶¶17-18. Moreover, the only M Science employees, other than Emmett, that Yipit even alleges *might* have had possession of any of the eight files are Pinsky and Roduit, neither of whom are employed by M Science. *See, e.g.,* DKT 91, p. 6. Accordingly, there is no basis for Yipit to argue that M Science might use or disclose the information in those eight files.

Third, M Science has already returned to Yipit any documents it located that contained information regarding Yipit's business or clients that Emmett provided to any M Science personnel, and has continued in good faith to return any additional documents located.

Fourth, M Science directed the employees in possession of those documents to delete them from their possession. *See* DKT 92, ¶3 and Ex 3; Napoli Dec., ¶20.

Fifth, each of those employees has submitted a Declaration confirming that he or she: 1) no longer has access to that information; 2) cannot and will not disclose that information to any other party; and 3) cannot and will not use that information (other than as necessary to assist with this litigation). *See* Tracht Dec., ¶6; Marrale Dec., ¶12; Jefferis Dec., ¶9; Fuchs Dec., ¶5; Faustini Dec., ¶16; Yoshida Dec., ¶5; Ng Dec., ¶5; Sacks Dec., ¶5; Ahsler Dec., ¶5; Christopher Dec., ¶5.

Finally, in August 2024, M Science directed all of its sales personnel not to use any Yipit information received from Emmett. M Science has since repeated this mandate to its personnel, including by sending a reminder memo to all sales personnel this week. Napoli Dec., ¶16 and Exs. B and C. Accordingly, in the event any new information regarding Yipit's business or clients received from Emmett is discovered, M Science's employees know that such information is not to be used or disclosed.

Give these facts, Yipit cannot meet its burden to demonstrate that it is likely to suffer actual, imminent, non-speculative irreparable harm in the absence of an injunction. *See e.g., TGG*

10

*Ultimate Holdings, Inc. v. Hollett*, No. 16 CIV. 6289 (VM), 2016 WL 8794465, at *4–5 (S.D.N.Y.

Aug. 29, 2016) (no irreparable harm where plaintiff had not presented facts "showing an imminent

danger that Defendants intend to disseminate such information to a wider audience or otherwise

irreparably impair the value of those secrets," and where defendants agreed to return plaintiff's

proprietary information).

> 3.    <u>Irreparable Harm Cannot Be Presumed or Found Here Under the Law.</u>

Lacking evidence of irreparable harm, Yipit seeks to be relieved of its burden to prove that

element by arguing that irreparable harm can be presumed.  Yipit argues that irreparable harm

should be presumed because "'the loss of trade secrets cannot be measured in money damages' as

'[a] trade secret once lost, is of course, lost forever.'"  DKT 91, p. 20 (citing *FMC Corp. v. Taiwan

Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (per curiam)).  However, that is not the

law.

In *Faiveley*, the Court explained that, despite the "passing observation" made in *FMC

Corp.*, upon which Yipit relies, no "presumption of irreparable harm automatically arises upon the

determination that a trade secret has been misappropriated."  559 F.3d at 118.  In rejecting the

"presumption of irreparable harm" argument, the Second Circuit held:

> A rebuttable presumption of irreparable harm might be warranted in
> cases where there is a danger that, unless enjoined, a
> misappropriation of trade secrets will disseminate those secrets to a
> wider audience or otherwise irreparably impair the value of those
> secrets.  Where a misappropriator seeks only to use those secrets-
> without further dissemination or irreparable impairment of value-in
> pursuit of profit, no such presumption is warranted because an
> award of damages will often provide a complete remedy for such an
> injury. …[W]here there is no danger that a misappropriator will
> disseminate proprietary information, "the only possible injury that
> [the] plaintiff may suffer is loss of sales to a competing product...
> [which] should be fully compensable by money damages"

*Id.* at 118-19 (citations and quotations omitted). *See also Passlogix, Inc. v. 2FA Tech., LLC*, No. 08 Civ. 10986, 2010 WL 2505628, at *10 (S.D.N.Y. June 21, 2010) (no irreparable harm where defendant used but did not disseminate trade secret to third parties); *Amimon, Inc. v. Shenzhen Hollyland Tech Co.*, No. 20-CV-9170 (ER), 2023 WL 2478159, at *6 (S.D.N.Y. Mar. 13, 2023) (no irreparable harm where plaintiff had shown only use of plaintiff's trade secrets "without further dissemination or irreparable impairment of value—in pursuit of profit," because the Second Circuit has made clear that "an award of damages will often provide a complete remedy for such an injury") (quoting *Faiveley*, 559 F.3d at 118-119).

Under this clear precedent, irreparable harm cannot be found absent a threat that the alleged trade secrets will be **disseminated, not just used.**  Apparently aware of this legal standard, Yipit half-heartedly argues that defendants might disseminate its trade secrets.  DKT 91, pp. 20-21. Yipit's conclusory allegations are unsupported by any actual evidence, however.  Rather, Yipit's baseless argument focuses on Roduit's potential future dissemination but, again, Roduit does not work for M Science.

To the contrary, as set forth above, M Science has taken measures to ensure, not only that any Yipit information disclosed by Emmett is not disseminated to a third party, but that any such Yipit information is not used by M Science.  Courts in this circuit have found no irreparable harm where, rather than threatening to disseminate the plaintiff's information, the defendants took measures to safeguard or return the plaintiffs' information.  *See e.g., TGG Ultimate Holdings, Inc., supra.*

Just weeks ago, this Court explained that a plaintiff could not demonstrate irreparable harm where there was nothing in the record showing that the defendants were "planning to 'disseminate [the trade] secrets to a wider audience or otherwise irreparably impair the value of those secrets'"

and where the defendants had taken measures to safeguard the plaintiff's proprietary information since the suit was filed. *ParTech, Inc. v. Jackson*, No. 24-CV-9381 (JAV), 2025 WL 343215, at *9 (S.D.N.Y. Jan. 29, 2025) (citing *Faiveley*, 559 F.3d at 118). Just like the defendants in *ParTech*, M Science has taken measures to safeguard Yipit's purported trade secrets. Thus, Yipit cannot demonstrate that M Science has any intent to disseminate or use Yipit trade secrets in such a way as to cause irreparable harm.

4.    <u>Yipit Has Provided No Evidence of Lost Clients Resulting from the Alleged Misconduct But, Even If It Had, Yipit Has a Remedy at Law.</u>

Here, Yipit offers no actual evidence that it has lost any clients as result of the alleged misconduct. While Yipit claims that the evidence "suggests" it has lost clients as a result of alleged misconduct, this claim is based entirely on conclusory allegation that "at least five customers" "unexpectedly 'churned,' *i.e.,* declined to renew their contracts with Yipit, *apparently in connection with* M Science's misappropriation." DKT 91, p. 10 (emphasis added). However, Yipit fails to provide any evidence of the alleged "connection" between the lost clients and any purported misappropriation of trade secrets. For example, to support its claim that misappropriation led to the loss of these clients, Yipit alleges M Science misappropriated "virtually all of Yipit's customer information," referring to the eight files allegedly exfiltrated by Emmett. DKT 91, p. 21; DKT 13, ¶26. But, again, M Science does not have those files and Yipit has proffered no evidence to the contrary. The only other evidence Yipit refers to are text messages between Emmett and Pinsky discussing ███████████████. Yipit speculates those messages may have caused those clients to leave Yipit. DKT 13, ¶26. This speculation fails considering that ███████ ceased being an M Science client in late 2023 and has not returned. DKT 53, ¶22; Faustini Dec., ¶12-14. Further, ██████ has been an M Science client since 2022. Napoli Dec.,

13

¶9.  Moreover, Pinsky did not pitch ▮▮▮ and did not pass along the ▮▮▮ information Emmett shared.  DKT 53, ¶23-24.

Contrary to Yipit's speculative allegations, the mere fact that Yipit may have lost some customers in 2024 does not mean it was due to misappropriation of trade secrets.  Clients in this industry often "churn" for any number of reasons, including the client's internal issues, lack of need for the research products and services they had previously purchased, or dissatisfaction with the provider's service.  Napoli Dec., ¶8.  For example, in 2024, Yipit experienced several issues that could have led to customer dissatisfaction, including serious technical issues resulting in delayed reports and publishing an incorrect report about Shopify.  DKT 53, ¶31.  Thus, Yipit's allegation that it lost the customers identified in its papers due to any alleged conduct of M Science is pure speculation, which is insufficient to establish entitlement to an injunction.  *Faiveley*, 559 F.3d at 118; *see also Geritrex Corp. v. Dermarite Indus., LLC*, 910 F. Supp. 955, 965–66 (S.D.N.Y. 1996) (no irreparable harm where plaintiff "provided no evidence of a direct link between defendants' activities and plaintiff's decreased sales").

Even if Yipit could prove that the customers identified in its papers "churned" due to alleged misconduct by M Science (and it cannot), the proper remedy for those losses is money damages.  As this Court recently recognized in *TomGal LLC v. Castano*, lost sales are "entirely monetary, quantifiable, and redressable by appropriate damages."  2022 WL 17822717, at *3 (S.D.N.Y. Dec. 19, 2022).

Finally, Yipit claims that it faces irreparable harm "in the threat of *future* customer loss" and "lost goodwill."  DKT 91, p.20.  But Yipit has not alleged it has lost any customers due M Science's alleged misappropriation of trade secrets since October of 2024, and has proffered no evidence that it is likely to lose customers in the future due to misappropriation by M Science.

Customers lost by Yipit last October are "past injuries [that] may provide a basis for standing to seek money damages, [but] they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that [it] is likely to be harmed again in the future in a similar way." *Nicosia*, 834 F.3d at 239.

5.    Yipit Delayed in Seeking Injunctive Relief Against M Science.

Finally, Yipit cannot establish irreparable harm due to its delay in seeking a preliminary injunction. "A significant delay in moving for a preliminary injunction may, standing alone, ... preclude the granting of preliminary injunctive relief, because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *TomGal LLC*, 2022 WL 17822717, at *4–5 (citation and quotation omitted). As the Second Circuit has explained, "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (citation omitted).

Although there is no bright-line rule, "courts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." *TomGal LLC*, 2022 WL 17822717, at *4 (citation and quotation omitted). *See also Monowise Ltd. Corp. v. Ozy Media, Inc.*, 17-CV-8028 (JMF), 2018 WL 2089342, at *2 (S.D.N.Y. May 3, 2018) (collecting cases); *Citigroup Inc. v. AT&T Services, Inc.*, 120 U.S.P.Q.2d 1888, 2016 WL 4362206, *5 (S.D.N.Y. 2016) (three-month delay cut against a showing of irreparable harm); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (delay of as little as ten weeks' sufficient to defeat presumption of irreparable harm).

Here, Yipit did not promptly seek an injunction against M Science, despite: (1) discovering Emmett had allegedly "misappropriated Yipit's confidential and proprietary information," in July 2024, and;[3] (2) allegedly "uncover[ing] extremely concerning evidence that Emmett repeatedly shared Yipit's trade secret, confidential, and proprietary information . . . with M Science," when Emmett returned his laptop prior to August 14, 2024.[4]  These letters came four and three months before the parties agreed to mediate in November 2024.

Yipit has not provided any credible explanation for its delay.  For example, Yipit has not explained why, if it was truly likely to suffer irreparable harm due to M Science's alleged possession of its purported trade secrets, it did not initiate legal action immediately after Emmett returned his laptop in July 2024.  DKT 15-4, p. 2.  Yipit clearly chose to attempt to collect evidence from M Science rather than to seek immediate relief, a choice inconsistent with an allegation of imminent harm.

Nor has Yipit explained why, in October 2024, it "sued Emmett and Pinsky to protect its secrets," but only "continu[ed]" its broader investigation into M Science," DKT 91, p 11, particularly given its allegations that "although M Science kept promising to return Yipit's information, it repeatedly delayed doing so," not providing the results of its investigation until "[a]fter Yipit initiated this suit."  *Id.*  Any attempt by Yipit to claim that it only determined it needed to file suit against M Science after receiving the documents from M Science in late October 2024, will be belied by the fact that much of the material relied upon in Yipit's Motion consisted

---

[3] DKT 15-1, p. 2.

[4] DKT 15-4, p. 2.

of messages between Emmett and Pinsky that Yipit had already obtained from Emmett's Yipit laptop prior sending its August demand letter to M Science.

    **B.**    <u>**Yipit is Not Likely to Succeed on the Merits of its Trade Secret Claims.**</u>

Yipit is not likely to succeed on the merits of its trade secret claims because it fails to show that (1) much of the information upon which its claims are based was actually received by M Science, or (2) the information received by M Science was, in fact, a "secret" susceptible to protection under the law.

As to the first point, Yipit alleges that between March and May 2024, Emmett "exfiltrated at least eight files containing Yipit's trade secret information," DKT 91, p. 6. But there is no evidence that M Science ever received even one of these eight files.

As to the second point, Yipit's papers gloss over the fact that the "'most important consideration'" for the Court in assessing Yipit's trade secret claims "'is whether the information was ***secret***.'" DKT 91, p. 14 (citing *Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc.*, 602 F. Supp. 3d 663, 672 (S.D.N.Y. 2022)) (emphasis added). For example, Yipit argues that information pertaining to its business, including product information or "'customer-specific data such as pricing arrangements and contract renewal dates' *can* 'constitute[] trade secrets'" in New York. DKT 91, p. 14 (citing *Liberty Power Corp., LLC v. Katz*, 2011 WL 256216, at *2 (E.D.N.Y. Jan. 26, 2011)) (other citation omitted). But the mere potential for such information to qualify as trade secret under New York law is not enough. *See, e.g., Production Resource Group, L.L.C. v. Oberman*, 2003 WL 22350939 (S.D.N.Y. Aug. 27, 2003) (Koeltl, J.) (denying preliminary injunction where plaintiff failed to produce evidence demonstrating its entitlement to trade secret protection for information such as pricing structure and methodology, bid components and profit margins, markups and rebate programs, supplier discounts, or customer contacts).

Here, the information that M Science employees received from Emmett predominantly consists of conversations about Yipit clients that were well known to M Science and, in most cases, were M Science clients or actively pursued prospects. The information contained in them is not secret. Identities of these clients are not legally protectable because they were either already known to M Science[5] or readily identifiable through public sources.[6] *See Free Country Ltd. v. Dreenen*, 235 F. Supp. 3d 559, 566 (S.D.N.Y. 2016) (no likelihood of success on misappropriation claim where plaintiff's "customers are well-known apparel retailers whose identities are not protected" and whose contact information was "readily ascertainable"); *Walter Karl, Inc. v. Wood*, 137 A.D.2d 22, 27 (2d Dep't 1988) ("injunctive relief is unwarranted unless circumstances are such that the customers cannot be ascertained by persons outside the plaintiff's business or are not generally known in the trade and are discoverable only via extraordinary efforts"); *Art and Cook, Inc. v. Haber*, 416 F.Supp.3d 191, 196 (E.D.N.Y. 2017) (denying preliminary injunction because "the fact that the contacts on Plaintiff's customer lists are generally known within Plaintiff's industry [was] fatal" to plaintiff's claims).

Furthermore, while "[d]ata relating to pricing can constitute a trade secret," for example "where a company uses some type of proprietary formula that gives it a unique advantage, such as a complex pricing or trading algorithm in a financial business," Yipit has not shown any such evidence here. *Free Country Ltd. v. Dreenen*, 235 F. Supp. 3d 559, 566-67 (S.D.N.Y. 2016) (internal citations omitted); *see also H. Meer Dental Supply Co. v. Commisso*, 269 A.D.2d 662, 663 (3d Dep't 2000) (plaintiff had not made the requisite showing that "confidential customer

---

[5] *See, e.g.,* Jefferis Dec. ¶4; Tracht Dec. ¶¶4-5; Faustini Dec. ¶13; Napoli Dec., ¶¶9-12.

[6] *See* Napoli Dec., ¶5; Jefferis Dec., ¶6.

list[s], . . . precise discounts given . . . to . . . customers, pricing book and information . . . and . . . usage reports detail[ing] ordering and purchase histories" are trade secrets) (alteration in original); *Marietta Corp. v. Fairhurst,* 301 A.D.2d 734, 738 (3d Dep't 2003) (pricing data and marketing strategies do not constitute trade secrets).  Rather, the evidence shows that clients in the alternative data industry routinely share information regarding the products they want and what they are willing to pay for them.  *See* Faustini Dec., ¶6; Marrale Dec., ¶4; Napoli Dec., ¶6; DKT 53, ¶26.

**C.**    **Yipit Has Unclean Hands.**

As set forth in Section II.C above, for at least two years, Luban, a high level Yipit employee, accessed M Science's restricted research portal and acquired M Science's trade secrets without authorization.  The only reason for a competitor such as Luban to do so would be to acquire M Science's proprietary data on behalf of Yipit.  Unlike M Science's action here to remedy Emmett's conduct, Yipit refused to even "admit or deny" that Luban engaged in the alleged conduct.  In addition, Yipit obtains competitors' customer information from their former employees and maintains a database containing M Science information, including pricing.  DKT 53, ¶17.

These facts "add up to the inescapable conclusion that [Yipit] has not displayed [the] standard of conduct requisite to the maintenance of this suit in equity." *Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 810 (1945).  "Courts in this Circuit and elsewhere have routinely found that a plaintiff's misconduct relates to the subject matter of its claims where, as here, the plaintiff has engaged in the same kind of behavior that it challenges." *Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 533-34 (S.D.N.Y. 2009) (citation omitted).  Yipit cannot credibly complain about M Science's conduct, given its own failure to prevent or address Luban's misconduct.  *See Nikkal Indus., Ltd. v. Salton, Inc.,* 735 F. Supp. 1227, 1238 (S.D.N.Y.1990) ("Since [Plaintiff] appears to have engaged in the very same conduct it has

challenged, the court would have been hard pressed to grant it any equitable relief, even if the conduct of [Defendant] had violated the Lanham Act.").

And that misconduct, which is at the heart of Yipit's own claims, provides another basis for the Court to exercise its discretion and deny Yipit's Motion.

### D.  Neither the Balance of the Equities, Nor the Public Interest Favor Yipit.

"In determining whether the balance of the equities tips in the plaintiff's favor and whether granting a preliminary injunction would be in the public interest, the Court 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *TomGal*, 2022 WL 17822717, at *5 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).

Here, the balance of the equities does not tip in Yipit's favor, because Yipit has not shown that it will be irreparably harmed by any action of M Science. *See id.* at * 6 (balance of equities tipped in defendant's favor because, *inter alia*, the plaintiff had not shown irreparable harm). Yipit argues that M Science has "no legitimate interests that would be harmed" by an injunction because "it is no hardship" for M Science to refrain from using Yipit's trade secrets or trade secrets to "lure away" Yipit's customers, or to return Yipit's trade secrets. DKT 91, pp. 22-23. But M Science has no intention of using Yipit's purported trade secrets for any reason and has returned any information it located regarding Yipit's clients or business that was disclosed by Emmett. Issuing an injunction would suggest otherwise and cause reputational harm to M Science. This case is being closely followed by and repeatedly reported on in the press and any order is likely to be reviewed by M Science's clients and prospects.[7] "In exercising their sound discretion, courts of

---

[7] *See, e.g.,* https://www.businessinsider.com/yipit-complaint-legal-fight-with-jefferies-m-science-2025-1.

equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *TomGal*, 2022 WL 17722717, at *5.

Yipit also argues that an injunction against M Science would advance the substantial public interest in the protection of trade secrets. DKT 91, p. 24. To the contrary, because there is no evidence that M Science is in possession of or in danger of disseminating any Yipit trade secrets, an injunction would not serve the public interest. *See e.g., TomGal*, 2022 WL 17722717, at *6 (public interest in enforcing contracts not undermined where plaintiffs could pursue damages and little danger alleged trade secrets would be widely disseminated).

### E. **Yipit's Proposed Injunction Order Is Not Sufficiently Specific.**

Finally, Yipit's Motion should be denied because its requested injunction order (DKT 89) (the "Proposed Order") fails to meet the specificity requirements set forth in Federal Rule of Civil Procedure 65(d)(1), which requires: "Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."

To comply with Rule 65, "[i]t must be possible to ascertain *from the four corners of the order* precisely what acts are forbidden without resorting to extrinsic documents." *Capstone Logistics Holdings, Inc. v. Navarrete*, 838 F. App'x 588, 590 (2d Cir. 2020) (summary order) (citations and quotations omitted) (emphasis added). "An order which does not satisfy the requirement of specificity and definiteness will not withstand appellate scrutiny." *EFS Marketing, Inc. v. Russ Berrie & Co.*, 76 F.3d 487, 493 (2d Cir. 1996) (quotation omitted).

The Second Circuit has repeatedly reversed injunction orders containing broad, general language similar to Yipit's Proposed Order. *See e.g., Corning Inc. v. PicVue Elecs., Ltd.*, 365 F.3d 156, 158 (2d Cir. 2004) ("[T]he preliminary injunction entered by the district court does not

identify the trade secrets and the copyrighted works that it bars PicVue from, respectively, misappropriating and infringing.  It is thus not possible to ascertain from the four corners of the order precisely what acts are forbidden; PicVue would have to resort to extrinsic documents to comply with the order's commands.  We therefore conclude that the preliminary injunction does not satisfy the specificity requirements of Rule 65(d).") (citations and quotations omitted); *see also ExpertConnect, LLC v. Parmar*, 773 F. App'x 651, 653 (2d Cir. 2019) (order enjoining defendants "from using any of ExpertConnect's confidential and/or proprietary information and/or trade secrets for any purpose" and "from disclosing any of ExpertConnect's confidential and/or proprietary information and/or trade secrets to any person or entity, other than ExpertConnect or ExpertConnect's employees or agents" "lack[ed] the level of specificity that Rule 65(d) requires").

On its face, Yipit's Proposed Order fails to comply with Rule 65(d)(1) because it fails to precisely identify or describe the alleged trade secrets or information that M Science would be precluded from using or possessing.  Indeed, Yipit's Proposed Order is indistinguishable from the orders stricken in *Corning, Inc.* and *ExpertConnect*.  Like the orders at issue in those cases, Yipit's Order refers only to unspecified "proprietary, confidential and/or trade secret information."

Yipit's Proposed Order is not saved by the fact that it refers to information that M Science "copied, saved or printed" because the identification of such information is not possible from the "four corners" of the order.  *See, e.g., Eyewonder, Inc. v. Abraham*, 293 F. App'x 818, 820 (2d Cir. 2008) (remanding in part because the injunction references extrinsic documents and explaining that even if the injunction is "easily understood" by the enjoined party, "we have not been so flexible" in finding that the district court conformed to Rule 65(d)'s requirements).

The specificity requirements of Rule 65(d)(1) are "no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Yipit's Proposed Order does not comply with Rule 65(d)(1), and is yet another basis for denial of Yipit's Motion.

## V.  CONCLUSION

M Science respectfully requests that the Court deny Yipit's Motion in its entirety.

Dated: March 7, 2025                    Respectfully submitted,

*/s/ Andrew J. Shapren*
**BUCHANAN INGERSOLL & ROONEY PC**
Andrew J. Shapren (admitted *pro hac vice*)
Anne E. Kozul (admitted *pro hac vice*)
50 South 16th Street, Suite 3200
Philadelphia, Pennsylvania 19102
Telephone: (215) 665-3853
andrew.shapren@bipc.com

Stephen W. Kelkenberg
(NY Reg. No. 4096269)
501 Grant Street, Suite 200
Pittsburgh, Pennsylvania 15219-4413
Telephone: (716) 725-4349
Facsimile: (412) 562-1041
stephen.kelkenberg@bipc.com

*Attorneys for M Science LLC and Michael Marrale*

**CERTIFICATION OF COMPLIANCE**

Pursuant to Paragraph II(D) of the Court's Individual Practices, I hereby certify that this brief complies with Judge Koeltl's formatting rules, and that the total number of words in this memorandum of law, excluding the cover page, table of contents, table of authorities, signature line, and certification of compliance is 6,940.

*/s/ Andrew J. Shapren*